UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWRENCE S. EPSTEIN<br>280 Park Avenue South #24<br>New York, NY 10010-6134<br><br>    Plaintiff,<br><br>    v.<br><br>PETE GEREN<br>Acting Secretary of the Army<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CA No. _____<br>)<br>)<br>)<br>)<br>) |

COMPLAINT FOR DECLARATORY RELIEF

This is a non-monetary claim to set aside that part of the decision of Army Board for Correction of Military Records No. AR 2003-090468 (18 November 2003), denying plaintiff's request to remove his Officer Evaluation Report, for the period 22 October 1990 to 5 March 1991.

JURISDICTION AND VENUE

Jurisdiction is conferred on this Honorable Court by the Administrative Procedure Act, as amended, 5 U.S.C. § 702 and § 706(2)(A).

Venue is proper as the Defendant is found in this District.

PARTIES

Plaintiff, Larry Epstein, is a retired Officer in the grade O-5, rank of Lieutenant Colonel, (LTC), from the United States Army Reserve.

Defendant, France Harvey, in his official capacity, is the Secretary of the Army.

FACTS

1. LTC Epstein in 1990 was an Army Reserve officer with military occupational speciality in Intelligence. His sub-specialty was in a Human Intelligence [HUMINT] and Counter-intelligence. He was assigned to a US Army Special Security Command ["SSC"] within a Special Security Group,

1

and was "detachment commander" of a Sensitive Compartmented Information (SCI) Facility. SSC commander was LTC Hudson, SSC group commander, COL Cromartie.

    2. In July 1990, LTC Epstein was activated for 16 days to deploy to Hurlbert Field Air Force Base, Florida, for an intelligence exercise, INTERNAL LOOK 1990. LTC Epstein served as the Detachment Commander of an SSC for this exercise. Typical to SSC active duty assignments, LTC Epstein's detachment unit was attached to a host unit and daily supervised by the Commanding General, Third Infantry Division. However, rules required that his OER rating officials still were LTC Hudson and COL Cromartie. An optional "letter input" can be submitted by the host unit supervisors which Hudson and Cromartie consider.[1] This however, does not mean the rating officials are rubber stamps by simply transferring the input the letters within the OER. The rating officials assess performance using "all reasonable means [including] personal contact, records and reports, that rated officer's Support Form 67-8-1, listing goals and accomplishments. The raters remain those chosen to prepare the OER presuming they best can fulfil the Army's evaluation policies:

> To ensure sound personnel management decisions can be made and that an officer's potential can be fully developed, evaluation reports must be accurate and complete as the situation allows. Each report must be *comprehensive appraisal of the officer's abilities, weaknesses, and potential*.

AR 623-105 ¶ 1.6c.(2)[italics added].

    3. In LTC Epstein's July 1990 active duty OER, LTC Hudson and COL Cromartie gave him the very highest marks, with a top block Senior Rater's profile. LTC Hudson stated that LTC Epstein had superior efficiency and effectiveness due to his "vast experience." COL Cromartie added that

> LTC Epstein performed his duties in an outstanding manner. *His leadership experience* and contributions had a profound impact. . . his knowledge *and experience in the intelligence field is significant* and will be a welcome asset to any RC/AC command. Promote him to Colonel. . . .he had outstanding potential. [emphasis added].

---

[1] AR 623-105, Table 5-1 (special duty up to 59 days); ¶ 7-6n. (OER is submitted for reservists on special active duty tours).

Epstein's ABCMR Exhibit B1-B2 (OER, Sec. V.c, LTC Hudson: "Promote to Colonel. Select for senior service college. Unlimited potential for higher level command and staff." Sec. VIIb., COL Cromartie ).[2]

4. During this AD duty tour at Hurlbert Filed, LTC Epstein was invited, through the Army Airborne Association, to attend an Israeli Army Airborne course in Israel. After his U.S. Army duty, and while on vacation he competed the course and was awarded the award *Israel Defense Forces Parachute Wings*. Also attending the same course was a retired U.S. Army Colonel and the U.S. Army Attache Office in Israel. LTC Epstein was authorized to wear this foreign award on his US Army uniform. LTC is of Jewish faith, as indicated as "religion" on his Officer Record Brief, DA Form 4037.[3]

5. During the Gulf War in 1990-1991, Epstein beginning October 22, 1990, was activated for a 6-month active duty tour under a Presidential emergency authority through April 21, 1991 at the US Army Special Security Group. LTC Epstein served in the very same SSC unit as Deputy Commander, still supervised by LTC Hudson, SSC Commander, and COL Cromartie, SSC Group Commander.

