IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAWRENCE S. EPSTEIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 07-0688 (RMU) |
| | ) | |
| PETE GEREN, | ) | |
| Secretary of the Army, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## NOTICE OF SUPPLEMENTAL ADMINISTRATIVE RECORD

Plaintiff-Epstein hereby supplements the administrative record only with those exhibits filed by Epstein in his agency appeal before the ABCMR.  As defendant stipulated in its Notice of Administrative Record, it did not possess his agency exhibits C, E-W.   The parties agreed that Epstein may add those missing exhibits.  They appear in 4 volumes totaling 26 pages.   For simplicity, plaintiff has labeled and will cite to these as "Supp.AR [page]."

Plaintiff decided not to file every exhibit or page thereof.  Certain exhibits filed below are no longer relevant to any issues before the Court:  (1) most of the omitted exhibits supported Epstein's argument for the BCMR to waive its 3-year limitations period and hear the case.  The Board waived its limitations period and adjudicated the case.  (2) other omitted exhibits, such as Epstein's Officer Evaluation Reports, medals, and commendation letters, are already contained in the AR as part of his Official Military Personnel File.  (3) other omitted documents are agency cover letters, such as to the appeal board OSRB or to the commander's inquiry.

If defendant believes that certain omitted exhibits or pages thereof are relevant, plaintiff's counsel will forward them to opposing counsel for review, and file them if necessary.  The contents of each exhibit can be surveyed by referring to Epstein's BCMR brief.  AR 15-36.


a/s   John A. Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen CO 80439
303 670-3825
Counsel for Larry Epstein

DEPARTMENT OF THE ARMY
HEADQUARTERS, US ARMY SPECIAL SECURITY GROUP
FORT GEORGE G. MEADE, MARYLAND 20755-5998

REPLY TO
ATTENTION OF:

IASSG-EA

1 April 1991

MEMORANDUM FOR LTC GABRIEL L. HUDSON, COMMANDER, USA SPECIAL SECURITY COMMAND, FORSCOM, ATTN: IASSG-MCP, COMMAND & CONTROL FAC (C2F) RM 76, BLDG 200, FORT MCPHERSON, GA 30330-6000

SUBJECT: Human Relations/Equal Opportunity Concerns

1. This memorandum responds to a recent informal complaint from a member of your command reflecting concerns of an equal opportunity nature. The Deputy Commander, USASSG, at my direction, investigated the complaint and completed a thorough review of the situation within your Headquarters. His report does not confirm the existence of discriminatory practices; however, it does reflect a need on your part to be more sensitive to ethnic and minority factors in your verbal actions.

2. You are cautioned to avoid future remarks of an insensitive and inappropriate nature such as those to LTC Epstein concerning his religious dieting habits. You must be especially sensitive in your choice of words and sensitive to reactions and perceptions of others about your words as well as your actions.

3. You should continue those actions you have already taken to energize your Human Relations/Equal Opportunity Program and educate all members of your command concerning the diversity and richness of the American cultural, racial, ethnic and religious experiences. You must insure that all SSC FORSCOM personnel are thoroughly trained concerning Army requirements to insure fair and equal treatment of all personnel, and understand the Army programs available for dealing with situations involving possible discrimination.

4. I am looking forward to discussing with you your program initiatives during our upcoming Commander's Conference.

GEORGE D. CROMARTIE, JR.
Colonel, MI
Commanding

EXHIBIT ___C___

MEMORANDUM FOR LTC Laurence S Epstein. 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

SUBJECT:  Counseling Statement

1.  I have discovered through an investigation that you have
    made statements to subordinates officers, NCO's and
    soldiers of this command which are not in the best
    interest of order, sound judgment and good discipline.
    Further, these statements are a breach of loyalty,
    integrity, and trust.  I order you to cease and desist
    this behavior immediately and make amends as necessary.

2.  Senior leaders of any organization must be cohesive,
    loyal, trustworthy and mutually complementary.  All
    leadership must work toward mission accomplishment,
    morale and esprit de corps.

3.  Behavior such as stated above is intolerable in any
    organization, particularly a small unit such as SSC
    FORSCOM. If this behavior continues I will have no
    recourse except to terminate your activity duty, deny
    your access to Special Intelligence and provide you a
    relief for cause OER.

                              Gabriel L Hudson  18 Jun 91
                              LTC AV
                              Commanding

D-7

# DEPARTMENT OF THE ARMY

UNITED STATES ARMY INTELLIGENCE AND SECURITY COMMAND

FORT BELVOIR, VIRGINIA 22060-5370

REPLY TO
ATTENTION OF

11mn 5 March 1992

MEMORANDUM FOR THE COMMANDING GENERAL, US ARMY INTELLIGENCE
AND SECURITY COMMAND, FT BELVOIR, VA 22060-5370

SUBJECT: Commander's Inquiry

1. As directed, I have conducted an inquiry into allegations made by LTC Epstein concerning the Officer Efficiency Report he received for the period 901022-910305, while on active duty with the Special Security Command, Forces Command, formerly a subordinate the Special Security Group.

2. LTC Epstein based his request for the Commander's Inquiry on the following allegations:

    a. The report, which is markedly lower than one rendered by the same rater and senior rater for a 16 day active duty period prior to the contested report, was because LTC Epstein was unwilling or unable to tolerate LTC Hudson's anti-Semitic remarks and jokes and overall insensitivity.

    b. LTC Epstein's rater's comments regarding "disloyalty" were a result of substantiated findings by an official Equal Opportunity investigation initiated by LTC Epstein.

    c. The report is illegal because it is in reprisal for LTC Epstein's initiation of equal opportunity complaints, unjust because the rating officials were unqualified as a result of the findings of the equal opportunity complaint; and unfair because it violates the letter and spirit of AR 623-105.

3. FINDINGS. The results (TAB A) of my inquiry are that LTC Epstein's allegations cannot be substantiated and the report is administratively correct. Each allegation was addressed and individuals with first hand knowledge of incidents were interviewed. My findings and conclusions are based upon observation, examination, and corroboration of details. Rating chain evaluative comments were not examined except where specific events described in the performance section were alleged or implied to have been erroneous or inaccurate. Specific comments in the OER regarding LTC Epstein's performance have been corroborated and nothing was found that would contradict the performance ratings of either the rater or senior rater. I found no evidence that the senior rater or rater were motivated by anti-Semitic feelings as reprisal, or that the report was based on anything other than an evaluation of LTC Epstein's performance of duty.

F-5

3

4.   RECOMMENDATION.   That the OER be forwarded, in accordance with para 5-30, d., to HQDA without further action.


Enclosure
TAB A:  Findings

JAMES T. HENNESSEY JR.
COL,  GS
Deputy Chief of Staff, Security


Approved:   CHARLES F. SCANLON
            Major General, USA
            Commander

F-6   4

TAB A:  FINDINGS

1.  RATER – RATED OFFICER RELATIONSHIP.

The working relationship between LTC Epstein and his rater, LTC Hudson, was characterized by considerable friction between the two. When this friction was brought to the attention of the senior rater, COL Cromartie took appropriate action to investigate LTC Epstein's complaints and, where necessary, took corrective action. Disagreements between LTC Hudson and LTC Epstein relating to operating procedures and personnel practices were often unresolved. This lack of resolution was a contributing factor in LTC Epstein's perception of discrimination. My inquiry determined that LTC Epstein had very strongly held views on right and wrong. He was outspoken and articulate in expressing his views and was perceived as inflexible.