6. In January 1991 Epstein initiated an Equal Opportunity complaint ["EO"] against LTC Hudson, his OER rater [Officer Evaluation Report].[4] The complaint alleged both ethnic/religious insensitivity and racially discriminatory practices at the unit. This eventually led to an informal EO inquiry or called a "command visit" from the US Forces Command in March 1991.

7. In the interim, and before the EO command visit, LTC Hudson on January 18, 1991,

---

[2] Before and after the assignment in July 1990, LTC Hudson and COL Cromartie had interviewed LTC Epstein, reviewed his Support Form. They stated verification of his duty performance was obtained from during the reporting period from the Commanding General, Third Infantry Division and its primary staff officers. G-2 (Intelligence), and G-3 (Operations).

[3] Ex. A (ORB, Sec. IV).

[4] 1993 intra-agency appellate Officer Special Review Board (OSRB) at 3 ¶ 3a. LTC Epstein made an earlier complaint in January (BCMR Ex D-5, ¶ (3))(b); 18 October 1991 formal EO Investigative findings conforming a letter complaining that unit's annual Christmas party "centered totally on Christian values" and members of other faiths should be considered).

gave LTC Epstein a vague counseling statement that

> his conduct was not in the best interests of order, sound judgment, and good discipline. [Hudson] ordered [Epstein] to cease and desist his behavior immediately. . . . or he would have no recourse but to terminate his active duty, deny him access to special intelligence, and relieve him for cause.[5]

8.     On February 16, 1991, LTC Epstein was issued orders extending his prior six month Presidential emergency call up for an additional six month tour, to be renewed consecutively on April 20, 1991. The new orders continued LTC Epstein's duty assignment at same unit, Special Security Group, under LTC Hudson and COL Cromartie.[6]

9.     In February, LTC Epstein was selected to attend the "most prestigious institution for education of the Army for future strategic leaders" — U.S. Army War College in 1992— as a resident student, Carlisle Barracks, Pennsylvania:[7]

> Military students selected are considered to hold considerable potential for promotion and future service in positions of increasing responsibility.
>
> * * *
>
> [Army College] is the capstone of professional military education and prepares selected military leaders to assume strategic leadership responsibilities in the military.

USAWC Resident Curriculum Catalogue 2005-06 at 11 (eligibility and admissions).[8]

10.    The March 1991 "informal" EO command visit substantiated that LTC Hudson's ethnic insensitivity resulted in him making "inappropriate remarks and jokes" to members of the unit concerning LTC Epstein's Jewish religious practices. However, the inquiry supported LTC Hudson's retort that anti-Semitic remarks and jokes were first initiated by Epstein, an orthodox Jew.

---

[5] Army BCMR decision at 3-4.

[6] BCMR Ex. B-6.

[7] U.S. Army War College [USAWC] website, www.carlisle.army.army.mil ("mission and vision" statement of commandant, Major General Hunton, October 2005).

[8] See also AR 351-1, *Army Training and Education* ¶ 3-33 (attendance at the War College is "the capstone of professional military education and prepares selected military leaders to assume strategic leadership responsibilities in the military.").

This is not plausible.[9] In any event, the substantiated ethnic insensitivity led to a recommendation that LTC Hudson, Epstein's rater, be admonished for ethnic insensitivity.   Subsequently, LTC Hudson on April 1, 1991, was issued a local "slap on the wrist" — a written admonishment from the senior rater, COL Cromartie, cautioning Hudson

> to avoid future remarks of an insensitive and inappropriate nature, such as those to LTC Epstein. . . .You must be especially sensitive in your choice of words and sensitive to reactions and perceptions of others about your words as well as your actions." [10]

11.     The informal inquiry went beyond EO issues raised by turning around the charges into a reprisal:  they shockingly alleged LTC Epstein was disloyal, disruptive, and should be either "reassigned to another command for lack experience or adversely involuntarily released from active duty." [11]

12.     On March 5, 1991, the day after the informal EO visit was presented, LTC Epstein was relieved.  Epstein was transferred to outside of the Special Security Group, to a staff job at the US Forces Command [FORSCOM] within it intelligence office (J-2).