2.  SPECIFIC ALLEGATIONS.

a. That the contested report was markedly lower from one received from the same rater and senior rater before only because of LTC Epstein's unwillingness or inability to tolerate his rater's anti-Semitic remarks and jokes and overall insensitivity.
**Finding:** Not relevant. There is no basis for comparison between the reports. The contested report was for a period of five months, was based upon daily contact, and evaluated LTC Epstein's performance in the Special Security Command, Forces Command, office. The report referred to by LTC Epstein that preceded the contested one was for 16 days while LTC Epstein was deployed away from the headquarters supporting a subordinate command's participation in an exercise. The rater and senior rater comments were based upon second hand reports and no direct observation. A subsequent report by a different rating chain, although with a higher rater evaluation, was similar overall to the contested report.

b. That LTC Epstein's rater's comments regarding "disloyalty" were a result of substantiated findings by an official Equal Opportunity investigation initiated by LTC Epstein.
**Finding:** Not corroborated. Rater comments concerning loyalty and integrity were based upon performance of duty, specifically the atmosphere established by LTC Epstein's disagreement with his rater's actions. The official Equal Opportunity complaint made by LTC Epstein was initiated after the report was first submitted. An unofficial complaint was made by LTC Epstein to his senior rater, COL Cromartie. COL Cromartie directed that an unofficial investigation be conducted by his deputy commander, LTC Langenfeld. LTC Langenfeld's investigation revealed the conflict that existed between LTC Epstein and LTC Hudson but, like the later official EO investigation, did not substantiate any discrimination. The unofficial investigation did result in action

F.7

5

by the senior rater to caution LTC Hudson on his need to be more sensitive to ethnic and minority factors and to avoid future remarks to LTC Epstein of an insensitive or inappropriate nature concerning his religious dietary habits. It should be noted that no investigation, either the command directed unofficial inquiry by LTC Langenfeld or the official Equal Opportunity investigation done by MSG Ramseur, found any discrimination.

c. That the report is illegal because it is in reprisal for LTC Epstein's initiation of equal opportunity complaints, unjust because the rating officials were unqualified as a result of the findings of the equal opportunity complaint; and unfair because it violates the letter and spirit of AR 623-105.

**Finding:** Not corroborated. LTC Epstein bases his allegation on perceived prejudice rather than substantiated discrimination. Although it could be argued that any perception of prejudice is a basis for invalidating an evaluation done by the individual exhibiting the perceived prejudicial activity, no substantiation of discrimination was found. Further, reference to 5 USC 2302 (Prohibited Personnel Practices) does not apply in this case. No discrimination was found to be practiced and the performance evaluation referred to applies to civilian employees and not military personnel. Denial by LTC Epstein that his performance may have been less than outstanding contributes to his perception that the report was unfair.

3. CONTRIBUTING FACTORS.

a. The circumstances that brought LTC Epstein and LTC Hudson together were unique. Operations DESERT SHIELD/STORM requirements established a situation where two distinctly different, immediately incompatible, personalities were forced to work together under stressful and often frustrating conditions. The stovepipe structure of the US Army Special Security Group and the location of one of its subordinate commands at Headquarters, US Forces Command, contributed to the lack of resolution of problems generated by the two officers.

b. LTC Hudson found LTC Epstein's repeated challenges to his authority as the commander frustrating and impossible to correct. LTC Epstein's inflexible approach to his role in the command did little to improve the dysfunctional work relationship. Although similar situations develop in other units, appropriate command action had to be taken by a geographically distant headquarters, in a war crisis period, and reconciled with active and reserve force personnel policies.

6

F-8

# SENIOR SERVICE COLLEGE ACADEMIC EVALUATION REPORT
For use of this form, see AR 623-1; the proponent agency is MILPERCEN.

| | | DATE 8 Jun 92 |
|---|---|---|

| 1. LAST NAME - FIRST NAME - MIDDLE INITIAL | 2. SSN | 3. GRADE | 4. BR | 5. COMPONENT |
|---|---|---|---|---|
| EPSTEIN, Lawrence S. | 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 | LTC | MI | USAR |

| 6. COURSE TITLE | 7. NAME OF SCHOOL | 8. SPECIALTY |
|---|---|---|
| USAWC (1-250-C15) 92 | US Army War College | P35    A -- |

| 9. PERIOD OF REPORT (Year, month, day) | 10. DURATION OF COURSE (Year, month, day) |
|---|---|
| From: 91 07 15   Thru: 92 06 15  [X] | From: 91 08 05   Thru: 92 06 08 |

11. EXPLANATION OF NONRATED PERIODS

12. DID STUDENT SUCCESSFULLY COMPLETE THE COURSE?  [X] YES  [ ] NO  (If No, explain reason in ITEM 16)

13. COURSE OBJECTIVE AND DESCRIPTION:   The ten-month course of instruction provides advanced professional education for senior military officers and their counterparts in other federal agencies and foreign armies.  Instruction focuses on strategic studies, war-fighting, national security policy, and the planning and execution of strategic and operational warfare.  Instructional methods include lectures, seminar presentations and discussions, planning exercises and war games, and individual research.

The curriculum taken by all students includes:  (1) examination, within an ethical framework, of the nature of leadership in a strategic environment; (2) U.S. national security policy, national military strategy, and the process and principles of their formulation; (3) examining the military requirements compared to achievable capabilities to support national military strategy and the functions of planning, programming, and budgeting systems; (4) translating national military strategy into near and mid-term programs and plans, with attention to joint and combined forces, doctrine, planning, decisionmaking, and warfighting and campaign planning; (5) examined principal characteristics and U.S. policy toward one of six regions of the world; and, (6) development and application of national and theater strategies through simulations, exercises and studies across the operational continuum.

The Advanced Course Program and optional courses provide students with a series of choices so they may pursue selected topics in considerable depth.

## 14. ADVANCED COURSE, RESEARCH AND SPECIAL PROGRAMS

a. ADVANCED COURSE TITLE (Field of Study)

| | CREDIT | AUDIT | CLASSROOM HOURS |
|---|---|---|---|
| (1) Regional Strategic Appraisal:  Sub-Saharan Africa | X | | 27 |
| (2) Jt Land, Aerospace, & Sea Simulation (JLASS):  NE Asia Wargame | X | | 27 |
| (3) Intelligence & Campaigning:  Case Studies in Surprise & | | | |
| (4) Deception | X | | 27 |
| (5) The Army's Partners:  Air Force, Navy & Marine Corps Forces | X | | 27 |
| (6) Roles & Missions of the U.S. Air Force | X | | 27 |
| (7) Fitness of the Army | X | | 27 |
| (8) | | | |

b. RESEARCH PROJECTS

LTC Epstein designed and produced an oral history project on the relationship of the military and media during Desert Shield/Storm.  He made an extraordinary contribution to the holdings of the Military History Institute by depositing over 300 pages of completed transcripts for use by future researchers.  The final product has been requested for review by offices of the Secretary of Defense and Headquarters, Department of the Army and was selected as a winner in the Army War College Writing Awards Program.