13.     Instead of a relief-for-cause OER requiring a general's advance written approval and cumbersome due process, the rating officials disguised the *de facto* relief as a routine, albeit derogatory, change-of-duty OER ending March 5, 1991.[12]  The OER rater's narrative alleges that because of LTC Epstein's

> lack of military experience, tact, and people skills [and that he was] was unable to heed my counseling and guidance and improve his performance, as a result, he was reassigned to another position. . . ."

---

[9] On May 17, 1991, the Defense Investigative Service [DIS] interviewed LTC Hudson after questioning LTC Epstein's loyalty and that he was perhaps an Israeli spy.  But instead of suggesting Epstein casually joked about his faith, LTC Hudson stated that Epstein "is very touchy about being Jewish and is very intolerant to others' religions. . . a very intense person." ACMR EX. S-4, S-5.

[10] Ex. C. (April 1991 Memorandum to LTC Hudson, "Subject: Human Relations/Equal Opportunity Concerns"); Ex. K at K5 ¶ 3a (OSRB noting the rater was "admonished" by Group Commander after informal EO investigation).

[11] Findings of 1993 OSRB reciting informal EO investigation.

[12] ABCMR at 4.

The senor rater's narrative similarly alleged:

> The commander and LTC Epstein were unable to resolve their differences and LTC Epstein was released for staff duty with J-2 [Forces Command].[13]

Moreover, the report refers back to the earlier January 1991 counseling statement where LTC Hudson had threatened to relieve Epstein if he did not cease and desist.[14]

14. The OER also contained derogatory comments and grades by the rater alleging LTC Epstein displayed "very poor judgment", and questioned his "loyalty and integrity." The senior rater issued a Number 3 block potential evaluation resulting in a below center-of-mass, or below average ranking of LTC Epstein among his peers. Because the OER was "so derogatory that the report may have an impact on the rated officer's career," it was *referred* to LTC Epstein to allow him to submit comments before the report was filed.[15]

15. Army regulation defines a relief as "an early release of an officer from a specific duty or assignment directed by a superior and based upon a decision that the officer failed in his performance of duty." AR 623-105 (1991 Update) ¶ 5-18a.[16] Because LTC Epstein was in the duty position of "Deputy Commander", no action was permitted until after written approval by the first general officer in the chain of command. AR 600-20 (1988) ¶ 2.15 (Relief for Cause.).[17] Moreover,

---

[13] OER at Part Vc (rater, LTC Hudson); Part VIIc (senior rater, COL Cromartie).

[14] ABCMR finding at 9 ¶ 5 ("It appears, based on the results of the ensuing [EO] investigation, and despite having been counseled, the applicant continued in his efforts to undermine the commander. . . . Accordingly, the rater sought to have him removed from the unit as his deputy commander [emphasis added].")

[15] AR 623-105 ¶ 4.27 (Referred Reports).

[16] AR 623-105 was published in original form in 1981 with changes 1 through 11 incorporated in annual "updates" through 1991. Change 12 was issued in the April 1992 Update.

[17] "Action to relieve an officer from any command position will not be taken until after written approval by the first general officer in the chain of command [emphasis added]." Id.

the standards to relieve are higher than a simple referred report:

> The relief of an individual for cause is one of the most serious steps taken. It is preceded by formal counseling by the commander or supervisor . . . ."

Id.

16. Once written approval of a general officer is obtained, the OER must identify the particular rating official directing the relief, and such official will clearly explain the reason for the relief in the narrative portion, then mark "Do Not Promote" or "Other", and state that the rated officer has been notified of the reasons for the relief. Another rating official may indicate "nonconcurrence" with the relief and state why the drastic remedy is unwarranted. Id ¶ 5-18b. The report will then be referred to the rated officer for comment. Id at ¶ 5-29. A "required review" by the next superior above the relieving official is performed to ensure the OER is not unclear, contains errors of fact, or otherwise violates the regulation. Errors must be are explained and the report returned. If changes are made, the report is again referred back to the rated officer. The report is reviewed again by the senior rater. Only then is the report forwarded for permanent filing. Id ¶ 3-13 (required reviews), ¶ 5-29 (relief reports).