15. DESCRIBE THE PARTICULAR ABILITIES THAT WOULD MAKE CERTAIN FUTURE ASSIGNMENTS APPROPRIATE

LTC Epstein has shown himself to be a highly qualified and experienced Military Intelligence professional, capable of serving at the Joint Operational level.  He was able to represent the U.S. Army Reserve (USAR) and act as a bridge between Active and Reserve Component seminar members.  He is well qualified to serve in any Intelligence position.  His abilities indicate that he can contribute best in senior positions in the USAR and should be placed in a high-level Individual Mobilization Augmentee (IMA) or Troop Unit position.

NOTE:  General officer & brigade command potential and academic ranking are omitted.

DA FORM 1059-2
1 NOV 77

G-2

| STUDENT'S NAME | STUDENT'S SSN |
|---|---|
| EPSTEIN, Lawrence S. | 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 |

**16. COMMENTS** (This Item Identifies the student's academic accomplishments.)

Cdr, U.S. Army Res Pers Cen, 9700 Page Blvd, St. Louis, MO  63132-5260

    a.  Examined and studied strategic military leadership focusing on ethics, values, strategic vision, and the management of change.  Identified personal abilities, skills, and values through self-assessment instruments, gave an oral presentation on strategic leadership competencies of a prominent historical figure, and wrote a philosophy of command for a strategic leadership position.

    b.  Analyzed the relationship between national security policy, strategy, and war.  In a course paper, explored an important strategic concept or issue for the United States in the 1990s.  In a small-group setting, observed the United Nations and local government during a field trip to New York City.  Participated in case studies and exercises involving the development of national military strategy.

    c.  Analyzed the development, resourcing, and management of force capabilities to support CINC requirements, wrote a paper concerning the management of change.

    d.  Studied joint organizations and doctrine; the National Military Strategy; its translation into global and regional guidance, and apportionment of forces in the Joint Strategic Capabilities Plan (JSCP); the JOPES, a process for developing theater and supporting plans; the CINCs' theater planning process for the development of theater strategies and theater war and contingency plans.

    e.  Examined U.S. interests and policies from a global geopolitical perspective, focusing on the use of national power, strategy development, campaign planning, and warfighting.  Analyzed U.S. global priorities and regional interests, developed con-cepts and objectives at the national and theater level, analyzed relationships among U.S. alliances and military operations, examined the use of military power across the operational continuum, and participated in case studies of selected campaigns. Studies augmented by small-group observations in a field trip to Washington, D.C. Presented critiques of U.S. policy, strategy, and military planning.  Participated in political-military simulations involving potential U.S. strategic objectives.

    f.  LTC Epstein achieved the U.S. Army War College academic standards for written presentations, oral presentations, preparation, and participation.

    g.  LTC Epstein volunteered to be a student sponsor for the International Fellow from Burkina Faso.  His sponsorship ensured that the International Fellow gained the maximum benefits from his seminar membership by integrating him in all the seminar's academic, social, and athletic activities.

    h.  LTC Epstein participated in the Joint Land, Aerospace, and Sea Simulation (JLASS 92) Exercise as the J2 working effectively at the strategic and operational levels of war.

    i.  LTC Epstein was selected as a winner in the U.S. Army War College Oral History Writing Awards Program for 1992.

PASS 9204   71/185

**17. AUTHENTICATION**

a. TYPED NAME, GRADE, BRANCH, SSN AND TITLE OF PREPARING OFFICER
ROBERT B. TINSMAN, Colonel, AD
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, Faculty Adviser

SIGNATURE

b. TYPED NAME, GRADE, BRANCH, SSN AND TITLE OF REVIEWING OFFICER
WILLIAM A. STOFFT, Major General, USA
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, Commandant

SIGNATURE

**18. MILITARY PERSONNEL OFFICER**

a. FORWARDING ADDRESS (Rated Student)
115 Hatteras Rd
Waretown, NJ  08758

b. DISTRIBUTION    MILPO TD 09
☐ 1. COPY FORWARDED TO STUDENT'S OFFICIAL RECORD
☒ 2. COPY FORWARDED TO STUDENT

G-3

EPSTEIN, LAWRENCE S., LTC, MI, 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


DCSPER OFFICER SPECIAL REVIEW BOARD
CASE SUMMARY

OER APPEAL

**Appeal Received By OSRB:**  29 Jun 93

**Promotion or Retention Status:**  No actions pending

**EVIDENCE/DOCUMENTS REVIEWED:**

1.  Contested OER, 22 Oct 90 - 5 Mar 91 (Encl 1)
2.  Appellant's ORB (Encl 2) and OMPF
3.  Appellant's Memorandum, undated, OER Appeal
4.  Memorandum for Commander, USASSG, Subj:  Command Visit to
    Special Security Command, FORSCOM, 4 Mar 91 (w/encl)
5.  Memorandum for [Rater], US Army Special Security Command,
    Subj:  Human Relations/Equal Opportunity Concerns, 1 Apr 91
6.  Appellant's EO Complaint, 17 May 91
7.  Memorandum for Commander, INSCOM, Subj:  EO Complaint, 18 Oct
    91
8.  Memorandum for Commanding General, INSCOM, Subj:  Commander's
    Inquiry, dated 5 Mar 92
9.  Memorandum for [Appellant], Subj:  Commander's Inquiry, 16
    Mar 92
10. Statement, Anti-Defamation League, 18 Jun 92
11. Statement, Jewish War Veterans of the United States of
    America, Inc., 27 Jul 92
12. Analysis of the Commander's Inquiry, undated
13. Statement, LTC Speer, 23 Jun 92
14. Statement, CPT Jencks, 10 Jun 92
15. Statement, 1LT Birdwell, 30 May 92
16. Statement, MAJ Birch, 3 Jun 92
17. Statement, LTC Rochwerger, 11 May 92
18. Statement, Mr. Stone, undated
19. Statement, G.G. Bowlin, undated
20. Statement, LTC Bell, 19 May 92
21. Statement, LTC Bird, 14 Apr 92
22. Statement, PNCM Bradford, 15 Jun 92
23. Statement, LTC Caudill, 23 Mar 92
24. Statement, LTC Cullen, 9 Jun 92
25. Statement, COL Fitzgerald, 22 Apr 92
26. Statement, Mr. Kaliveas, 7 May 92
27. Statement, COL Maestas, 30 Mar 92
28. Statement, Ms. Riley, 30 Apr 92
29. Statement, Mr. Santoli, 29 Mar 92