17. Because the relief was disguised under a change-of-duty OER, the unit ignored all the relief-for-cause due process under ARs 623-105 and 600-20. Most appalling is that this *de facto* relief-for-cause occurred from the findings of an informal EO "visit" that were rendered non-final when Epstein immediately was granted a follow-on "formal" EO investigation. This EO investigation was completed in October 1991 and discredited the harsh evaluation. See AR 623-105 ¶ 4-21 ("No reference will be made to incomplete investigations (formal or informal) * * * if the rated officer is absolved , comments about the incident will not be included in the OER").

18. Shortly after LTC Epstein was fired, LTC Hudson received the admonishment letter for religious and ethnic insensitivity from COL Cromartie in April 1991. Within weeks— and before the OER was even filed— criminal accusations against Epstein were secretly made by LTC Hudson and a senior Army official, Mr. Coburn (unit Senior Staff Officer) to the Defense Investigative

Service [DIS], the agency responsible for security clearances.[18] The accusations included inflammatory charges of treason in a time of war that Epstein was an Israeli spy, a homosexual and sexual pervert.[19] A later DIS espionage investigation showed that Mr. Coburn, whether at the behest or in support of Hudson, informed a DIS agent that "it was [my] personal opinion" that LTC Epstein was an Israeli spy. In this context, LTC Hudson told DIS agents that LTC Epstein's loyalty and integrity could not be trusted.[20] As noted earlier, the DIS inquiry went so far as to interrogate Epstein's former associates from past military intelligence units reaching to the 1970s about possible links to Mossad, the Israeli intelligence service, and the militant Jewish Defense League.[21] This pending DIS investigation into disloyalty and lack of integrity was also not complete when the OER was issued and filed. AR 623-105 ¶ 4-21.[22]

19.     It makes little sense to accuse LTC Epstein of being a double intelligence agent coupled with open incompetence, poor people skills, sexual perversion, and homosexuality. The charges made to DIS were baseless, and the agency did not further pursue the allegations. But DIS never notified LTC Epstein it eventually closed the investigation. Years later, LTC Epstein learned this in documents obtained under Privacy Act and FOIA requests. Until that time, LTC Epstein believed he was under a veil of suspicion. Heightening his fears in the 1990s was the media frenzy surrounding the notorious Israeli spy case of Navy employee Jonathan Pollard, eventually imprisoned for life, with international clemency pleas harshly denied.

---

[18] Each Army Reserve unit has a senior, full-time civilian executive who manages the unit and works directly for the Army commander, here Mr. Coburn worked for LTC Hudson.

[19] Ex. D at 4-5.

[20] Ex. S at S6 (DIS interview); Ex. D at D5 (Coburn making same statement to EO investigator).

[21] Ex. S, DIS Investigation, 24 May 1991 at S3 thru S7 (DIS interviews with Hudson, Coburn, and former USAR supervisor John McLaughlin, 1825th Military Intelligence Battalion).

[22] BCMR Ex. D-5 (Formal EO investigative finding that pending were "the OER and accusations against his character as portrayed to the DIS agents").

20. In October 1991, the findings of the formal EO investigation were approved by COL Nickisch, Deputy Chief of Staff, INSCOM.[23] The findings substantiated Hudson's

> inappropriate remarks and jokes concerning religious (Jewish) dietary habits in the presence of [LTC Epstein] and others. * * * . . .the working environment within the unit undoubtedly left members with the impression that unequal treatment did exist in the unit. [24]

In June 1994 the Army's new zero-tolerance EO policy equated ethnically insensitive behaviors such as off-color jokes as "verbal abuse." Moreover, such behaviors "can have an adverse impact on unit cohesion and readiness." [25] Because these anti-Semitic jokes were by the unit's own commander LTC Hudson, they no doubt contributed to the EO finding of adverse unit impact by encouraging the impression of favoritism.