K-3

EPSTEIN, LAWRENCE S., LTC, MI, 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

30. Statement, COL Cary, 27 Apr 92
31. Statement, MG Stofft
32. Statement, Mr. Williams, 25 Mar 92
33. Letter to Appellant from MG Stofft, undated

**AR REFERENCES:** AR 623-105 (OER System) unless otherwise stated.

**DISCUSSION:**

1. This is the first appeal of a Change of Duty OER for the period 22 Oct 90 - 5 Mar 91, 5 rated months. During this period, the appellant was assigned as Deputy Commander, USASSC, FORSCOM, Ft McPherson, GA 30330. This OER was referred to the appellant under the provisions of para 4-27c. The appellant provided a written response to the referral and requested a Commander's Inquiry. In this rebuttal, the appellant noted that this same rating chain had rated him as outstanding in every respect in a previous OER (28 Aug 90). He also notes in the rebuttal that "the sole and only variables in the intervening period were [his] unwillingness or inability to tolerate [his] commanders's anti-Semitic remarks and jokes together with his overall insensitivity." [His] disloyalty resulted in an official investigation which in pertinent part states, "allegations relating to [the rater], and his negative comments concerning [the appellant] and the overall insensitivity of his (the rater's) verbal communications with others was substantiated.....and about 20% of the enlisted personnel believed discrimination existed."

2. The appellant/s contends that the OER is inaccurate (substantively and administratively) and unjust. The appellant contends the following:

   a. The contested OER is administratively in error because the appellant was evaluated by a rating official who, in violation of para 5-30b(1)(a), had substantiated findings against him from official investigations.

   b. An informal investigation substantiated the allegations concerning inappropriate remarks and jokes concerning the appellant's religious dietary habits and recommended that the "the Commander should counsel [the rater] concerning his (the rater's) insensitive and inappropriate remarks about the appellant's religious dietary habits."

   c. Part IVa(8): The appellant contends that not once did he display "very poor judgment which resulted in embarrassment to the command"--let alone three times;

2

EPSTEIN, LAWRENCE S., LTC, MI, 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

d.  Part IVb(3) and (5):  The appellant contends that the rater never had any reason to doubt the appellant's loyalty or integrity, let alone on three different occasions;

e.  Part Vc:  All statements in part Vc, following the third sentence, are without substantial basis in fact;

The appellant requests that the OER be deleted from his file.

3.  In support of his appeal, the appellant provided the evidence listed above.

a.  **Appeal Memorandum:**  In this memorandum, the appellant notes that in Jan 91 he initiated an Equal Opportunity (E.O.) complaint with the Commander, US Army Special Security Group, and the ensuing "informal" investigation concluded that the appellant's rater did make inappropriate remarks and jokes concerning the appellant's religious dietary habits and recommended that the appellant's rater be counseled for his insensitive and inappropriate remarks.  Based on the facts that the rater, following an admonishment from his commander, was permitted to execute an OER on the appellant, effectively destroying the appellant's reputation and promotion potential, the appellant requested a formal investigation by the Command (USASSG) Equal Opportunity Office into the possibility of discrimination.  The appellant states that the E.O. investigation substantiated his allegations and concluded that "the working environment within the unit was one which undoubtedly left members with the impression that unequal treatment did exist in the unit."  When the Senior Rater (SR) acted on the contested OER, the appellant requested a formal Commander's Inquiry.  This inquiry dismissed the application of para 5-30 on the basis that, in the opinion of the investigating officer, the derogatory remarks, verbal abuse, and jokes did not constitute discrimination.  In addressing specific portions of the contested OER, the appellant challenges each part of the OER that cites and challenges his display of sound judgment, and, questions his loyalty and integrity.  He notes that the Commander's Inquiry could not confirm the "three occasions" where poor judgment was displayed.  Neither could the rater confirm nor the Commander's Inquiry document, with specificity, the statements in the contested OER that questioned his loyalty and integrity.  Concerning this issue, the appellant states that the contested OER is devoid of any specificity and the inquiry fails to present any documentation.

b.  **Memorandum: Command Visit to Special Security Command FORSCOM:**  This memorandum details the results of the first

3

K-5

EPSTEIN, LAWRENCE S., LTC, MI, 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

informal investigation into the allegations made by the appellant
concerning patterns of racial and/or ethnic harassment,
discrimination or misconduct by the rater concerning members of
his command. This informal investigation (completed on 4 Mar 91)
concluded that:

(1) the appellant was not experienced in higher level
staff work;

(2) several of the appellant's actions while at FORSCOM
were inappropriate and did reflect negatively on the command;

(3) the appellant became defensive and attributed the
rater's counseling of him as motivated by professional jealousy
and ethnic/racial prejudice;

(4) the rater was correct in questioning the appellant's
competence and in not trusting him with important actions;

(5) there was no evidence that the rater's counseling of
the appellant performance was based on anything other than
professional experience and judgment;

(6) the rater had made inappropriate remarks and jokes
concerning the appellant's religious dietary habits, but they had
been first initiated by the appellant and not the rater—and
stopped when the appellant brought the subject to the rater's
attention;

(7) the appellant was not loyal to his commander and his
actions were disruptive to the command; the investigating
officer noted that the appellant may have "stirred things up" and
violated the rater's trust and confidence by relaying the details
of private conversations back to individual soldiers; the
appellant also suggested to subordinates that he was better
suited to command than was the rater;

(8) the rater has the trust and confidence of his
subordinates; and, most of the subordinates were not aware of any
prejudice on the part of the rater;

(9) the Commander, USASSG should counsel the rater
concerning his insensitive and inappropriate remarks to the
appellant about the latter's religious dietary habits; and,
the appellant should be reassigned to another command based on
the personality conflict with the rater, his inexperience in
working at higher levels of command, and because of his lack of

4

K-6

EPSTEIN, LAWRENCE S., LTC, MI, 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

loyalty to the rater.  If reassignment was not possible, the appellant should be released from active duty.

c.  **USASSG Memorandum to the Commander:**  On 1 April 1991, the Commander of the US Army Special Security Group informed the rater that the informal EO investigation had been completed; the investigation did not confirm the existence of discriminatory practices; however, the investigation did reflect a need on the part of the rater to be more sensitive to ethnic and minority factors in his verbal actions.  The memorandum also cautioned the rater to avoid future remarks of an insensitive and inappropriate nature such as those to the appellant concerning his dietary habits.

d.  **Appellant's Memorandum to Commander, INSCOM:**  On 17 May 91, the appellant requested a formal E.O. investigation into his allegations of discrimination.  This request again noted racial and religious discrimination on the part of the rater.

e.  **INSCOM'S E.O. Investigation:**  On 18 Oct 91, the Intelligence and Security Command completed the E.O. investigation requested by the appellant.  This investigation concluded that:

(1)  there was no evidence to support the appellant's claim of discriminatory practices by the rater;

(2)  the rater had made inappropriate remarks and jokes concerning the appellant's religious dietary habits;

(3)  there were conditions which contributed directly to the appellant's concerns;

(4)  the personality conflict between the rater and appellant led to the [E.O.] complaint;

(5)  concerning the contested OER, the issues surrounding the appellant's poor duty performance are not clearly documented and the counseling statements given to the appellant do not clearly state exactly what the appellant did;

(6)  the inappropriate remarks by the rater were done more to antagonize the appellant, rather than be anti-Semitic.