21. The Formal EO findings also *reversed* the informal EO findings on poor duty performance and disloyalty, as the exaggerated product of a personality conflict between two LTCs. The formal and more extensive EO investigation concluded, in effect, that no adequate "formal counseling" occurred in January 1991, as required un AR 600-20, to support a relief for cause:

> the issues surrounding appellant's poor duty performance <u>are not clearly documented</u>. The counseling statement given by LTC Hudson does not clearly state exactly what LTC Epstein did. It is written in a way that allows the reader to form their own opinion and could be considered subjective in nature. . . . [and that] there is no doubt in my mind that a <u>strong personality conflict</u> existed between LTCs Hudson and Epstein * * * Mr. Coburn did use the impending clearance validation of LTC Epstein as an opportunity to damage his career by implying he could be a spy for the Israeli government [emphasis added]. [26]

22. LTC Epstein was called by the EO investigator in November 1991 stating that his report had an additional finding that both "LTC Hudson and Mr. Coburn were anti-Semitic."

---

[23] U.S. Army Intelligence and Security Command.

[24] Formal EO findings, cover memorandum ¶ 3.

[25] DA Pam 350-20 (June 1994) ¶ 14-2 (command insensitivity impacts upon unit cohesion and readiness), ¶ 14-5 (Verbal Abuse).

[26] Ex. D6.

9

However, COL Nickisch disapproved this finding claiming that "because of the post-Gulf War environment, this would be embarrassing within the intelligence community." [27]

23. The formal EO investigator's methodology was approved by the Command, including one-on-one interviews at all levels of command of 18 of 21 personnel assigned, one telephonic interview of one reassigned officer, interviews of the Deputy J-2, FORSCOM, the Deputy Chief of Staff, Reserve Affairs, INSCOM, the FORSCOM EO officer, and review of personnel actions (military justice, awards, re-enlistment). The EO investigator looked directly into whether specifically alleged poor duty performance in the OER was documented or corroborated.

24. The EO investigator found unsubstantiated Hudson's "cease and desist" warning to LTC Epstein in January 1991 of disloyalty and dishonesty and threatened relief-for-cause OER and denial of special security clearance. The cease and desist letter was in response to allegations that Plaintiff-Epstein had knowingly conspired to incite fellow soldiers to falsely believe discriminatory practices existed in the unit and to file complaints.[28] The EO investigator found Plaintiff-Epstein did *not* act in bad faith to breed distrust and disloyalty but as the deputy commander, had acted upon real perceptions in the unit, the complaints by several members, and repeated targeting at himself.[29] Finally, the EO investigation appeared to assist the unit by constructively identifying various causes for perceived discrimination, such as Hudson's "overall insensitivity of verbal communication with others," while offering various solutions.

---

[27] LTC Epstein in his supplemental statement before the ABCMR, certified to the truthfulness of these facts under penalty of perjury. Suppl.State. ¶ 6a.

[28] Ex. D-7 (Hudson Counseling statement, 18 JAN 91, to Plaintiff-Epstein).

[29] Exhibit at D (EO Inquiry substantiated "existence of conditions which contributed directly to LTC Epstein's concerns" including Hudson's inappropriate ethnic remarks, personality conflict, and poor working environment "that undoubtedly left members with the impression that unequal treatment did exist in the unit"); Ex. D-2 (Executive Summary stating Hudson's negative comments concerning. . . LTC Epstein and overall insensitivity of his verbal communication with others was substantiated."); Ex. D-3 to D-6 (EO Findings at ¶ 4.a(2)(perceptions of three soldiers saw favoritism); ¶ 4.b(1)(stress and poor organizational climate reinforced perceptions of discriminatory practices and some soldiers did make EO complaints to LTC Epstein, as deputy commander, which "appeared on surface to have merit").