(7)  there was a strong personality conflict between the rater and appellant, and the Commander, SSG should consider these factors when reviewing the appellant's OER.

5

K-7

EPSTEIN, LAWRENCE S., LTC, MI, 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

f.  **INSCOM Commander's Inquiry (CI):**  On 5 Mar 92, INSCOM concluded a Commander's Inquiry to investigate the allegations made by the appellant.  **OSRB Note:  This inquiry was conducted to look into the allegations made by the appellant concerning the OER he received during the period 901022 - 910305 (the contested OER).**  This inquiry concluded the following:

(1)  the allegations made by the appellant concerning the nature of the contested OER cannot be substantiated, and the report (contested OER) is administratively correct;

(2)  specific comments in the OER concerning the appellant's performance have been corroborated and nothing was found that would contradict the performance ratings of either the rater or senior rater;

(3)  no evidence was found that the SR or rater were motivated by anti-Semitic feelings as reprisal, or that the report was based on anything other than an evaluation of the appellant's performance of duty;

(4)  concerning the allegation that the contested OER was markedly lower than a previous report (same rating chain) only because of the appellant's unwillingness or inability to tolerate the rater's anti-Semitic remarks and jokes and overall insensitivity, the Inquiry found the allegation not to be relevant;

(5)  concerning the allegation that the rater's comments regarding "disloyalty" were the result of substantiated findings by an official E.O investigation requested by the appellant, the Inquiry found no corroboration.  The Inquiry noted that the rater comments concerning loyalty and integrity were based upon performance of duty, and the atmosphere established by the appellant's disagreement with the rater's actions;  the official E.O. complaint was initiated after the contested OER was first submitted;

(6)  concerning the allegation that the contested OER is illegal because it is in reprisal for the initiation of the E.O. complaint, and unjust because it was rendered by rating officials who were unqualified as a result of the findings of the E.O. complaint, and unfair because it violates the letter and spirit of AR 623-105, the Inquiry found no corroboration.  The Inquiry states that the appellant based his allegations on perceived prejudice rather than substantiated discrimination.

K-8

EPSTEIN, LAWRENCE S., LTC, MI, 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

g. **CG INSCOM Letter to Appellant:** On 16 Mar 92, INSCOM commander informed the appellant that a Commander's Inquiry revealed no error, violation or regulation, or wrongdoing regarding the evaluation report (contested OER).

h. **Supporting Statement, LTC Speer:** In this supporting statement, LTC Speer comments on one of the incidents that the rater used in support of his evaluation of the appellant's lack of display of sound judgment. The incident involved the taping of a training film on field Sensitive Compartmented Information Facilities, and the fact that the appellant had failed to properly coordinate the action with the unit's chain of command. In the opinion of the third party, the incident did not merit discussion in an OER and did not have the effect that the rater stated it had.

i. **Other Third Party Supporting Statements:** The appellant provided a series of other third party statements, all attesting to his outstanding performance, ability, loyalty, and integrity. Some of these statements were from individuals who were also called to active duty during Desert Storm. The remainder of the third party statements were from individuals the appellant met at the US Army War College. They, too, attest to the intelligence, professionalism, loyalty, and integrity of the appellant. While supportive of the appellant, these third parties were not in good positions to observe the appellant from vantage points approximating those of the rating chain, and were not privy to the demands and expectations of the rating chain. Thus, they must be considered irrelevant.

4. The OSRB deemed it necessary to contact the rater and other persons.

a. The OSRB contacted the rater on 9 Aug 1993 and informed him of the appellant's contentions and a need for further information. The rater agreed to the release of the following paraphrased summary of his comments that would be included in the Case Summary and releasable to the appellant under the Freedom of Information Act/Privacy Act (FOIA/PA). The rater remembered the appellant and recalled the contested OER. The rater stated that the OER, as written, was both fair and objective. It reflected no bias, religious or otherwise, and was not in reprisal or retaliation for the various complaints the appellant had lodged against the rater. In discussions with the OSRB, the rater summarized many of the "incidents" that led the rater to conclude the appellant showed poor judgment (interaction with FORSCOM command element/training film/confirmation of raw intelligence). The rater also discussed the various loyalty/integrity issues.

7

K-9

EPSTEIN, LAWRENCE S., LTC, MI, 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

He noted that the appellant often went behind his back,
especially with the enlisted soldiers, and discussed privileged
communications that were intended to be solely between the
commander (rater) and the deputy commander (appellant).  The
rater said he believes the appellant has no loyalty to anyone
other than himself.  He (the appellant) continually tried to
undermine his authority, and went as far as asking the rater to
relinquish command in favor of the appellant.  The rater noted
the incidents concerning jokes about religious dietary habits,
but they had been initiated by the appellant, and carried on by
the appellant.  When the appellant informed him that he felt they
were inappropriate, they stopped.  The rater concluded his
remarks to the OSRB by noting that a personality conflict existed
between the individuals, but it was qualification and
performance, not personality, on which he based his evaluation of
the appellant.

    b.  The OSRB contacted the USAR Advisor to INSCOM on 9 Aug
1993 and informed him of the appellant's contentions and a need
for further information.  The USAR Advisor had been contacted
originally by the rater and other members of the command
concerning the appellant.  The USAR Advisor agreed to the release
of the following paraphrased summary of his comments that would
be included in the Case Summary and releasable to the appellant
under the Freedom of Information Act/Privacy Act (FOIA/PA).  The
USAR Advisor remembered the appellant and recalled the OER being
contested by the appellant.  The USAR Advisor stated
philosophically, the rater had, throughout this entire incident,
remained fair and impartial, at least from his perspective.  The
USAR Advisor stated that the rater tends to err on the side of
the individual, and does all he can to motivate his subordinates.
It was his opinion, based on the information available to him,
that the appellant had agitated within the unit, questioned the
commander's authority, and failed to heed to counseling.  When
the rater asked him what he should or could do, the USAR Advisor
advised him to counsel thoroughly, and if that didn't work,
exercise his responsibilities via the OER system.  The real, key
issues, from the USAR Advisor's perspective were:  (1)  the
radically different perception (between the rater and the
appellant) of the organization and how it was being commanded;
(2) the continuing disagreements between the rater and appellant;
and (3) a conflict of ideas.