25.     The EO investigator also found unsubstantiated certain of Hudson's OER accusations that LTC Epstein performed in less than satisfactory manner, and created problems by using poor tact and unprofessionalism.[30] The OER narrative at Part Vb., claims LTC "lack of military experience, tact and people skills" and several incidents.  In response to LTC Epstein's proffer that he made numerous recommendations to improve the unit operations, LTC Hudson curiously admitted to the EO investigator that "he agreed that LTC Epstein had very good ideas and he adopted many of them." [31]  Secondly against Hudson's accusation, the investigator independently corroborated LTC Epstein's benign version of events that he had not improperly released "raw intelligence data" during a situation in Desert Storm.[32]

26.     When the rating officials took no action on the EO findings, LTC Epstein in March 1991, requested a Commander's Inquiry under ¶ 5-30, to look into the negative OER comments.[33] This *post hoc* and non-binding advisory function had no teeth and are required to be deferential to the rating officials, and not performed by a general officer.  It could not be for the purpose of obtaining a general officer's advance written approval whether to take the serious step to relieve LTC Epstein from his deputy command position.  A commander's inquiry is

> after-the-fact [where] [34] * * * [r]ating officials should evaluate, and have their opinions constitute the organization's view of the rated officer [35]* * * the commander will not pressure or force rating officials to change their evaluation * * * the commander may not evaluate the rated officer, either as a substitute for, or in addition to the designated rating

---

[30] Ex. D-4.

[31] D-5 ¶ c(3)(a).

[32] Ex. D-4 to D-5, ¶ 4.c(1), c(3)(c)(investigator's telephone interview with Mr. Lynch, FORSCOM Operations Officer [FOC] "whose account of the incident mirrors that of LTC Epstein"); see D-8 (Epstein statement of incident).

[33] Ex. F ( 4 March 1992 request for Commander's Inquiry).

[34] AR 623-105 ¶ 5-30a.

[35] Id ¶ 5-30b.(1).

11

      officials' evaluations [36] * * * the commander does not have the authority to direct that an evaluation be changed. . . . [37]

Moreover, the 1992 update to AR 623-105 shows that the provision under AR 600-20 requiring general officer approval before a relief, was placed not in the section for a commander's inquiry but under the section for relief reports. AR 623-105 ¶ 5-18a.1.

    27.    Here, the *post hoc* and non-binding advisory was delegated to a Colonel Hennessey under ¶ 5-30.[38]  As such, the Colonel did not focus his inquiry on the threshold due process questions for a relief report:

    (1) whether prior formal counseling existed and was adequate;

    (2) the identity the rating official directing the relief;

    (3) nor inquire whether such official clearly explained the reasons for relief in the narrative portion nor state that LTC Epstein was on notice of those reasons;

    (4) nor whether the other rating official non-concurred with the relief or otherwise stated why the drastic remedy was warranted;

    (5) nor whether such a proper relief report was referred to LTC Epstein for comment; and

    (6) nor was a final required relief review by the next superior above the relieving official performed to ensure the OER is clear, contains no errors of fact, or otherwise did violate the regulation.

And finally, the scope of Colonel's Hennessey's inquiry did not attempt to reconcile the conflicting factual findings from the formal EO investigation already approved by INSCOM.

    28.    Incredibly, Hennessey turned upside down the presumption of regularity by discrediting the prior Hudson/Cromartie OER in July 1990 that sweepingly declared LTC Epstein had "vast experience" and "leadership experience", and "his knowledge and experience in the intelligence field is significant."  Hennessey now allowed these rating officials to *ex post facto* debunk their own prior OER as unsubstantiated because it was based on "second hand reports and

---

[36] Id ¶ 5-30b.(2), (3).

[37] Id ¶ 3-15.

[38] Ex. F-4.


no direct observation." [39]   In other words, the raters are asking to believe their prior OER comments were inaccurate since they *ignored their duty* as the designated rating officials (because of their experience in the intelligence field) and so *did not* make a comprehensive, accurate and complete appraisal of LTC Epstein's abilities, weaknesses, and potential using all means— i.e., we just rubber stamped the input letters.  Now, the rating officials ask to be wholly believed that they faithfully and fully adhered to that same rating duty so their current comments of "lack of experience" are accurate.  This clearly illustrates the high deference granted rating officials typical of the narrow scope in a *post hoc* commander's inquiry.  It highlights the distinction in requiring *prior* general officer approval before taking the most serious step of relieving a commander.  LTC Epstein was then attending the most prestigious War College precisely because the Army had determined his military experience by 1991 showed "considerable potential for promotion and future service in positions of increasing responsibility."