5.  Para 9-7a places the burden of proof on the appellant to
provide clear and convincing evidence to justify deletion or
amendment of an OER.

    a.  Para 4-13b  states that areas of professional competence
in part IVa will be indicated on a scale of 1 to 5, 1 being high.
Exceptional or unsatisfactory performance will be noted in the

8

K-10

EPSTEIN, LAWRENCE S., LTC, MI, 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

comments part of block IVb.  Rater comments are mandatory to explain or clarify ratings of 4 or 5.  There is no requirement to justify a 2 or 3 rating.  It is the opinion of the Board, based on available evidence, that the rater's evaluation of the appellant's competence and ethics is factually stated.  Nothing the appellant has provided, to include the third party statements, refutes the numerical ratings and narrative evaluation in Part IV of the contested OER.  The one supporting statement that does cast some doubt on one of the "incidents" is of insufficient weight to counter the preponderance of evidence that the appellant did in fact fail to display sound judgment and was less than loyal to the commander and unit.

b.  Para 4-14c(2) states that in part Vb the rater compares the rated officer's performance with the duty requirements.  The focus is on results and how they were achieved.  In part Vd the rater compares the rated officer's potential for promotion with that of his contemporaries.  The rater places an X in the appropriate boxes.  There is no requirement to justify or explain a II or III performance box check with examples of negative performance, or a II potential box check with any rationale.  The Board again notes that, based on the evidence provided by the appellant, there is no rationale to question the rater's performance and potential evaluation of the appellant.  The narrative remarks of the rater were corroborated by three separate investigations and inquiries by the rater's higher headquarters.

c.  Concerning the SR's evaluation, the Board notes that Para 4-3b states that evaluations of potential are assessments of the rated officer's ability compared with that of his contemporaries, to perform in positions of greater responsibilities in higher grades.  Part VIIa is an evaluation of potential, not performance.  While the available evidence is not conclusive that the SR's evaluation of the appellant's potential is entirely correct (based on the total file of the appellant), it is, in the Board's opinion, correct (from a block evaluation perspective), the Board believes the Part VIIb narrative to accurately capture both the performance and assignment potential of the appellant.

d.  Para 5-32a(3) states that an OER accepted at HQDA is presumed to represent the considered opinions and objective judgment of the rating officials at the time of preparation.  In this case, the appellant did not provide the necessary evidence to delete the OER, and therefore, the presumption of regularity referred to in para 5-32a must be applied.

K-11

**EPSTEIN, LAWRENCE S., LTC, MI, 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**

<u>**CONCLUSIONS:**</u>

The appellant has failed to provide clear and convincing evidence
that supports his contentions that the contested OER is
inaccurate and unjust and violates para 5-30b(1)(a).  Therefore,
the OER should not be deleted.

<u>**RECOMMENDATIONS:**</u>

1.  Deny the appeal.

2.  File appeal correspondence on the appellant's "R" fiche.

10

K-12

30 May 1992

MEMORANDUM FOR COMMANDER, U.S. ARPERCEN

SUBJECT: PERFORMANCE OF LTC EPSTEIN AT FORCES COMMAND  DURING DESERT STORM

1. I, Diane E. Birdwell, 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, reported to the Special Security Command on 7 MAR 91 for assumption of command of the Special Security Detachment for Second U.S. Army. While I was to work at FT Gillem, my chain of command and support came from the Special Security Command (SSC) at FT McPherson. LTC Gabriel Hudson was my rater.

2. Almost immediately after coming to the SSO system in Atlanta, I could see there were several problems in the SSC. The most obvious to me was one of morale, both among the officers and enlisted. I was told to not mention LTC Epstein's name around LTC Hudson, because he did not like him, and the conventional wisdom was that to succeed with LTC Hudson was to stay away from LTC Epstein, even though LTC Epstein was the subject matter expert and the one the troops seemed to really respect.

3. On many occasions, enlisted soldiers complained in confidence to me that they believed LTC Hudson to be racially and religiously biased. The most pointed example came when a soldier asked what my beliefs were, and I replied, "Roman Catholic." The soldier then said, "Well, you should do well with the colonel, even if you are a woman." Further explanation of that statement revealed that the SSC commander was also of the belief that women didn't necessarily belong in the military. As far as race and religion being brought up in my immediate presence, the very first time I went to FT Gillem for formal introductions as the incoming commander, LTC Hudson asked me several questions concerning my beliefs. He seemed happy that I was of the same faith as he. He also tried to be "helpful" to me in telling me what part of town not to live in. He referred to the black areas as "high crime" and not desirable.

4. The only vocal critic of LTC Epstein was Mr. Corbett Cobern, the SSO for FORSCOM. He really did not like LTC Epstein, and made disparaging remarks several times, once in front of enlisted soldiers. I thought that was unprofessional that he would comment that,  "CPT Jencks' choice of friends was poor", considering that the augmentation unit had been deactivated, and both officers mentioned were no longer around. I personally found this statement humorous, because Mr. Cobern had the respect of absolutely NOBODY at FORSCOM. In other conversations with other officers, both company  and field grade, not one bad comment was made about LTC Epstein.

5. My personal contact with LTC Epstein resulted from the fact that while LTC Hudson was the commander of the SSC, LTC Epstein was the expert on procedures, both on protocol and security. My previous assignment had mainly dealt with physical security of nuclear weapons, so I only knew the basics of the SSO system, as well as how to prepare and deliver "the Blackbook" for a three-star commander and his high ranking staff of an army-level staff. I learned a lot from LTC Epstein, but he was always careful to caution me that I should check with LTC Hudson before proceeding with the advice, lest I might contradict or embarrass my rater. He was always involved with

K-14

the workings of the J-2, but would make time for those who would ask. Others from SSC told me that it was LTC Epstein who prioritized and delegated duties, set to motion several projects for information and training and created SOP's were there had been none. The last task stated seemed to be the sore part with LTC Hudson, according to others. Instead of seeing the contributions he could bring during a war, LTC Hudson seemed to be embarrassed by the fact that LTC Epstein could make things happen and actually understand what was going on. This attitude was unnecessary since people were aware that LTC Hudson was an aviator by training. Nonetheless, every time I went to the SSC office, I could feel a definite mood of anxiety. While a soldier need not like the commander, he or she should at least have reason, other than rank, to respect their boss.

6. A MSG Ramseur came to my detachment during his investigation of LTC Epstein's EO complaint. He did not actively seek me out, but came to speak with my NCOIC, SFC Abbie G. Hall. Once I was aware of the reason for his visit to my SCIF, I purposely took him aside and told him that if I could sense that their were serious problems at the SSC because of LTC Hudson's behavior, then it must be bad. I was contacted by LTC Epstein in early March when he notified me that a field grade officer/investigator might contact me about incidents at the SSC. I never object to answering questions or helping someone do their job. However, it is now middle May, and I have yet to hear from anyone.