     29.   Because COL Hennessey conducted a commander's inquiry, his report was deliberately vague and relied generalities deferential to the rating officials.   As such, it does not even attempt to meet the minimum standards to overcome the presumption of regulatory in appeals of an OER.  AR 623-105 Appendix N-2b. (evidence necessary to adequately refute a contested report "should be specific and not deal in general discussions of the appellant.").  For example, COL Hennessey offered absolutely nothing in support except to baldly assert that "specific comments in the OER were corroborated," based upon individuals with first hand knowledge of the incidents.[40]  Compare this vague statement of "individuals" with the formal EO investigation stating that 19 of 21 unit members were personally interviewed, including the raters.  Hennessey does not state who these individuals are he interviewed, the nature of their testimony, offers no corroboration as to their

---

[39] Ex. F-7.

[40] Ex. F5 ¶ 3 (summary of findings).

veracity amid the retaliatory DIS spy allegations and EO complaint against the command, nor offers any analysis whatsoever.

30. Problematic is that in response to Epstein's reprisal claim for his EO complaint, Hennessey mixes up the OER completion date with the EO complaint date. Hennessey implies that reprisal is a red herring because the OER was signed by Hudson on 14 May 1991, when Epstein faxed his request for a formal EO complaint on 17 May 1991.[41] But Hennessey fails to note that Hudson was issued the written admonishment for his EO failures on 1 April 1991 based upon the informal EO investigation.

31. Moreover, the Hennessey inquiry never addressed the informal EO inquiry's allegation that LTC Epstein should be fired because he lacked experience. Hennessey merely stated that there was considerable friction because LTC Epstein was "outspoken, articulate officer who held very strong views of right and wrong." [42]

32. The COL Hennessey report was adopted without comment by MG Scanlon:

> The inquiry revealed no error, violation of regulation, or wrongdoing regarding the evaluation report. Accordingly I will take no further action and consider the matter closed.

BCMR Ex. F-3, ¶¶ 2-3. During this time LTC Epstein was not represented by military or civilian legal counsel. He was attending the Army War College in Pennsylvania.

33. On 19 August 1993, the OSRB denied LTC Epstein's OER *pro se* appeal.

34. From 1994 to 1997 Plaintiff-Epstein was non-selected for promotion to COL (USAR).

35. In October 1997, Plaintiff-Epstein was retired from the USAR for maximum years of service (28 years commissioned services).

36. In November 2003, the Army BCMR denied Epstein's request to remove his referred-OER. Epstein, through legal counsel, clearly raised the procedural violation that his relief was

---

[41] Ex. F-7 ¶ 2b.; compare with Ex. D ¶ 1a. (non-secure facsimile by Plaintiff-Epstein 17 May 1991).

[42] Ex. F-7 ¶ 1.

14

disguised as a change-of-rater report, with the Board admitting he was "removed from the unit." BCMR at 2-3, 9 (¶ 5). Calloway v. Brownlee, 366 F.Supp.2d 43 (D.D.C. 2005)(remand when ABCMR arbitrarily failed to address an implied non-frivolous argument that *de facto* relief was disguised as change-of-duty NCO-ER thus depriving soldier of procedural due process).

37.    This is novel case. It involves anti-Semitism by senior military leaders and reprisals for LTC Epstein for raising the issue. The cabal of bigots spread wanton character assassination to derail LTC Epstein's promising military career and a promotion likely to follow after the War College. Reprisals included a summary relief and feigned appearance of procedural due process, followed by false accusations of treason in war-time, incompetence, sexual perversion, and homosexuality. The treason charges were baseless but no one was punished. And to further avoid embarrassment, the Army covered-up the EO finding in 1991 that the both LTC Hudson and Mr. Coburn were anti-Semitic.

38.    Plaintiff-Epstein now seeks judicial review of the BCMR decision limited to its denial of his request to remove his referred-OER for the period October 1990 to March 1991. Epstein is not seeking monetary relief. The equitable relief to remove the only stigmatizing referred-OER in his career is of sufficient importance and vindication— that report is the focal point of religious bigotry, his unlawful firing, the ensuing emotional trauma from a criminal investigation for alleged wartime treason, and a constant reminder insulting his 28 years of patriotic Army service.