7. As I read the OER given to LTC Epstein by LTC Hudson, I do not recognize the officer it describes. PART V, Section C seems very misleading. It talks about an officer who "was tactless to the XO of the Chief of Staff... at least three times he disclosed privileged information to soldiers... issued uncoordinated guidance resulting in confusion." Never does LTC Hudson give specifics, facts, about these incidents, nor does he say that these actions were ever met with counseling or reprimands. As an officer who has had to give negative counseling statements, I realize it is not an easy thing to do, but it takes intestinal fortitude and a confidence in your beliefs to administer one. The negative statements combined with a rating of "3" on PART IV, a.8 DISPLAYS SOUND JUDGMENT, strike me as totally contrary to what I observed and heard. If LTC Epstein was so bad, why was he allowed to continue with complete access during a wartime situation? These comments by his rater smell of professional jealousy and personal dislike, rather than factual events. It 8is a personal disappointment to see that a COLONEL acting as senior rater would write negative things about LTC Epstein, when he was over 700 miles away and had very little contact with the SSC's everyday activities. Why did he place one LTC under another, and why did he let a "clash of personalities" go on so long?

8. I am now in reserve status, and can be contacted at:

    5938 Village Glen Dr., #235
    Dallas, TX  75206
    (214) 363-7151

               Diane E. Birdwell
               Diane E. Birdwell
               1LT, USAR

K-15




# DEPARTMENT of DEFENSE
## DEFENSE INVESTIGATIVE SERVICE

FILE NO:

> EPSTEIN LAWRENCE STEVEN
>
> M 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      49/04/01 36
> 90320-DS0-1590-103

# WARNING

MAR  2 1992

THIS FILE IS THE PROPERTY OF THE DEFENSE INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE DEFENSE INVESTIGATIVE SERVICE.

SPECIAL INSTRUCTIONS:

It is certified that the material in this file is being retained pursuant to DoD Directive 5200.27, DIS Regulation 20-2 and DIS Manual 28-2.

Date Acquired _____ 1991        Signature _Sbroke_

RETAIN FOR:   | 60 Days | 1 Year | 10 Years | 25 Years | Permanent |

*LR*

FOR OFFICIAL USE ONLY

DIS Form 3
85 Feb        Previous edition will be used until exhausted.

S-2

| FROM | DATE |
|---|---|
| Defense Investigative Service<br>Personnel Investigations Center<br>P.O. Box 454<br>Baltimore, MD 21203-0454 | MAY 24 1991 |

| TO | |
|---|---|
| | EPSTEIN LAWRENCE STEVEN<br><br>H 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        49/04/01 36<br>90320-DSO-1590-103 |

## NOTICE

THIS DOCUMENT, ACCOMPANYING REPORTS AND ATTACHMENTS ARE THE PROPERTY OF DIS. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO SUBJECT OR COUNSEL WITHOUT SPECIFIC AUTHORIZATION FROM DIS.        THIS TRANSMITTAL DOES NOT CONSTITUTE A DENIAL OR GRANTING OF CLEARANCE. FOLLOWING COMPLETION OF FINAL ACTION THIS FORM, ACCOMPANYING REPORTS WITH ATTACHMENTS AND ALL REPRODUCTIONS SHOULD BE DESTROYED. IF ADVERSE ACTION IS TAKEN AS A RESULT OF DIS INVESTIGATIVE ACTIVITY ADVISE: INVESTIGATIVE FILES DIVISION, PERSONNEL INVESTIGATIONS CENTER, DIS, P.O. BOX 1311, BALTIMORE, MD. 21203-1211.

## ITEMS CHECKED ARE APPLICABLE

|  | |
|---|---|
| | Results of investigation are attached. This matter is ☐ pending ☐ closed. |
| | Results of prior investigation, copy attached, should satisfy current requirements. |
| | DIS/DCII records reflect NAC/ENTNAC completed favorably on _____. |
| | OPI Form 79 was submitted to OPM. |
| X | Prior file no. 85274DE311811A2F    completed by DIS    attached. |
| | Prior file no. _____    completed by _____    attached. |
| | Reply received reference file no. _____ indicated:<br>____ No information pertinent to your inquiry.<br>____ File destroyed/missing.<br>____ File does not pertain to Subject.<br>____ Adjudicative material only. |

**REMARKS:**

S-3

| S REPORT OF INVESTIGATION | DATE 17 MAY 91 | L: 91037 |
|---|---|---|

CONTROL 90320-OSO-1590-1.3    STATUS RUC

RIBUTION    COPY TO

E BY /A M A. ZERYENICK, 0303, 0080, 1.69

| SOCIAL SECURITY NO. 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 | FORMER MIL SV. NO. | BIRTH (DATE) 01 APR 49 | (GPC) 36 | (PLACE) NEW YORK |
|---|---|---|---|---|

TITLE
EPSTEIN, LAWRENCE STEVEN/LTC, USAR-R

VESTIGATIVE RESULTS
R RECORD CHECKS AND INTERVIEWS, AS APPROPRIATE, WERE FAVORABLE AND
TERVIEWEES RECOMMENDED SUBJECT FOR A POSITION OF TRUST, ULESS OTHERWISE
DICATED.

CEPT FOR THE CONFIDENTIAL DATA SET FORTH IN THIS REPORT, PERSONS
D AGENCIES HAD NO OBJECTION TO THEIR IDENTITY BEING RELEASED TO THE SUBJECT.

PLOYMENT REFERENCES
    Gabriel L. Hudson, LTC, USA, Special Security Command (SSC), HQ Forces
ommand (FORSCOM), Ft McPherson, GA with daily contact as supervisor and with
cial contact one monthly at office functions including visits by Subject in
dson's home twice from OCT 90 to present, provided the following
formation. Hudson felt that Subject was not honest because he lied on
veral cases. Hudson said when the first phase of the air war started in the
dle East, Special Compartmented Information (SCI) was transmitted into
bject's area. The SCI was raw intelligence which had not been confirmed and
bject released it to the J-3 as confirmed SCI. When it was discovered the
CI had not been confirmed, Subject denied releasing the SCI. Also, Subject
aveled to Ft Benning, GA on business and took a female civilian with him.
dson asked Subject if he had taken care of the civilian's travel orders
ecause the civilian needed them before she could travel. Subject told Hudson
e had obtained travel orders for the civilian when in fact he had not. The
ivilian traveled without travel orders.

udson further stated that he did not feel Subject was loyal to him as
ubject's supervisor. Hudson said Subject would take privileged information
o soldiers under Hudson's command about whom the information concerned and
hus created racial incidents. Subject would tell soldiers that management
id not like blacks or females. Hudson does not know for sure; however,
elieves Subject has relatives in Israel. Subject is very touchy about being
ewish and is very intolerant to others' religions. Subject told Hudson he
ad been to Israel on religious trips. Hudson did not know if Subject
ompleted a military tour in Israel.

udson did not feel Subject was very stable saying that Subject was a very
ye 2 intense person who does not like to let system operate as it should.
nder pressure Subject becomes very nervous and shifts blame under pressure.