39.    In the Summer of 2006 the leadership of Jewish War Veterans of the United States of America (JWV), considered supporting the present court case of LTC Epstein, retaining special counsel. The mission statement of the JWV states that it

> is the oldest active veterans association in the United States, founded by Civil War Veterans in 1896. [It] is dedicated to those programs that support the needs of our veterans, community, combats anti-Semitism and bigotry, supports American youth through scouting, scholarships and anti-drug programs, and assists oppressed Jews worldwide.[43]

---

[43] www.jwv.org

40.     The JWV and its counsel, after reviewing the entire case file with its retained counsel, found the facts disturbing.  On November 11, 2006, the organization's National Commander Norman Rosenshein issued a written statement supporting the federal court claim of LTC Epstein:

> In between his favorable [OER] ratings and his relief from his intelligence duties there was one importance occurrence.  Epstein, who is an Orthodox Jew, had openly expressed his concerns about some sensitive religious practices in his unit. . . [as] substantiated by an investigation by an "Equal Opportunity" unit.   An admonishment was issued to the superior officer, who then changed the ratings of Epstein and relieved him * * * [the JWV] has trust in the Federal Court and the Army to court the injustice that LTC Epstein has suffered.

Subsequently, the JWV is considering application to file a legal brief in this present court case as an *amicus* party.

41.     On December 21, 2006, plaintiff was diagnosed by Dr. Jacqueline Friedman, with Amyotrophic Lateral Sclerosis (ALS), also called Lou Gehrig's disease.[44]  ALS is a progressive neuromuscular disease that weakens and eventually destroys motor neurons (components of the nervous system that connect the brain with the skeletal muscles).  Plaintiff's counsel raises this fact for the purpose to ensure the court proceedings and briefing schedule are not unreasonably delayed.

### CAUSE OF ACTION

The Army's refusal to grant relief violated the Administrative Procedure Act as arbitrary and capricious agency action, unsupported by substantial evidence, and otherwise not in accordance with Army regulations.

### PRAYER FOR RELIEF

That this Honorable Court declare that the Army's denial of relief violated the Administrative Procedure Act as arbitrary and capricious agency action, unsupported by substantial evidence, and otherwise not in accordance with Army regulations.

---

[44]  Dr. Jessica Sharma, 212 686-7500 Neurology Department, New York Veterans Administration Medical Center.

  That the Court set aside Lieutenant Colonel Epstein's Officer Evaluation Report for the period 22 October 1990 to 5 March 1991, or in the alternative remand this case to the Army BCMR for appropriate relief.

  That this Honorable Court grant reasonable attorney fees and costs.

            Respectfully Submitted,

            *[signature: John Wickham]*

            John A. Wickham, Esq. DC Bar 454863
            32975 Saint Moritz Drive
            Evergreen, CO  80439-6720
            (303) 670-3825

Of Counsel:
Jewish War Veterans of the United States of America
1811 R. Street, N.W.
Washington D.C. 20009
202 265-6280

07-688
C
RMU

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

LAWRENCE S. EPSTEIN
280 Park Avenue South #24
New York NY 10010-6134

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   88888
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

PETE GEREN, ACTING SECRETARY OF THE ARMY
U.S. Army Litigation Division
901 N. Stuart Street, Suite 400, Arlington VA 22203-1837

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

JOHN A. WICKHAM, ESQ.
32975 SAINT MORITZ DRIVE
EVERGREEN, CO 80439-6720
(303) 670-3825

Case: 1:07-cv-00688
Assigned To : Urbina, Ricardo M.
Assign. Date : 4/16/2007
Description: EPSTEIN v. GEREN

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
⦿ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ⦿ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)   OR   ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

3

| ○ G. Habeas Corpus/2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ● 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
5 USC 702, 706(1), Administrative Procedure Act, arbitrary and capricious, unlawful, unsupported agency action

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Select YES only if demanded in complaint   JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction)   ☐ YES ☒ NO   If yes, please complete related case form.

DATE APRIL 11, 2007   SIGNATURE OF ATTORNEY OF RECORD _John J. Wickham_

4/16/07

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

JTC

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.