LASSIFICATION
FOR OFFICIAL USE ONLY

WARNING THIS DOCUMENT IS THE PROPERTY OF THE DEFENSE SERVICE. CONTENTS MAY BE DISCLOSE OFFICIAL DUTIES REQUIRE ACCESS MER BE DISCLOSED TO THE PARTY(S) CONCER AUTHORIZATION FROM THE DEFENSE INV

PAGE 1    MOH    MAE    CS    S-4

DIS REPORT OF INVESTIGATION

| CODE | CONTROL | DATE |
| --- | --- | --- |
| DA1AU | 90320-DS | |

| STATUS | |
| --- | --- |

| DISTRIBUTION | COPY TO |
| --- | --- |

MADE BY
S/A M A ZERYLNICK, 3403, USA, 393.

| SEX | SOCIAL SECURITY NO. | FORMER MIL SV. NO. | BIRTH (DATE) | (GPC) | (PLACE) |
| --- | --- | --- | --- | --- | --- |
| M | 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 | | 9? Apr 19 | | |

MI TITLE
EPSTEIN, LAWRENCE STEVEN/LTC, USAF-R

---

when things don't get done. Hudson said Subject became very critical and cannot take criticism. Hudson was not aware if Subject had received any psychological treatment or counseling for any reason, including disability. Hudson otherwise provided only favorable information regarding Subject, but did not recommend Subject for a position of trust with the US government because of questions about Subject's honesty, loyalty and integrity, as an officer. Hudson said that in a war-time situation he would use Subject, but if given the choice he would not chose Subject. Hudson stated he was willing, at a later date, to testify at a board or hearing and to execute a signed, sworn statement concerning the information he provided, if he is requested to do so at that time. (S/A R G Matchette, 0080 and S/A E T Rushton, 2369).

2. On 5 Mar 91, Corbett S. Coburn III, GS-12, Special Security Officer (SSO), US Army Special Security Command (USASSC), Forces Commdn, Ft McPherson, GA who who had daily contact with Subject as co-workers from OCT 90 to present was interviewed and provided the following information:

that overall he did not feel that Subject was honest nor in his opinion a trustworthy individual. Coburn recalled during the initial stages of the Desert Storm air war an intelligence flash message came into the office. At the time the information in the message contained only raw, unconfirmed intelligence. However, Coburn stated that Subject passed this intelligence to higher command authority as confirmed information. The higher command used this information to formulate plans which caused a problem. Coburn stated that when Subject was questioned about this Subject denied ever sending the information out as being confirmed. Coburn stated that several people in the office witnessed this incident. Coburn also did not feel that Subject was reliable nor did he appear to work well with subordinates. Finally, Coburn recalled that on one occasion Subject threatened an enlisted man at Ft Bragg, NC with an adverse action after the man provided Subject with some photos that Subject could not return because he did not want to approach. Coburn stated that the photos were not returned because he had gotten them from the captain by saying he was acquiring them for some reason Subject said he could not ... the black and .....

---

CID REPORT OF INVESTIGATION

| CODE | CONTROL | STATUS |
| --- | --- | --- |
| | 00320-05- | |

DISTRIBUTION

MADE BY
A M A STEVENSON, SA

| SEX | SOCIAL SECURITY NO. | FORMER MIL SV. NO | BIRTH (DATE) | (SPC) | (PLACE) |
| --- | --- | --- | --- | --- | --- |
| M | 118-   -    | | | | |

TITLE
BURSTEIN, LAWRENCE STEVEN

...Coburn could not ...
subject brought Prince into ... ... ...
... highly restricted area ... ... ...
into the BCIV.

Coburn stated that he was concerned about Subject's extreme interest in and concern for Israel.  Coburn recalled that Subject wore Israeli parachute wings on his uniform when on occasion, about three weeks ago, mentioned to Coburn that while he was in Israel (Coburn could not recall any specific dates) Subject met an Israeli general.  Coburn was not sure but thought Subject told him that the general was Chief of Staff of one of the military services.  Coburn stated he could not recall if Subject ever told him whether or not Subject had ever been contacted by Israeli military intelligence.  Coburn did not know if Subject had ever mentioned having any Israeli business connections.

...been to strike Israel. Subject told Coburn ... made phone calls to ... ... in Israel to make sure his cousins ...

Coburn said that it was his personal opinion, though he had nothing concrete to base this opinion ...

... resulting Subject having problems with alcohol, illegal drugs ...

... recommend ...
become necessary ...

| FOR OFFICIAL USE | | | | WARNING |
| --- | --- | --- | --- | --- |
| PAGE | | | | |

S.6

25

THIS REPORT OF INVESTIGATION                03 JAN 91

| CODE | CONTROL | STATUS |
|---|---|---|
| 014MM | 90320-DSO-1530-1DS | RUU |

DISTRIBUTION

MADE BY
S/A K O'BRIEN, 1671

| SEX | SOCIAL SECURITY NO. | FORMER MIL. SVC. NO | BIRTH DATE | EPI | PLACE |
|---|---|---|---|---|---|
| M | 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 | | 01 APR 49 | 36 | NEW YORK |

TITLE
EPSTEIN, LAWRENCE STEVEN/LTC, USAR ----------------------------------

INVESTIGATIVE RESULTS
THE RECORD CHECKS AND INTERVIEWS, AS APPROPRIATE, WERE FAVORABLE AND
INTERVIEWEES RECOMMENDED SUBJECT FOR A POSITION OF TRUST, UNLESS OTHERWISE
INDICATED.

EMPLOYMENT REFERENCES
1.  John P. McLaughlin, Retired, 10 Majestic St., Lincroft, NJ, with monthly
contact as supervisor from 1973 to 1977.  McLaughlin advised that he and
Subject were both attached to C Co., 1626th Military Intelligence Bn., USAR
Center, Bronx, NJ, and the whole battalion is now defunct.  McLaughlin stated
that it was rumored through their battalion that Subject was a strong
supporter of and possibly a member of the Jewish Defense League (JDL), a group
McLaughlin described as "radical, military" with strong connections to Israel.
McLaughlin stated he asked Subject a direct question regarding his rumored
connection with the JDL and Subject stated he was not involved with or a
member of JDL.  McLaughlin advised that he had no reason to doubt Subject's
veracity.  McLaughlin also reported that there were rumors of Subject having
connections or being a member of Israeli intelligence, specifically, the
Mossad.  McLaughlin stated that none of the rumors regarding Subject's
involvement with the Mossad or the JDL were substantiated.  McLaughlin advised
that the JDL was very strong in Brooklyn, especially on the campus of
Subject's college, Brooklyn College.  McLaughlin has no reason to doubt
Subject's loyalty to the US and did not believe the rumors regarding Subject.
McLaughlin provided nothing but favorable comments regarding Subject; however,
refused to recommend Subject for a position of trust because he has had no
contact with him since the 1970's and does not know anything about Subject's
present character.

------------------------------ END OF THIS DOCUMENT ------------------------------

| CLASSIFICATION FOR OFFICIAL USE ONLY | WARNING |
|---|---|
| | THIS DOCUMENT IS THE PROPERTY OF THE DEFENSE INVESTIGATIVE SERVICE. CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE DEFENSE INVESTIGATIVE SERVICE. |

PAGE 1    SJS    KO    RPD

DEPARTMENT OF DEFENSE — DEFENSE INVESTIGATIVE SERVICE
STANDARD SYSTEM DOCUMENT DIS FORM 1 (9-72)

S-7