IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE S. EPSTEIN          )
                             )
        Plaintiff,           )
                             )
        v.                   )          Case Number: 07-0688 (RMU)
                             )
PETE GEREN,                  )
Secretary of the Army,       )
                             )
        Defendant.           )
_____)

PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff-Epstein, by and through his undersigned counsel and pursuant to Fed. R. Civ. P. 56 and LcvR 7.1(h), cross-moves for summary judgment because there are no material facts in dispute and plaintiff is entitled to judgment as a matter of law. Submitted herewith is Epstein's memorandum of points and authorities in support of his cross-motion. Fairly contained therein is Epstein's opposition to defendant's motion. The Court is also directed to the following pleadings: Epstein's Opposing Statement of Material Facts as to Which There is No Genuine Issue; Plaintiff's stipulated Supplemental Administrative Record (4 volumes); Plaintiff's Exhibit A; Plaintiff's Appendix (Volumes 1-2); and Epstein's complaint. A proposed order is attached.

November 27, 2007                    Respectfully submitted,


                                    /s/  John A.Wickham, Esq.
                                    DC Bar No. 454863
                                    Counsel for Plaintiff Larry Epstein
                                    32975 Saint Moritz Drive
                                    Evergreen CO 80439
                                    303 670-3285
                                    wickham1@wispertel.net

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWRENCE S. EPSTEIN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case Number: 07-0688 (RMU) |
| | ) |
| PETE GEREN, | ) |
| Secretary of the Army, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff-Epstein, through his undersigned counsel, submits his memorandum in support of

his cross-motion for summary judgment.  Contained therein is Epstein's's opposition to defendant's

motion for summary judgment.  Filed herewith is Epstein's Opposing Statement of Material Facts

as to Which There is No Genuine Issue.  Filed separately by Epstein is the parties' stipulated

Supplemental Administrative Record.  See Def. Notice of Administrative Record (allowing exhibits

before the BCMR no longer in defendant's possession).  See Pl. Notice of Supplemental

Administrative Record.  Epstein also refers the Court to attachments Plaintiff's Appendix (Volumes

1-2), and the complaint.

Secondly, Epstein refers the Court to Plaintiff's Exhibit A.   This is the 2006 Press Release

by the Jewish War Veterans cited in the complaint at ¶ 39.  It is submitted to show the organization

has taken an official position in support of LTC Epstein.

Regulations:  A.Reg. 600-21 *EO Program* (1986), DA Pam 350-20 *Unit EO Training*

*Guide* (1994), Training Circular TC 26-6, *Commander's EO Handbook* (1992)  A.Reg. 600-20

*Command Policy* (1988,1999, 2006);  Field Manual FM 101-5 *Staff Organization and Operations*

(1997);  A.Reg. 27-10 *Military Justice* (2005);   A.Reg. 600-100 *Army Leadership* (2007);  FM 22-

100 *Army Leadership* (1999);  A.Reg. 635-100 *Officer Personnel Separations* (1989), A.Reg. 604-

5, *Personnel Security Clearance Regulation* (1988).

1

<u>Acronyms</u>  The Administrative Record is AR or SupAR. Army Regulation, A.Reg.  FM (Field Manual).  OER (Officer Evaluation Report).  LTC (Lieutenant Colonel).  DIS (Defense Investigative Service, conducts security background investigations to protect classified information). SSO (civilian Special Security Officer, manages operations of Sensitive Compartmented Information Facilities).

## STATEMENT OF FACTS

The Court is respectfully directed to Epstein's's opposing statement of material facts that contain his objections and additions to defendant's statement of facts.   The remainder of pertinent facts are contained within the body of Epstein's's memorandum below.

## BACKGROUND

**I.  Due Process for the adverse "referred OER" and its subset the relief-for-cause report**

A.  <u>General</u>.

All OERs that are completed— whether favorable other adverse— undergo final "review." This is normally accomplished by the senior rater.  It includes making sure other rating officials have complied with the regulation, and that evaluations are examined so that "discrepancies are clarified or resolved."  Def. Appx, A.Reg. 623-100 ¶ 3-14a.  The review functions vary somewhat in the category of derogatory OERs called "referred reports."   This means that after the adverse report is initially completed it is referred by the senior rater to the rated-officer for acknowledgment and opportunity for comment.  <u>Id</u>  ¶ 4-27, 5-28 ("Exceptional Processing Procedures").  If after referral the senior rater (as reviewer) determines the officer's comments provide "significant new facts" that could change the rating, the report may be returned back to other ratings officials to reconsider.  The senior rater "will not pressure or influence" the other rating officials.  <u>Id</u> d 5-28*d*. If the report is changed but is still derogatory, it must be referred back to the rated officer.

**B.  The relief report**

Relief reports are a subset of referred-reports when the rated officer is relieved-for-cause. A relief report is within the two categories of "mandatory reports." The first category requires that the rated officer complete at least 90 days. Id at 18-19 (**Section I— 90-Day Minimum**, *e.g.*, change of rater, change of duty, annual, etc). A relief report falls within the second category. Id 19-20 (**Section II– Other than 90-Day Minimum**, *e.g.,* initial tour on active duty, officer reported missing, relief for cause, or Army-directed). There is a third category of "optional reports" but does not include a relief report. Id ¶ 5-20.

The second category, or "section II," mandatory reports are required to follow what is termed a "basic rule:"

> Reports <u>must be prepared on the following occasions</u>. Specific time requirements, if any, are listed with each <u>condition causing</u> a report to be written.

<u>Id.</u> ¶ 5-13 ("Basic rule")[emphasis added].

Thereafter under this category II report, the Army defines the occasion or condition causing a mandatory relief report:

> A [relief] report is required when an officer is relieved for cause .... defined as an early release of an officer from a specific duty or assignment directed by a superior and based upon a decision that the officer failed in his or her performance of duty. In this regard, performance of duty consists of completion of assigned tasks in a competent manner and compliance at all times with accepted professional officer standards shown in part IV ["Professionalism"].[1]
> * * *
> The relief of an individual for cause is one of the most serious steps taken. It is <u>preceded by formal counseling</u> by the commander or supervisor unless such action is not deemed appropriate under the circumstances.

A.Reg. 600-20 (1988) ¶ 2-15[emphasis added]. The minimum standards to meet the counseling requirement are stressed in order to provide for clarity and specificity:

> The rating officials greatly affect a rated officer's performance and professional development. Thus these officials <u>must insure that the rated officer throughly understands</u> the organization, its mission, [their] role in support of the mission, and all the standards by which [their] performance will be judged.

A.Reg. 623-105 ¶ 4-2a (Role rating official)[emphasis added]

---

[1] A.Reg. 623-105 ¶ 5-18a.

**C.  OER polices applicable to preparation and review of all reports**

1.  The phrase noted above. that OER reviewers must resolve or clarify "discrepancies," is not defined.  OERs in general must not  be "illegal, unjust, or otherwise in violation of this regulation." A.Reg. 623-105 ¶¶ 3-15, 5-30.   Each senior rater/supplemental reviewer

> must examine the entries on [OERs] to insure that objectivity and fairness have been maintained....[and] keep in mind the interests of both Army and the rated officer. * * * Insure subordinates write [reports that] are complete and provide a realistic evaluation.

Id ¶ 1-6*a*.(7). Id ¶ 3-12*f.* (respectively).

2.  Prohibited comments are "the use of inappropriate or arbitrary remarks about race, religion, or color" as outlined in the Army's Equal Opportunity policies.  Moreover, below the objective level grading, "subjective evaluation must not reflect a rating officials' personal bias or prejudice.  ¶ 4-21.1  Officers serving as the EO Officer will not be given unfavorable ratings in retaliation for criticism of command policies and practices.  Id ¶ 4-24.  This warning certainly applies with equal force to rated officers not serving in that capacity but who make an EO complaint.  Pl.Appx. 2, A.Reg. 600-21 *EO Program* (1986) ¶ 2-8 (when evaluating personnel, rating officials will consider the extent and effectiveness of leadership and support in EO matters); ¶ 2-12a.(2)(command training will focus on behavioral characteristics and other indicators of EO problems, and importance of promoting a healthy EO climate).

The Army "Command Policy" regulation, A.Reg. 600-20 (1988), contains its own EO policy that mimics the EO policy in A.Reg. 600-21.  It does not define discrimination, but subsumes it within the Army's broad EO policy goal as two categories ¶ 6-3a: "provide equal opportunity and treatment for soldiers without regard to race, color, religion, gender or national origin," and  ¶ 6-3b "soldiers will not be accessed, classified, trained, promoted or otherwise managed."  These categories describe offensive behavior, conduct or treatment, and personal discrimination, and institutional discrimination.   Lastly, the command policies provide procedures to accommodate the

religious practices of soldiers— "the Army places high value on the rights of its soldiers to observe the tenets of their respective religions." Pl.Appx 46, ¶ 5-6. This high value expressly extends to include "accommodations for religious dietary practices." Id 46 ¶ 5-6h.(2).

There are EO training companions to the Command Policy regulation. They set forth lesson plans for use at unit level. They are issued in both a recurring "training circular" and permanent pamphlet. Pl.Appx 33-41, TC 26-6, *Commander's Equal Opportunity Handbook* (1991); Id 29-32, DA Pam 350-20 *Unit EO Training Guide* (1993). The training circular describes "barriers to cultural interaction" as behaviors which constitute racist or sexist in nature listing "ethnic racist, jokes." Id 37. It defines the characteristics of discrimination as including "discriminatory/ethnic or racial slurs * * * [or] direct and indirect institutional discrimination." Id 38-39. Finally, if prejudice and discrimination are not identified, the results on a unit "can have devastating impact on mission effectiveness and morale." Id. 40-41. Similarly, the Pamphlet offers a lesson plan to identify issues of racial and ethnic differences: "if we are not sensitive to their importance, they can have an adverse impact on unit cohesion and readiness." Id ¶ 14-2. This is emphasized

> The branches of the American military service are probably the most culturally, ethnically, and racially diverse organization in our country. ....Therefore, leaders who are aware of the cultural and racial differences of the soldiers assigned to their unit, are better able to develop and maintain unit cohesion.

Id 32 ¶ 14-3.

In 1999, the Army regulatory provisions governing command EO policy stated that "significant deviations" from a commitment to eliminate unlawful discrimination must be documented— "documentation includes appropriate in administrative, disciplinary or legal action to correct inappropriate behavior." Pl.Appx 5, A.Reg. 600-20 ¶ 6-3c. The 2006 verison of the same regulation defines "unlawful discrimination" not just as actual practices with intent to discriminate but from insensitive speech that disparages or belittles:

> c. Definitions  * * *
>
> (2) *Disparaging terms*. Any action used to degrade or connote negative statements pertaining to race, color, gender, national origin, or religion. Such terms may be expressed as verbal statements, printed material, signs, symbols or posters. The use of these terms constitutes unlawful discrimination.

Pl.Appx. A.Reg. 600-20 (2006)¶ 6-2c [emphasis added]. The unlawful nature of "disparaging terms" is comparable to the well established prohibition in OERs of "inappropriate or arbitrary remarks about race, religion, or color." These two administrative standards are measured from the more serious military offense of "reproachful, provoking speech or gestures," punishable by court-martial. 10 U.S.C. § 917 (Article 117, generally means when a reasonable person would expect such actions to induce a breach of the peace). This Article 117 and related speech offenses are encompassed within all EO inquiries. Pl. App. 2, A.Reg.600-21 (1986), ¶ 2-6b, if during informal EO inquiry the investigator suspects UCMJ violation under Article 117 *inter alia,* the inquiry will terminate to notify commander for criminal action).

With respect to disparaging remarks as constituting unlawful discrimination under ¶ 6-2, the prior 1986 EO policy and 1991 version of OER policies are not inconsistent. Both prohibit as examples of unlawful discrimination the inappropriate and arbitrary remarks or speech. They violate *per se* the "equal treatment" policy goal because of adverse impact on mission effectiveness, unit cohesion, and readiness. Moreover, the 2006 explanation page entitled "summary of changes" does not mention ¶ 6-2 from prior issues. Pl.Appx. 6A. In sum, to constitute unlawful discrimination, it is enough to use disparaging or arbitrary remarks without additionally showing they resulted in denial of a some other benefit like promotion, assignment, or other favorable personnel action.

The prohibition on disparaging terms or arbitrary remarks, has been officially interpreted by an U.S. Army base to mean that language in which a reasonable person would find offensive or prejudicial, including jokes, slurs, gestures or innuendos. The behavior

> is not excused even if the offender considers the remarks only a joke or jest. This is particularly unacceptable when the offender is in the chain of command...Do not consider this kind of behavior as being of minor consequence. It is improper and can lead to complaints of harassment and/or discrimination that under the circumstances may have an adverse impact on the entire organization.

PlAppx. 48 (Fort Lee, Commander's EO Handbook, 2004, ¶ 2-8b)[emphasis added].

Related to the category of OER prohibitions are evaluations by rating officials who become *per se* disqualified or ineligible after substantiated findings against them brought by the rated officer. This particular circumstance raise a fundamental concern that begs the perception of

unfairness and injustice— the inherent potential for bias or reprisal from a conflict-of-interest. A.Reg. 623-105 ¶ 5-30b.(1)(a) (report has serious irregularities or errors from an unqualified rating official who had substantiated findings against them from an official investigation). This is consistent with another provision, in that an official investigation runs afoul of any objective measure that an evaluation "must not reflect a rating officials' personal bias or prejudice." ¶ 4-21.1 Moreover, an official EO investigation renders inadequate the perfunctory advice to raters not to give unfavorable ratings "in retaliation for criticism of command EO policies. Id ¶ 4-24.

When any soldier presents an EO complaint, the command may decide whether to investigate the matter at the lowest level within the command, or appoint a disinterested investigating officer outside the command. The former is called caused an "informal inquiry into the allegations to determine if they have merit, and if so assist the commander in resolving the complaint at the lowest appropriate level." Pl.Appx. 2 (A.Reg. 600-21, *EO Policy*, ¶ 2-6b, also referred to as "informal investigation or fact finding inquiry"). If after resolution or facts indicate a formal investigation is warranted, a disinterested officer may be appointed outside the command. Id ¶ 2-6c.

There is no distinction in the regulations that the EO "informal inquiry" by an Army commander is not considered "an official investigation" within the meaning of A.Reg. 623-105, ¶5-30b.(1)(a). Rather, the EO procedures only state that the choice of processing a complaint is the commander's responsibility whether to resolve it at the lowest level. Pl.Appx. 2 ¶ 2-6b. This is relevant— Epstein in March 1992 requested a OER Commander's Inquiry alleging the report and adverse comments therein, were a reprisal after the rater became disqualified under ¶ 5-30 to write his adverse OER. Comp.¶¶ 26, 30. This relied on Epstein's prior EO informal inquiry *against* his rater that was substantiated in part and required remedy. Remedy included (before the OER was written) the rater receiving a written admonition for "remarks of an insensitive and inappropriate nature to Epstein," and overall insensitivity to "ethnic and minority factors." The admonishment addressed remedial actions to both these issues. Sup.Appx. 1.

However, the later 1992 OER Commander's Inquiry dismissed the ¶ 5-30 disqualification by equating EO informal inquiries as "*unofficial* investigations." Id 5 ¶ 2b [emphasis added]. But

see <u>Black's Law Dictionary</u> 978 (7th ed 1979)(official act: "one done by an officer in his official capacity under color of an law and by virtue of his office; an authorized act.").

       3.  <u>Forwarding completed and correct OER reports</u>.  Only when reports are complete are they forwarded to unit personnel officials.  These officials review the OERs to insure "reports are complete and administratively correct."  A.Reg. 623-105 ¶ 5-36*c*.  Only then is the report forwarded for final review at the Headquarters Department of Army, Commanding General, Total Army Personnel Center [TAPC].  The CG is the executive agent of the Army Secretary, and will "exercise final review authority on all evaluation reports."  The CG, TAPA is responsible for the final gate-keeping role:

> Correcting or returning to rating officials reports that may be in error or may violate provisions of this regulation * * * [the CG] will direct the rendering of reports when circumstances warrant. . . .

A.Reg. 623-105 ¶ 1-8.  In sum, if the forwarded OER is incomplete, in error, or violates the regulation, filing in the officer's personnel record is prohibited.

    **D.  Substantive due process differences in completing and reviewing a relief report**.

    The OER due process afforded the relieved officer is not simply duplicated in the same manner from the garden variety adverse report "referred" for comment.  The process may be grouped into four additional functions under either "special instructions" or "supplementary review."  <u>Id</u> ¶ 5-18 *b-e*; ¶ 3-13*b*(3).

    *Special instructions:*

    *(1)*.  <u>Notice of reasons</u>.  The report must identify the rating officer who directed the relief. That official "will clearly explain the reason for the relief" in the OER's narrative section.  The official "will also state that the rated officer has been notified of the reason for the relief."  <u>Id</u> ¶ 5-18 *b*(2).  To make sense, this notice must have occurred before the OER is completed.  Once completed (with senior rater's evaluation), it is referred back to the rated officer for comment.

*(2).*  Recommendation.  The relief report must be marked to reflect a recommendation of either "Do Not Promote" or "Other."   The latter requires an explanation and reasons "in view of the action to relieve." Id ¶ 5-18*b*(1).

*(3).*  Other rating officials must investigate to express dissenting opinion.  Rating officials not directing the relief "must evaluate" the OER to determine whether they agree with the relieving official, and if not, may non-concur. Id. 5-18*e*.  Requiring such rating official to investigate other raters' evaluations adds another layer of review: it goes beyond the narrow focus on their own assessment of the rated officer's performance or potential.  Id ¶¶ 3-6d, 3-9a (rater and intermediate raters assesses performance), ¶ 3-12 (senior raters assess ability and evaluate potential).

Once again, one cannot perform this critique unless the relieving official already completed and presented their portion of a relief report.  Moreover, this critique effectively imposes an investigative function on other rating officials *before* the report is completed and referred to the relieved officer for comment.  Although the extent of this investigation is not defined, it logically means fulfilling the same tasks as the "supplemental reviewer" of a relief report— verify derogatory information is true, insure the relieving official fully explains and justifies the reasons for relief, insure that formal counseling occurred, and that notice of the reasons to the rated officer.  And finally, after the completed relief-report is rebutted by the rated officer, each rating official not-directing the relief must again revisit this dissenting function.

*Supplementary review*

*(4).*  Reviewer's statement of compliance, or non-compliance with objections in enclosure. Before the review, the relief report must be referred to the rated officer for comment.  All relief reports will then be reviewed by the first Army officer senior to the person directing relief.  If the rater directs relief, the senior rater performs the review.  Id ¶ 3-13b(3), ¶ 4-28.  If the reviewer "is satisfied the report is clear, accurate, complete, and fully in accord with the regulations he or she will indicate that the report complies with this regulation." Id. ¶ 5-29c.  However, if the reviewer finds the report is "unclear, contains errors of fact, or it otherwise in violation with this regulation, he or she will return the report....indicating what is wrong."   During this time, the senior rater "will avoid all statements and actions that may influence or alter an honest evaluation by the rater." Id.

9

[emphasis added].  If the corrected report is still not satisfactory to the reviewer, or other rater disagrees with the changes, the reviewer "will indicate objections by adding an enclosure to the OER." Id. ¶ 5-29c.(4). The  acceptable objections are limited to a list— whether the facts fully explain and justify the reason for relief, derogatory information is verified, the OER is properly prepared, and referral comments considered.  Id ¶ 3-14b.

The enhanced standards for supplemental review of relief-reports under ¶ 3-14b are favorably compared with the routine senior rater's review for all non-relief OERs — evaluations merely "examined and discrepancies are clarified or resolved * * * [insure they] are complete and provide a realistic evaluation." ¶ 3-14a, ¶ 3-12f (called "rating chain review").

The routine "rating chain review" standard is not enhanced by the referral procedures, under ¶ 5-28.  If the rebuttal comments provide "new and significant facts...that could affect the rated officer's evaluation [the senior rater] may refer them to other rating officials" who may in turn reconsider their evaluations.  Even then, "the senior rater will not pressure or influence them." 5-28d [emphasis added].  In other words, even referral by the senior rater of significant new facts is optional.

Beyond referred processing, the reviewer of relief-reports is obligated to additionally conduct an independent inquiry whether to express a dissenting opinion.  That substantive inquiry, as already set forth, must verify truthfulness of every derogatory fact, and insure the relief is explained and justified, then must indicate "compliance."   Where this inquiry reveals errors of fact or other violations, the reviewer "will return the report." ¶ 5-29c(2) [emphasis added].  The reviewer can influence or pressure the relieving official to alter an evaluation if some aspect is not honest— i.e., derogatory information not verified, facts misrepresented or untruthful.  Even where the dissenting reviewer does not influence the relieving officials, the reviewer "will indicate objections" by adding an enclosure.  Id ¶ 5-29c.(4).[2]  So, whereas other dissenting rating officials

---

[2] As set forth supra even before the relief-report is completed, other rating officials not directing the relief (here the senior rater) "must evaluate" whether they disagree.  While a dissenting rating official "may" non-concur, a dissenting reviewer must separately state objections.

not directing the relief  must evaluate and "may" non-concur, a dissenting reviewer must separately

state objections.

The underlying intent for the differences between processing of referred and relief OERs is

expressed in the cautionary Army policy— relief of an individual "is one of the most serious steps

taken." A.Reg. 600-20 ¶ 2.15.


### E.  Relief from any command position

A final due process requirement exists under Army command policy.  Army Regulation

600-20 ¶ 2.15 [emphasis added], broadly states that

> action to relieve an officer from <u>any</u> command position will not be taken until after written
> approval by the first general officer in the chain of command of the officer being relieved.

This phrase does not otherwise qualify in any way the definition, or restrict its context—

i.e., that the relieved officer must be <u>the</u> sole and only commander of the entire unit or organization.

Rather, it appears on its face to apply to any officer filling a command-designated "position."   And

presumably they are granted some command authority "that involves direction and control of other

soldiers."  Pl.Appx 17, FM 22-100 *Army Leadership* (1999)(command authority involves direction

and control of other soldiers.).  <u>See</u> <u>Blacks' Law Dictionary</u> 86 (7th Ed 1979)("any" defined as "an

indefinite number, of whatever kind or quantity; does not necessarily mean only one person, but

many have reference to more than one or many").

Clarification from other Army sources indicate that an officer in the position as deputy or

assistant commander qualifies under ¶ 2-15.  An otherwise narrow focus on ¶ 2-15 in isolation and

torn from the whole of Army regulation and policy, is a "formula for disaster that nullifies another

[provision] on the same subject."  <u>Smith v. Brown</u>, 35 F.3d 1516, 1522-23 (Fed.Cir.1994).  By

giving full reference to certain laws that fit most logically and comfortably into in the context of the

whole body of law, <u>Smith</u> relied on Supreme Court decisions on how to interpret two clauses within

one statute, and statutes on the same subject:

> The court will not merely look to a particular clause. . .but will take in connection with it the
> whole statute (or statutes on the same subject) and the objects and policy of the law, as
> indicated by its various provisions, and give it such a construction as will carry into
> execution the will of the legislature.

11

Smith at 1523.   That court therein rejected the government's statutory interpretation that sliced up phrases while ignoring their context because it left the remainder "mere surplusage, entirely without meaning." Smith at 1524, quoting  Marbury v. Madison, 5 U.S. 1 (1803).

Army sources conclude that the terms "deputy or assistant commander" are used for a deliberate reason— they occupy "unique" positions because they are delegated command functions. This includes issuing orders to direct and control the staff.  Id 9, FM 101-5, *Staff Organization and Operations* (1997)("deputy or assistant commander extends the commanders span of control); Figure 2-2 (shows that deputy commander as separate from staff); Id 11-12 (relationship between deputy/assistant commander and the staff is unique; they give orders to the staff within the limits the commander prescribes).  One example, is that only the deputy commander may be delegated certain disciplinary powers to punish soldiers.  Pl.Appx. 14, A.Reg. 27-10 (2005) ¶ 3-7c(1) (any commanding general may delegate powers under Article 15, UCMJ, to an officer "actually exercising the function of deputy or assistant commander").   Another example comes from the duties of senior Army leadership under regulation— it lists jointly both a commanding general and deputy commanding general as providing "command and control" functions.  Pl.Appx. 16, A.Reg. 600-100 *Army Leadership* (2007) ¶ 2-9 (Commanding General of Army Accessions Command and Deputy Commanding General of Initial Military Training will provide "command and control of the recruiting and initial military training...").

Finally, the prior approval rule looks to the first general officer "in the chain of command of the officer being relieved."   A "staff officer" is never within the "chain of command." Because a deputy commander is defined as not a staff officer, they fall within the ambit of the chain of *command*.  Pl.Appx. 3, A.Reg. 600-20 (1986) ¶ 2-1 (the "command channel" does not include staff officers and administrative NCOs not in the chain of command).

Moreover, the logical selection of the name as a deputy "commander" — versus executive officer or chief of staff — is to precisely differentiate command from staff functions.  It appears that the underlying intent for the "prior written approval" rule to involve a general officer is the potential disruptive impact of a relief on unit functioning— by suddenly removing officers who are

granted command authority to direct and control other soldiers. Therefore, using terms like deputy "commander" is not mere surplusage, entirely without meaning.

## II.     Epstein is Entitled to Summary Judgment

The Standard of review for correction of military records, and evaluation reports.

Defendant skews the case law to scare the Court away by erecting a nearly impossible threshold of review. Defendant implies that to prevent the courts from becoming a runaway appellate forum "for every soldier" dissatisfied over their ratings, that "only the most egregious agency action does not satisfy [the] very deferential standard of review." Def. Mem 3-4, citing Cone v. Caldera, 223 F.3d 789, 793 (D.C.Cir. 2000), and Kreis v. Sec'y of Air Force, 866 F.2d 1508,1515 (D.C.Cir. 1989).

This is not the correct standard. First of all, both these courts' remarks were addressing their inability to correct records when BCMR denials had relied on unlimited discretion not involving any objective standards under statute or regulation. As a result, the denials did not offer any judicially ascertainable standards to measure compliance.

First, the court in Kreis in *dicta* was addressing the unique situation where a BCMR (that removed an adverse evaluation report) considered it unnecessary to set aside a promotion non-selection, presumably because there was "lack of harm." Id (in that circumstance "it is simply more difficult [for a court] to say the Secretary acted arbitrarily...than it is if he is required to act whenever a court determines that certain objective conditions are met."); see McDougall v. Widnal, 20 F.Supp. 2d 78, 82-83 (D.D.C. 1998)(unlike plaintiff in Kreis who claimed removal of adverse records voided his non-promotion, McDougall is not asking for retroactive promotion but correcting his records).

Similarly in Cone, the district court interfered with the Secretary's discretion because "a court lacks the special expertise needed to review officer's records and rank them on the basis of merit [citation omitted]..." Id 795. There were no objective standards to apply:

13

[a]lthough the district court found the regulations do not mandate that each senior rater maintain [peer potential rankings] in a bell-shaped-curve distribution, it nevertheless found the ranking arbitrary and capricious....after undertaking [its own] a statistical analysis.

Id 792.

This is not the concern in Epstein's modest claim. The Army OER regulation sets forth standards of objectivity, completeness, and fairness, along with special instructions for relief reports. An additional issue is that the rater twice became *per se* disqualified— Epstein's removal and evaluation were completed after his substantiated EO complaint against his own rater for disparaging remarks (constituting unlawful discrimination), and after the rater was officially admonished, and with the referral process after the second formal EO investigation. And yet the rater was given *carte blanch* to fire then adversely evaluate Epstein, followed by savage defamation before the DIS as an Israeli spy, sexual pervert, and sociopath.

On these two procedural issues, his OER is subject to judicial correction or voidance under the traditional APA agency standards. Dodson v. Dep't of Army, 988 F.2d 1199, 1206 (Fed.Cir. 1993)(removal of one adverse NCO-ER did prejudice soldier's consideration by discharge board under objective standards of AR 623-105 that stated "if a report is low or compares unfavorably with those of his peers, it is fatal to his chances of selection"); Taylor v. United States, 33 Fed.Cl. 54, 59 (1997) (soldier's adverse records are subject to judicial correction under regulatory standards that require objective, substantially fair and complete).

In cases analogous to Epstein, courts have applied regulatory standards to the facts to find military raters and superiors had improperly classified duty evaluations or orders. Bond v. United Stated 47 Fed.Cl. 641, 649-50 (2000)(court may inquire whether underlying reasons for assignment orders were properly classified as "for training" or "for support of active duty mission"). Muse v. United States, 21 Cl.Ct. 592, 611-12 (although OER was not technically labeled an adverse report to allow referral comments, the derogatory ratings made it "nevertheless adverse in fact" thereby

**A.  To save the agency decision, defendant improperly supplies a harmless error rationale that is not provided by the BCMR**

The BCMR's decision is barren of detail on the issue of relief reports and their procedure.  It never even mentions the word.  Nor can one find any procedural citations involving relief-for-cause OERs.  The government attempts to salvage the BCMR's failure to explain why it denied the claim.

First, defendant struggles to present the BCMR's boilerplate and generic quotation as its explanation *sub silentio*:

> The ABCMR set out plaintiff's argument that he had been improperly relieved in the introductory section of its opinion:  "[t]he the bottom-line issue in this case is. . . . **whether or not [the report] was rendered in accordance with applicable regulations in effect at the time**."

Def. Mem 6-7 [emphasis in original], quoting AR 10 ¶ 8.[3]

Next, defendant's counsel spends considerable time supplying its own argument to fill in the Board's silence.  Litigation counsel tries to deflect this dilemma by assuming *arguendo* that if the OER report was mislabeled, it was harmless error.  Defendant argues that there is no substantive due process differences, or material processing impacts, between routine referred reports and relief reports.  So as defendant states, "the only thing that would have changed is that the OER would have stated it was a relief-for-cause OER."  Def. 9.  But defendant's counsel or a reviewing court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." Dickson v. Rumsfeld, 68 F.3d 1396, n. 16 (D.C.Cir. 1995)(citing  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) and  SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).  It is only *after* defendant tries filling in the holes in the Boards' decision, that its litigation counsel pastes legalese that the Epstein's claim was by the agency:

> carefully considered....thoroughly reviewed....exhaustively examined....set out in details the facts....well reasoned and supported by the evidence."

Def. Mem. 5, 6, 7, 13.

---

[3] Defendant is also incorrect that this is the "introductory section" of the agency decision.  The quote appears on page the concluding 9, the last of its 10 pages.  The only thing following is "in view of the foregoing there is no basis for granting the applicant's request."

Epstein's litigation claim is unlike in <u>Calloway v. Brownlee</u> where it was uncertain if plaintiff before the BCMR raised the same issue. <u>Id</u> 366 F.Supp.2d 43, n. 9 (D.D.C. 2005). Moreover, the defendant there argued that the issue was never raised. That court deferred to protecting that *pro se* soldier-applicant with a remand to reconsider the new claim. <u>Id</u> at 55. In Epstein, the issue of a mislabeled relief report that was dressed-up as a change-of-duty was clearly raised before the Board. AR 25-26 ¶¶¶ 2, 3, 6 (applicant's BCMR brief, "applicant's illegal summary relief without due process"). The defendant does not disagree. Def.Mem. 6-7.

### (1). The BCMR's inference is unsupported by evidence that the rater's attempted relief of LTC Epstein was disapproved

Unlike in <u>Calloway</u> where the BCMR never addressed the relief claim, remand here is unnecessary. The BCMR's path can be discerned why it avoided detail on the relief issue. The Board invents facts that the rater wanted to relieve LTC Epstein but this was disapproved, albeit by some unknown higher authority. AR 10 ¶ 5 (applicant continued to undermine rater's authority "accordingly the rater <u>sought to have</u> him removed from the unit [emphasis added]."). The BCMR infers *sub silentio,* a secret agreement to still fire Epstein but issue a change-of-duty report. This is fiction. There is no evidence in the record to support the story line. There is nothing in the EO inquiry, EO investigation, commander's inquiry, or OSRB testimony, to indicate an attempted relief was disapproved. The BCMR in an evidentiary vacuum blindly looked at the type of report from Part I "Reason for Submission" then presumed a change-of-duty OER was correct. AR 9 (referring earlier to A.Reg. 623-105, ¶¶ 3-57 and 6-6, that OERs accepted for filing are presumed administratively correct.). Defendant points to nothing else to help the BCMR, and merely states it "does not concede" that a relief occurred. Def.Mem. 10.

### (2). Defendant applies the wrong standard of review for the harmless error test

With the BCMR no longer bothered whether relief procedures, it embarks on an irrelevant detour— whether Epstein should have received a better OER. AR 10 ¶ 8 ("whether contested

report properly reflects his performance and potential during the period"). With this different

inquiry, it applies the wrong administrative standard of review for the relief issue. It relies on the

nearly impossible appellate threshold to "alter or withdraw" already filed reports:

> [A]n OER accepted by HQDA is presumed to be administratively correct.... Requests that an accepted OER be altered, withdrawn or replaced will not be honored. An exception is granted only when information which was unknown or unverified is brought to light and...is so significant that it <u>would have resulted</u> in a higher or lower evaluation.

AR 9 [emphasis added].

The BCMR here is using the analogous "but for" legal test. In other words, but for the error

of a rating official unaware of significant information, the evaluation would have been better. <u>Cf</u>

<u>Sanders v. United States</u>, 594 F.2d 804, 814-816 (Ct.Cl. 1979) (where "but for" an inaccurate OER

in officer's record, he would have been favorably selected for promotion). In other words, Epstein

would have to show a direct causation that 'but for' the procedural and processing errors of not

labeling the OER a relief report, it would have resulted in a favorable OER. Because that is the

same standard the BCMR applied in its inquiry, defendant's counsel makes the same mistaken to

argue harmless error. Def. Memo 9 (*arguendo* if Epstein had been relieved, then the only change

was that his OER "<u>would have stated</u> it was a relief-for-cause OER, a result more adverse

[emphasis added]").

Because the issue here is procedural error under a harmless error test, the BCMR and

defendant improperly carry-over to this forum, the test to alter already correctly filed OERs.

Because Epstein below establishes that a procedural error or violation occurred, he need only raise

*prima facie* evidence that this "may have been contributory" to the accuracy of his OER.

Specifically, whether it may have been contrary to insuring the OER policy goals are met of

"maintaining objectivity and fairness...[and] that the report is complete and a realistic evaluation."

When the BCMR and defendant applied the wrong standard, it "slams shut the courthouse door to

review military board actions....no matter how such boards might abuse their discretion or violate

their regulations." <u>Sanders</u> at 814.

**B. LTC Epstein was entitled to Relief OER due process under the 'basic rule' prescribing the conditions that cause that mandatory report.**

1. On March 5, 1991, he was released early from duty based on the rater's decision alleging failure to comply with professional standards of loyalty, integrity, and performance, after he was unable to heed counseling to improve.

At the outset is the rater's derogatory narrative, alleging performance failures after counseling was ignored, as the cause for the summary release. Secondly, the release occurred the day after the informal EO investigator said Epstein should be "reassigned, and if not possible removed from active duty." Supp.AR 12-13 ¶3b(9)(Mar 4 EO report); AR 43 (OER ending Mar 5). The rater adopts the adverse EO conclusions in the narrative. Even the BCMR chimes in to support the rater. AR 10 ¶ 6 (Epstein disobeyed orders of his commander and undermined his authority). These circumstances or conditions triggered a relief report and its attendant exceptional processing. Epstein was fired by the rater but the report was improperly processed as a change-of-duty. His rating officials' discretion was limited on how to characterize the mandatory reporting circumstances under AR 623-105, ¶ 5-18.

Third. It is nonsense to suppose that later promotion boards or personnel managers would interpret the OER as accompanying a routine duty change in due course. It was an adverse Referred OER so will have an adverse career impact. Epstein was not given a second chance to recover or rehabilitate the alleged failed performance.

Fourth. Paragraph 5-18 defines relief as "early release based a decision that the officer failed" in performance, meaning completion of tasks competently and compliance at all times within accepted professional officer standards. The report said Epstein "as a result" of a failure to heed counseling, was reassigned after repeated failures in performance, loyalty, and integrity.

Fifth. The rater then unleashed a tsunami of incompetence— no military experience, no tact or people skills, seriously degraded morale and esprit de corps of the soldiers and the command, and caused extreme embarrassment to the command. This is a wholesale indictment of Epstein's fitness as an officer, let alone as a LTC in the intelligence field. The rater sarcastically implies that while Epstein lacks "interpersonal skills" he does have superb knowledge of

machinery, i.e., "computers and ADP equipment."  This is not associated with commissioned officers, but sociopaths.

Sixth.  The rater then carried out with uncommon zeal the other EO recommendation to boot Epstein from the Army, and destroy his character.  When the OER was being completed, the rater conspired with his unit's civilian "senior security officer" (SSO).  They relied on the OER evaluation to exaggerate the accusations of disloyalty, dishonesty, and strange behavior.  They did not use the proper procedure to involuntarily release a reserve officer from active duty.[4]

Instead, the rater and SSO used Epstein's pending renewal of his Top Secret security clearance to expand a criminal DIS investigation.  The DIS routine renewal investigation began in January 1991 and was completed by May 1991.  But the clearance was held up for another six months until October 1991.  Sup.AR 23-26 (DIS interviews Jan-May 91);  AR 144 (Oct 91).  The palpable intent of the rater and SSO against LTC Epstein—a military intelligence officer— was to "damage his career."  They suggested he was an Israeli government spy, homosexual, sexual pervert, and psychologically unstable.  AR 65-66, 67 (findings of Formal EO Investigation).  The rater lied to the Formal EO investigator asserting no "derogatory statement" was made to the DIS questioning LTC Epstein's loyalty. Sup.AR 23-24 (rater telling DIS agent that Epstein was not honest on several cases during the war; released intelligence data, has relatives in Israel; was not very stable, did "not recommend him for position of trust with the US Government because of questions about his honesty, loyalty, and integrity as an officer").

Epstein was the investigated by the DIS for military treason as a possible Israeli-US intelligence double agent — a UCMJ war-time offense punishable by death.  They then heaved on character assassination of instability, and sexual deviance.  Amid this appalling defamation, the defendant strains to argue that no anti-Semitism existed against the Jewish Epstein, but only benign and isolated insensitivity, nor was he fired but merely transferred in due course.

---

[4] There are only two procedures to involuntarily release reserve officers on active duty. Pl.Appx. 19, A.Reg. 635-200 (1989).  The Active Duty Board, under ¶ 3-49a, may release an officer without a hearing based simply on a record- review of poor performance or misconduct.  Or, Chapter 5 allows "elimination" after a formal Board of Inquiry.  Id 21.

The nature of these exaggerations would be comic if the accusers were not deadly serious to ruin Epstein's military intelligence career. Their desperation to ruin LTC is exposed by their untenable accusations of being both a crafty double-agent and psychologically unstable. The willingness to distort facts and lie casts doubt on the credibility of the rater and qualifications to evaluate. It also strongly suggests the rater's pattern of circumventing procedure— EO standards, relief for cause, releasing reservists from active duty, and security clearances.

### C.    Failure to designate the OER a relief-report was prejudicial

The defendant's harmless error argument is without merit. Prejudice is demonstrated both procedurally *per se*, and under the particular circumstances.    Plaintiff will address each *seriatim.*

1. The administrative presumption runs against the defendant because the senior rater on Epstein's report did not enter the required relief statement that "this report complies with [A.Reg. 623-105 ¶ 5-29.]" Accordingly, the special instructions and supplementary review are presumed not to have occurred. To sidestep this problem, defendant argued above, that the compliance statement is empty and gratuitous— it signifies no substantive differences in due process.

Defendant next argues that Epstein is without a remedy because no "mechanisms exist to stop a relief-for-cause." Def. Mem 9. That is not the issue. Rather, if an OER under the facts is not properly prepared and "complete" according to the standards of A.Reg. 623-105, then filing in LTC Epstein's OMPF was improper— as in any soldier's case. Muse at 605 ("if OERs are not prepared in a manner required by law, they are not properly included in the officer's records"), citing Guy v. United States, 221 Ct.Cl. 427, 432 (1979).

Defendant effectively re-writes two regulations by eliminating the need for five paragraphs, as described above:  A.Reg. 623-105, ¶ 3-14b, ¶ 4-28, ¶ 5-18, and A.Reg. 600-20, ¶ 2-15. This in effect, exempts rating officials from these provisions.  Rating officials can ignore if their evaluation of a subordinate meets the threshold standard of an early release for failures in performance or professionalism.  It means nullifying the strong caution that rating officials and commanders are deterred from relieving subordinates because "it is one of the most serious steps taken" and

preceded by formalized written counseling.  And rating officials may ignore the predicate "formal counseling" and "notice of reasons" for a relief, or that the reasons be fully explained in the report, are accurate, and justify the relief.   And defendant removes the deterrent to hasty reliefs since other non-relieving rating officials no longer must independently investigate each other to "non-concur" (*e.g.* formal written counseling, material errors of fact, reprisals, or early release too serious a step taken).  And defendant removes the final deterrent gate-keeper to reliefs:  the supplemental reviewer will never "indicate compliance" on the report to guarantee that every rating official followed the "special instructions."  And most significantly, the defendant removes all these processing steps <u>before</u> the report is referred to the relieved officer.  But the predicate to referral and supplemental review is that the OER first be "completed" by complying with special instructions.  <u>Id</u> ¶ 5-28a, ¶ 5-29a.  Without this predicate, it renders defective both the referral itself and supplemental review.

2.    The defendant's harmless error argument is without merit under the circumstances.  The OER processing was only under the procedures for routine referred OERs.  The entire report was completed under a narrow and less rigorous standard of review.  The report was never processed as a relief report, and the senior rater never stated it "complied" with ¶ 5-29.  So the defendant cannot speculate that the report otherwise was complete and proper for filing.

Secondly, the OER's rater portion does not state that Epstein was notified of the reasons why he was relieved before the report was prepared.  <u>Id</u> ¶ 5-18 *b*(2)

Thirdly, the report does not state that early release was preceded by "formal counseling." Nor does the report explain that because of exigent circumstances a decision was made to justify waiving this requirement.  A.Reg. 600-20 ¶ 2-15.  It is not enough under relief procedures for the report to state that LTC Epstein was "unable to heed counseling and guidance and improve his performance."  The later formal EO investigation in October 1991 found the only formal counseling wholly inadequate:

> The issues surrounding LTC Epstein's poor duty performance <u>are not clearly documented</u>. The Counseling Statement given by LTC Hudson <u>does not clearly state exactly what LTC Epstein did</u>.  It is written in a way that allows the reader to form their own opinion and could be considered subjective in nature.

AR 66-67 (EO findings)[emphasis added];[5] Sup.AR 2 (counseling statement).  In that vague counseling, the rater threatened:  "if this behavior continues I will have no recourse except to.... provide you a relief for cause OER."  The Formal EO findings from the disinterested investigator, in effect reversed the informal EO findings on failed performance, disloyalty, and lack of integrity. Being inconvenient to defendant's case, its counsel omits its completely while twice block-quoting entire passages from the superceded informal EO inquiry.  The Formal EO investigation was necessary because it was "inappropriate [for the officer] who conducted the informal inquiry to formally investigate the complaint within than organization."  A.Reg. 600-21 ¶ 2-6c.

Fourth.  The rater avoided these problems pointed out by the EO investigator.  First, labeling the report a non-relief OER dispenses with formal counseling.  This means no documentation is necessary so that a bare remark in the rater's narrative passes muster.

Fifth.  The Formal EO investigator interviewed the rater to followup to determine the basis of the alleged unsatisfactory performance and disloyalty.  AR 65 ¶ 4c.(1).  The investigator interviewed the two senior officers that the rater offered to corroborate his version.  Id.  But instead, these officials— a Colonel and LTC— flatly disputed the rater's version.  They added that Epstein had done nothing wrong.  Id 66 ¶ 4c(3).  When the investigator returned to the rater he conceded "LTC Epstein had very good ideas and he adopted many of them."  Id.  The investigator then reviewed Epstein's established OER record portraying him as an excellent officer.  Id ¶ 4d.(1).  In sum, not only was the counseling letter inadequate, but the alleged unsatisfactory performance, disloyalty, lack of people skills, were without any basis in fact.

Sixth.  The investigator substantiated, in part, the discrimination complaint against the rater, and against his poor EO command climate  Although there were not discriminatory practices infecting promotion or other opportunities, the rater's

---

[5]Pl.Appx. 2, A.Reg. 600-21 *EO Program*  (1986) ¶ 2-6, (after informal inquiry the facts may indicate that a formal investigation is warranted by disinterested officer outside the command).

negative comments concerning the dietary habits of LTC Epstein, and the overall insensitivity of [the rater's] verbal communication with others, was substantiated.[6] * * * Additionally, during the same time period, the working environment...undoubtedly left members with the impression that unequal treatment did exist in the unit.[7]

In other words, EO policies were being violated— the unequal treatment from disparaging comments, and overall perception of unequal opportunities within the command.

Despite the investigative finding that the unsatisfactory duty performance was unsupported, a disconnect appears— the rater's ethnic insensitivity was "not anti-Semitic but more to antagonize" Epstein. AR 67. The investigator excused the perceived bigotry on the basis of personality conflicts between Epstein and his rater. Because the DIS reports were classified, it was unknown that the rater had lied to the EO investigator about not making derogatory statements. Moreover, EO policy is that the rater's use of "disparaging terms" is *per se* unlawful discrimination. This disconnect is explained because investigator originally <u>did</u> find the rater was anti-Semitic. But his superior COL Nickisch disapproved this claiming "because of the post-Gulf War environment, this would be embarrassing within the intelligence community." Complaint. ¶ 22.[8] <u>See</u> Sup.AR 19 ¶ 3 (30 May 1992 Statement of 1LT Birdwell, "On many occasions, enlisted soldiers complained in confidence to me that they believed LTC Hudson to be racially and religiously biased").

Seventh. Because the report was improperly labeled, the senior rater was not required to investigate and non-concur despite the rater's failure to "explain and justify" the relief with proof of formal counseling. Moreover, only in the context of a serious action of a relief report does the EO's finding have relevance: "The issues....[of] poor duty performance are not clearly documented." For a referred OER, the rater's existing narrative of counseling and poor performance will suffice for any review. Because the senior rater/reviewer is not required under rlief-reports to "return the report. . . .indicating what is wrong" then no objections are added as an enclosure. <u>Id</u>. ¶ 5-29c.(4).

---

[6] AR 63 ¶ 1.

[7] AR 62 ¶ 3.

[8] LTC Epstein before the ABCMR, certified this fact under penalty of perjury. AR 26 ¶ 6a.

3.    <u>Fundamental flaws in the Commander's Inquiry violate procedure, and void the OER</u>.

For the same reasons, the later OER Commander's Inquiry cannot resurrect support for the adverse OER.  It went no farther than replicate the narrow scope of OER review as a change-of-duty report.  Nor did it reconcile the informal and formal EO findings, the latter showing no support for any accusations of poor performance.  Nor did the inquiry address the reprisal claim in the context of the DIS defamation that occurred at the time the OER was being completed.  _

(a)   <u>Rating official disqualification under ¶ 5-30b(1)a</u>.  This latter problem links a second issue unrelated to the question of a mislabeled relief report.  The commander's inquiry rejected Epstein's claim of rater disqualification under ¶ 5-30b(1).  Epstein contended the OER was a reprisal, including the adverse allegations therein such as disloyalty.  He asserted reprisal after his official EO complaint substantiated "anti-Semitic remarks and jokes and overall insensitivity." Sup.AR 5 ¶ 2a.   This EO complaint also resulted in the rater being formally admonished by the group commander.

The transparent attempt in the commanders' inquiry to reject the ¶ 5-30 claim is troubling. It is a whitewash of disparaging anti-Semitic remarks by a commander who is allowed to then fire Epstein, defame him to the DIS as a disloyal, dishonest, and brand him a sociopath.   But the consequence of downplaying and rationalize *post hoc* this discriminatory treatment only serves to expose the violation of ¶ 5-30.  This alone voids the report as it never should have been processed.

The approach of the commander's inquiry to this reprisal issue is somewhat disjointed.  It dismissed as reprisal the rater's alleged disloyalty because the OER was completed in May 1991 before Epstein's "official EO complaint" and thus the formal or "official investigation."  And it was the prior March 4th EO informal inquiry or "unofficial investigation" that said Epstein was disloyal. In other words, an <u>un</u>official investigation cannot invoke ¶ 5-30b(1) provisions to disqualify raters.

Secondly, the commanders' inquiry adds that the unofficial EO investigation determined that the accusation of disloyalty could not be a reprisal in the absence of "any discrimination" by the rater.  Sup.AR 5 ¶ 2b.  The commanders' inquiry found it irrelevant that the rater was later formally admonished "to be more sensitive to ethnic and minority factors and to avoid future remarks to LTC Epstein of an insensitive and inappropriate nature concerning his religious dietary

24

habits." Id. 5-6.  The commander's inquiry did concede however, that "it could be argued that any perception of prejudice is a basis for invalidating an evaluation done by the individual exhibiting the perceived prejudicial activity." Id 6.  But the commander's inquiry quickly invents his own arbitrary test that even reasonable perceptions of prejudice are irrelevant unless "discrimination was found to be practiced."  So *ergo*, the provisions of ¶ 5-30b were not invoked to disqualify the rater from firing and adversely evaluating Epstein after his EO complaint.

(b).    Analysis    The EO complaint and informal inquiry cannot be given a superficial distinction that they 'don't count' as an official investigation for purposes of ¶ 5-30b(1)a.  The pertinent distinction is not whether an investigation is unofficial or official, but if complaints are processed internally or externally.  Moreover, it makes no sense arguing that an informal EO inquiry was a sufficient basis to officially fire Epstein, officially admonish the rater, officially evaluate Epstein, and officially defame him before DIS, but then not official enough for purposes of ¶ 5-30.

So the commander's inquiry then turns to more whitewash— in any event, no investigation unofficial or official, found any discrimination.  The commander's inquiry is contending that Epstein's EO complaints substantiated nothing because there was denial of some tangible benefits, presumably promotions, or other opportunities.  Yet the tangible benefit at issue is that every officer is entitled to an OER environment free from the potential of adverse ratings in retaliation for EO criticism of the commander, under ¶ 4-24.  And secondly, ¶ 5-30b(1) only requires "substantiation" from an investigation, not reading into it institutional or invidious acts of personal discrimination.

The informal EO inquiry did substantiate EO violations by the rater/commander — personal disparagement, and overall insensitivity to ethnic and minority factors.  Epstein was then fired.  The admonishment is further substantiation of EO violations.  Epstein was adversely rated at the same time Epstein was tarred-n-feathered before the DIS.  Together this triggers  ¶ 5-30b(1).

Second.   Under the "exceptional processing" of a Referred-OER, the evaluative period does not end when rating officials have signed, but is procedurally extended— here until March 1992 when both rating officials were given the opportunity to reconsider their evaluations, albeit now after the (1) second substantiated "formal EO investigation" (18 October 1991) against both raitng officials, and (2) Epstein's rebuttal comments citing that new investigation against them (the new

investigator recommended the rating officials reconsider based on the new EO findings).   This means the potential for reprisal under ¶ 5-30b(1) was 'a continuing claim,' as it were, to infect the referral process.   Under procedure, when a senior rater refers rebuttal comments to the rater, it must contain "significant new facts about the rated officer's performance that could affect the evaluation....and the rater in return may reconsider their evaluation." Id ¶ 5-28d.   But prior to the referral opportunity, a new substantiated EO investigation reversed much of informal EO inquiry, including the senior rater' adverse evaluation— it disputed poor performance, raised further reprisal to the DIS, and expanded the rater's EO violations in perpetuating an overall poor EO command climate that "undoubtedly left members with the impression that unequal treatment did exist in the unit." [9]   This again invokes both and senior rater disqualifications under ¶ 5-30b(1)a.   Both rating official refused to change their original evaluations.   AR 143.

Third.   The investigator conveniently exempted from the definition of discrimination disparaging remarks, regardless of circumstances.   The Army's big-tent EO policy engages in no such fine hairsplitting because the military's unique war-fighting mission demands high unit cohesion and morale— a practice of disparaging remarks can have devastating impact on mission effectiveness and morale.[10]   That is why they constitute unlawful discrimination.   Certainly disparaging remarks by a commander are not in an exempted category but are an aggravated violation of the letter and spirit of providing equal treatment to a soldier by his commander.   This is particularly inexcusable when the Army "places high value" on the rights of its soldiers to observe the dietary and other tenets of their religions.   It is further aggravated because it involved a military intelligence unit during war with Iraq when a US ally, the Jewish state of Israel, was attacked with SCUD missiles.   It is also aggravated because of the disruptive or divisive impact on the unit when a commander creates the perception of ethnic prejudice against his principal deputy who is delegated critical command functions.

---

[9] AR 62 ¶ 3.

[10] For the same reason why a host UCMJ "criminal" offenses have no civilian parallel, such as contempt towards officials, disrespect, mutiny, misbehavior before the enemy, provoking speeches and gestures, adultery, debts, fraternization, indecent language, cohabitation.

This highly aggravated case of a commander's ethnic disparagement of a deputy commander, resulted in counter-accusations that Epstein was disloyal and had seriously degraded morale and esprit de corps. But the EO investigations at least, extended the blame to the commander's inappropriate remarks, poor EO climate, and overall insensitivity to minorities. This snowball impact on unit cohesion and morale is precisely a result expected—

> Do not consider this kind of behavior as being of minor consequence. It is improper and can lead to complaints of harassment and/or discrimination that <u>under the circumstances may have an adverse impact on the entire organization</u>.

Pl.Appx. 48 (Fort Lee, Commander's EO Handbook)[emphasis added]. The rater's rampage led to slander (the rater then lied about it) before the DIS to destroy Epstein's military intelligence career. This confirms that the commander's inquiry was a whitewash, and why rater disqualification was invoked.

### D. Failure to obtain written approval by a general officer in the chain of command

Finally, labeling the report a non-relief allowed removal of a deputy commander without written approval by the first general officer in the chain of command. The defendant's litigation counsel supplies its own vague reason why the rule does not apply, suggesting "the bedrock tenets of military organization and discipline." Def. Memo. 10. The Court may not uphold the BCMR's decision where it never addressed defendant's arguments anywhere in the agency decision. Defendant's counsel or a reviewing court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." <u>Dickson</u> at n. 163.

### CONCLUSION

For the foregoing reasons, plaintiff respectfully requests the Court deny defendant's motions for summary judgment, and grant plaintiff's cross-motion for summary judgment, and set aside LTC Epstein's OER for the period 22 October 1990 to 5 March 1991.

/s/  John A. Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen CO 80439
303 670-3825
Counsel for Larry Epstein

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE S. EPSTEIN                )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        Case Number: 07-0688 (RMU)
                                   )
PETE GEREN,                        )
Secretary of the Army,             )
                                   )
        Defendant.                 )
_____)

PLAINTIFF'S STATEMENT OF OPPOSING MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Plaintiff-Epstein, by and through his undersigned counsel, pursuant to LcvR 7.1 (h), submits

his opposing statement of material facts in support of his cross-motion for summary judgment.

Epstein's objections or additions to defendant's Statement of Facts correspond to

defendant's paragraph numbers (i.e, objection or addition to defendant's ¶ 3 will appear as

plaintiff's ¶ 3.1, etc). Citations are to the Administrative Record [AR], the parties' stipulated

Supplemental Administrative Record [SupAR], Complaint [Comp.], Army Regulations [A.Reg.].

Other military acronyms apply: OER (Officer Evaluation Report), ABCMR (Army Board for

Correction of Military records), LTC (Lieutenant Colonel), EO (Equal Opportunity), DIS (Defense

Investigative Service), SSO (Special Security Officer).

2.1.    Plaintiff adds the following: LTC Epstein's primary Military Occupational Speciality

[MOS] was Military Intelligence. His secondary MOS (sub-specialties) were Human Intelligence

and Counter-Intelligence. AR 137 (DD Form 214, Item 11).[1]

3.1.    Plaintiff adds the following: During this 1990 active duty tour, he was assigned to the

US Army Special Security Command ["SSC"] and was "detachment commander" of a Sensitive

_____

[1] *E.g.,* his OERs in the 1990s show assignment in both these sub-specialities. AR 72-77 (Human
Intelligence), AR 68-71 (Counter-Intelligence).

1

Compartmented Information (SCI) Facility. The SSC commander was LTC Hudson, SSC group commander, COL Cromartie. AR 86.[2]

    4.1. <u>Plaintiff adds the following paragraphs</u>:   For this OER, his rater was LTC Hudson and senior rater COL Cromartie. AR 86. The rater stated that LTC Epstein was

> a professional, enthusiastic, technically and tactically competent officer who performed his duties...in an outstanding manner. * * * His superior efficiency and effectiveness coupled with <u>his vast experience</u> * * * Promote to Colonel....Unlimited potential for higher level command and staff.

AR 87 [emphasis added]. His senior rater COL Cromartie awarded LTC Epstein the highest "potential" evaluation grade (#1 top block of 9 possible), and commented that "Epstein's "knowledge and experience in the intelligence field is significant." <u>Id</u>. COL Cromartie had senior rated LTC in the previous duty in 1990, with performance as "outstanding." AR 88-89.[3]

    4.2. Of the 16 OERs Epstein received as a Major and LTC from 1984 to 1997, about 70% or ten, contained the highest senior rater evaluation, or above-center-of-mass.[4] Five contained center-of-mass.[5] The one OER at issue *sub judice* is the only below-center-of-mass in his record (22 Oct 1990 to 5 Mar 1991). AR 84-85.[6]

    4.3. During this duty tour in 1990, LTC Epstein was invited, through the Army Airborne Association, to attend an Israeli Army Airborne course in Israel. After his U.S. Army duty, and while on vacation, he competed the course and was awarded the "Israel Defense Forces Parachute Wings." Also attending the same course was a retired U.S. Army Colonel and the U.S. Army

---

[2] "Sensitive Compartmented Information" is the most classified intelligence information and requires special handling procedures. <u>See</u> DOD Directive 8520.1 (Protection of SCI).

[3] A.Reg. 623-105 ¶¶ 3-12, 4-3. A senior rater's potential block marking is assessment of rated officer's ability compared with that of contemporaries. A senior rater's rating tendency is called his or her "profile." In common usage, an officer who exceeds the majority of officers rated is "above center of mass." An officer rated consistent with the majority is "center of mass," while those rated below the majority "below center of mass."

[4] AR 69-77, 87, 91, 93-97.

[5] AR 79-81, 89, 99-101.

[6] 17 officers are senior rated; 5 at above-center-mass (top block), 11 center-of- mass; Epstein the only below-center-mass.

Attache Officer assigned to the US Embassy in Israel.  LTC Epstein applied and was authorized to wear this foreign award on his US Army uniform.   Comp. ¶ 4.   LTC is an orthodox Jew, as indicated as "religion" on his Officer Record Brief, DA Form 4037.  AR 37.

5.1.  Plaintiff adds the following paragraphs: Beginning October 22, 1990, LTC Epstein was assigned to the same USA Special Security Group now as a Deputy Commander.  He was still rated by LTC Hudson and senior-rated by COL Cromartie.  The time period through mid-1991 was during the "Gulf War" involving Iraq's invasion of Kuwait. AR 42 (OER); Compl. ¶ 5.

5.2.  On December 26, 1990, LTC Hudson recommended LTC Epstein for the Army Reserve Achievement Medal covering the period "1985 to present."  AR 162.  The proposed citation focused on Epstein's most recent duty as the Deputy Commander:

> For exemplary performance of duty, efficiency and fidelity while serving...[in his present assignment at] the Special Security Command * * * His knowledge of the Special Security System ensured that he quickly got to the heart of the special projects he was assigned, and presented complete, insightful, and workable solutions.  LTC Epstein's contributions to the total Army reflect great credit on him, his organizations, and the United States Army.

AR 162.

5.3    Shortly thereafter, LTC Epstein wrote a letter to the Deputy J2 stating that the command's annual Christmas party was "centered totally on Christian values," then recommended members of other faiths should be considered.  The rater, LTC Hudson, later alleged this had "created a problem for the Chief of Staff over the EO matter in which [Epstein's] used poor tact and demonstrated lack of professionalism."  Sup.AR 65 ¶ c.(1).  However, the later Formal EO Investigation in 1991 found Hudson's account of events unsubstantiated.  Id 66 ¶ (3)(b)("the J2 agreed this was a valid point, and was not an issue with the unit's Chief of Staff.").

5.4.   Thereafter in January, LTC Hudson began making jokes about LTC Epstein's Jewish ethnic heritage, and dietary habits.  Sup.AR, AR 67 ¶¶ (2)(EO Investigation; comments and behavior "unprofessional and in poor taste").  Also, several black female soldiers approached LTC Epstein and provided statements alleging their concerns of racial discrimination.  Sup.AR 63 ¶ 1, 64 ¶ (2), 65 ¶b.(1).  See also Sup.AR 19 ¶ 3 (30 May 1992 Statement of 1LT Birdwell, "On many occasions, enlisted soldiers complained in confidence to me that they believed LTC Hudson, a

3

Catholic, to be racially and religiously biased"). LTC Epstein was "unwilling and unable to tolerate his commanders' anti-Semitic remarks and jokes together with his overall insensitivity;" Sup.AR 10 ¶ 1; Sup.AR 23 (LTC Hudson later statement to DIS, May 1991, that Epstein "is very touchy about being Jewish and is very intolerant to others' religions.")

5.5.    Soon thereafter, in early January 1991 Epstein initiated an EO complaint to the Group Commander (senior rater Col Cromartie) *against* LTC Hudson, his rater. The complaint alleged both ethnic/religious insensitivity and racially discriminatory practices at the unit. Sup.AR 11 (¶ 3.a); AR 11 Comp.¶ 6; AR 18 (¶ 5). This complaint caused an "informal inquiry into the allegations to determine if they have merit, and if so assist the commander in resolving the complaint at the lowest appropriate level." Pl.Appx. 2 (A.Reg. 600-21, *EO Policy*, ¶ 2-6b, also referred to as "informal investigation or fact finding inquiry"). If after resolution the facts indicate a formal investigation is warranted, then a "disinterested officer" may be appointed outside the command).

6.    Plaintiff objects: Defendant reverses the chronology of the informal EO complaint and counseling statement. Defendant inserts the EO complaint as ¶ 7 after LTC Hudson's counseling statement of January 18, 1991.

6.1.    Plaintiff adds the following. The counseling statement by LTC Hudson, accusing LTC Epstein of disloyalty, occurred after the EO complaint. Comp ¶ 7; AR 23-24 ¶ 1a.

9.1.    Plaintiff adds the following: His active duty extension through October 1991 continued LTC Epstein's duty assignment at the same unit: "Assigned to: USA Special Security Group." AR 44.

9.2.    Plaintiff adds the following: In February, LTC Epstein was selected to attend the U.S. Army War College. The reporting date was July 15, 1991. AR 153 (orders stating "reporting prior to prescribed date not authorized"). The resident 10-month The War College at Carlisle Barracks, PA, is the "most prestigious institution for education of the Army for future strategic leaders:" [7]

---

[7] U.S. Army War College [USAWC] website, www.carlisle.army.army.mil ("mission and vision" statement of commandant, Major General Hunton, October 2005).

4

Military students selected are considered to hold considerable potential for promotion and future service in positions of increasing responsibility.

\* \* \*

[Army College] is the capstone of professional military education and prepares selected military leaders to assume strategic leadership responsibilities in the military.

USAWC Resident Curriculum Catalogue 2005-06 at 11 (eligibility and admissions). See also AR 351-1, *Army Training and Education* ¶ 3-33 (attendance at the War College is "the capstone of professional military education and prepares selected military leaders to assume strategic leadership responsibilities in the military.").[8]

11.  Plaintiffs objects.  Defendant only selectively quotes findings from the informal EO inquiry.  About 1/3 of the findings are not quoted.  The defendant fails to state most of the findings unfavorable to the rater, LTC Hudson.  Moreover, the defendant repeats its selective quote *in toto* within a footnote in its memorandum brief.  Def.Mem. 11 at n. 5.  The Court should refer to the entire findings of the EO inquiry contained in the OSRB decision.  Sup.AR 11-13.

12.1.  Plaintiff adds the following paragraphs:  LTC Epstein during the EO informal inquiry vigorously pointed out that LTC James Hemenway was anti-Semitic.[9]  Hemenway never interviewed Epstein and spent only one day at the unit.  Epstein recalled that Hemenway had a confrontation with Epstein years earlier as a fellow captain at Fort Huachuca, Arizona, when Hemenway was a Reserve captain and police officer nearby in Tombstone Az.  Epstein recalled that when then CPT Hemenway approached and read Epstein's uniform name tag and confirmed he was Jewish, Hemenway stated " I don't speak to Jews." AR 24 ¶ 1a.[10]  LTC Hemenway in 1991 did not find Hudson was anti-Semitic by accepting Hudson's account that the Jewish remarks were jokes, and initiated by Epstein himself (albeit Hudson later admits to DIS that Epstein was "very touchy about being Jewish").  Hudson stated that he allegedly stopped the comments when Epstein complained.  Sup.AR 12 ¶ (6).

---

[8] This regulation was not in Epstein's BCMR application because the Board has access to all regulations.  And as background material not in dispute here, it is not in plaintiff's appendix.

[9] The name "LTC Langenfeld" is incorrect.

[10] Epstein before the BCMR certified the truthfulness of these facts under penalty of perjury.

12.2.   After the informal inquiry, LTC  Epstein requested and granted a formal EO investigation.  Epstein explained before the BCMR that he did not raise the Hemenway allegation until 2003 for various reasons.  This was primarily to avoid further reprisal against his Army career in counter-intelligence.  For example, the 1991 Israeli spy allegations against him, and the 1990s media-celebrated Israeli spy incident of Jonathan Pollard.  The latter was a US Navy employee during the time sentenced to life imprisonment.  Despite many books and Israeli government pleas, President Clinton denied clemency.  AR 19-20.  Epstein was also worried because a senior Army intelligence official in October 1991, COL Nickisch redacted the later Formal EO finding of anti-Semitism against Epstein.  The reason given was that in the post-Gulf War environment " it would be embarrassing within the intelligence community" with a perception of purging Jewish intelligence officers form the US Army.  AR 26 ¶ 6a.

13.1.   Plaintiff adds the following paragraphs   The transfer of LTC Epstein on March 5, 1991, occurred the day after the March 4th informal EO inquiry was completed.  Sup.AR 12-13 ¶3b(9)(Mar 4 EO report); AR 43 (OER ending Mar 5, 1991).

13.2.   Plaintiff on March 5, 1991, was suddenly transferred to a staff position without requisite qualifications or experience, and outside of the US Army Special Security Command and Group.  AR 82.  The new position required a "Signals Intelligence professional [and therefore] presented an exceptional challenge outside of [Epstein's]  area of expertise." AR 83 (Part Vc).  He remained in this position for 72 days until May 17, 1991, when his active duty orders expired.  He received an OER for the period 5 March to 17 May 1991.  Id.  That OER stated:

> Exceptionally efficient officer who demonstrated outstanding results in every endeavor * * * Great potential.  Promote and he is ensure selected for advanced military schooling and challenging assignments.

14.   Plaintiff objects and adds the following paragraphs: Defendant incorrectly indicates in its chronology for ¶¶ 14-15 that the adverse referred-OER against LTC Epstein was issued by his rater, LTC Hudson, *before* April 1, 1991.  On April 1st  LTC Hudson was issued a letter of admonishment for religious and ethnic insensitivity in response to LTC Epstein's EO complaint against him.  Sup.AR 1.

6

14.1   LTC Epstein was summarily removed on March 5, 1991 from his position as Deputy Commander. LTC Hudson had not written his portion of the OER until he signed it on May 14, in Part II (Authentication). A.Reg. 623-105 ¶ 4-11a (rating officials sign "after completing their part"). The senior rater completed his part October 8, 1991. Epstein did not receive the completed OER until referred to him January 10, 1992. AR 142. Neither the rater or senior rater ever changed their original reports. 143.

14.2.   When the rater completed his part of the OER on May 14, 1991, he adopted all the findings by the informal EO inquiry that were adverse to Epstein. The rater did not adopt the findings adverse to the rater concerning his ethnic insensitivity and inappropriate remarks, nor the existence of alleged personalty conflicts. Sup.AR 12-13 ¶3b(9)(Mar 4 EO report); AR 43 (OER).

15.   Plaintiff already expressed his objections with this paragraph.

15.1.   Plaintiff adds the following paragraphs: In mid-May 1991 at the time the rater was completing Epstein's OER, the rater and SSO Coburn contacted an agent from the DIS for interviews. Sup.AR 23-25 (DIS agent interview write-up of LTC Hudson interview May 17, 1991; exact Coburn interview report date unreadable). Their interviews were included in the DIS renewal of Epstein's special Top Secret security clearance, called a Periodic Reinvestigation–Special Background Investigation. AR 144; see Pl.Appx 26-27, A.Reg. 604-5, *Personnel Security Clearance Regulation* (1988) ¶¶ 2-303, 2-305 ( SBI provides additional coverage back 15 years for determining eligibility to access to SCI intelligence).

15.2   Epstein's SBI was initiated at least since January 1991. Sup.AR. 26 (earliest interview appears at 23 Jan 1991).

15.3.   According to the formal EO findings, The intent of LTC Hudson and Mr. Coburn was to "damage [Epstein's] career" in military counter-intelligence. They directly alleged or implied that Epstein was an Israeli government spy, a homosexual, sexual pervert, dishonest, disloyal, untrustworthy, unstable, and was not recommended for a security clearance. Sup.AR. 65-66, 67 (Formal EO Investigation summary based on EO interviews in August 1991); Sup.AR 23-25.

15.4.    The rater LTC Hudson in August 1991 misrepresented to the formal EO investigator that he had made no "derogatory statement" to the DIS in May 1991 that would question LTC Epstein's "loyalty." Sup.AR. 65-66 (EO interview); Sup.AR 23-24 (rater telling DIS agent that Epstein was not honest on several cases during the war; believes he has relatives in Israel; Epstein was not very stable, did "not recommend him for position of trust with the US Government because of questions about his honesty, loyalty, and integrity as an officer").

15.5.    Under A.Reg. 604-5 involving standards to grant security clearances, the phrase "significant adverse information" lists allegations of dishonesty, unreliability, instability, homosexuality, aberrant or deviant sexual conduct or behavior.  Pl.Appx. 28.  The most serious allegation involves acts or attempts at espionage, or establishing a sympathetic association with a spy or secret agent or foreign nation.  Id 25-26.

15.6.    Epstein was the investigated by the DIS for alleged military treason during the Gulf War as an Israeli-US intelligence double agent, a UCMJ offense punishable by death.  This delayed the SBI re-investigation beginning in January 1991.  Clearances were not granted until about 10 months later in October 1991.  AR 144.  The delayed process and accusation caused LTC Epstein "great anxiety."  He became fearful over more reprisals from the Israeli spy allegations.  AR 3.

16.    Plaintiff objects.  Defendant selectively quotes from the Formal EO investigation to the extent of argument.  Defendant omits findings contradicting the informal EO inquiry that support Epstein.  The Court should refer to the original document as the appropriate source. Sup.AR 62-67.

16.1.    Plaintiff adds the following paragraph:  After the Formal EO investigative report was prepared, LTC Epstein was called by the EO investigator in November 1991.  The investigator stated that his report had an additional finding: "LTC Hudson and Mr. Coburn were anti-Semitic." However, his superior COL Nickisch disapproved this finding asserting that "because of the post-Gulf War environment, this would be embarrassing within the intelligence community." [11]

18.    Plaintiff objects, and to ¶ 20.  Defendant is incorrect that the "senior rater completed his portion of plaintiff's OER" after receiving the results of both the informal and formal EO

---

[11] LTC Epstein in his supplemental statement before the ABCMR, certified to the truthfulness of these facts under penalty of perjury.  AR 26 ¶ 6a.

investigations.  <u>Se also</u> Def. ¶ 20 (then senior referred the completed OER to Epstein for rebuttal).
The senior rater signed his portion of the OER on October 8, 1991, *before* the results of the formal
EO investigation on October 18.  Army Regulation presumes a rating official signs the OER after
completing their part.  In December 1991 after reviewing the Formal EO report the senior rater did
not change the OER. AR 143 (remains as written).

The remainder of plaintiff's objections to defendants state of facts are in the nature of
argument contained in Epstein's brief.

/s/   John A. Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen CO 80439

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE S. EPSTEIN           )
                              )
        Plaintiff,            )
                              )
        v.                    )        Case Number: 07-0688 (RMU)
                              )
PETE GEREN,                   )
Secretary of the Army,        )
                              )
        Defendant.            )
_____)

ORDER

UPON CONSIDERATION of the defendant's motion for summary judgment, plaintiffs'

opposition thereto and his cross-motion for summary judgment, oppositions and replies, and the

entire record, it is hereby

ORDERED that defendant's motion for summary judgment is denied, and plaintiff's cross-

motion for summary judgment is granted.


DATED:_____


_____

UNITED STATES DISTRICT JUDGE


copies to:


John A. Wickham, Esq.
32975 Saint Moritz Drive
Evergreen, CO. 80439


Brian Baldrate
Assistant United States Attorney
Judiciary Center Building, 10th Floor
555 Fourth Street, N.W.
Washington, D.C. 20530

Case 1:07-cv-00688-RMU     Document 17-3     Filed 11/22/2007     Page 1 of 29

**Headquarters**
**Department of the Army**
**Washington, DC**
1 January 1984

**Army Regulation 600–21**

**Effective 1 February 1984**

Personnel—General

# Equal Opportunity Program in the Army

The original form of this regulation was first published on 1 January 1984. Since that time, changes have been issued to amend the original. This UPDATE printing incorporates all of those changes directly into the body of text.

This UPDATE publishes a new change 4, which is effective 30 May 1986. The portions of the text that are revised by Change 4 are highlighted in this printing.

By Order of the Secretary of the Army:

JOHN A. WICKHAM, JR.
*General United States Army*
*Chief of Staff*

Official:

R. L. DILWORTH
*Brigadier General, United States Army*
*The Adjutant General*

**Summary.** This revised regulation on the Army Equal Opportunity (EO) Program—
  a. Includes policy on sexual harassment.
  b. Changes the title of the EO staff officer and noncommissioned officer to EO adviser (EOA).
  c. Describes typical EOA duties.
  d. Modifies requirements for selection and training as EOAs.
  e. More explicitly defines the role of the unit discussion leader.
  f. Clarifies affirmative action plan procedures.
  g. Expands guidance concerning imposition of off-limit sanctions.

**Applicability.** This regulation applies to the Active Army, and the U.S. Army Reserve. It also applies to U.S. Army elements and agencies worldwide; civilian supervisors of military personnel; members and units of the Army National Guard when called to Active Federal Service; and members and units of the US Army Reserve when serving on active duty, active duty for training, annual training, or inactive duty training status. It applies to all proponent agencies of administrative publications.

**Impact on New Manning System.** This regulation does not contain information that affects the New Manning System.

**Internal control systems.** This regulation is subject to the requirements of AR 11-2. It contains internal control provisions but does not contain checklists for conducting internal control reviews. These checklists are being developed and will be published at a later date.

**Supplementation.** Supplementation of this regulation at major Army command level is permitted, but is not required. A draft copy of each supplement must be provided to HQDA (DAPE-HRL-E), WASH DC 20310-0300, for approval before publication.

**Interim changes.** Interim changes to this regulation are not official unless they are authenticated by The Adjutant General. Users will destroy interim changes on their expiration dates unless sooner superseded or rescinded.

**Suggested Improvements.** The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel. Users are invited to send comments and suggested improvements on DA Form 2028

(Recommended Changes to Publications and Blank Forms) directly to HQDA (DAPE-HRL-E), WASH DC 20310-0300.

**Distribution:** ~~To be distributed in accordance with DA Form 12-9A requirements for AR, Personnel General—Active Army, ARNG, USAR—A.~~ Distribution of this issue has been made in accordance with DA Form 12-9A requirements for 600-series publications or by Subscription Card for users that have submitted a subscription card for this regulation. AR 600-21 distribution is A for Active Army, ARNG, and USAR.

**Changes.** Changes to the basic publication will be indicated using the strikethrough and undescore method, and the tint method. Strikethrough indicates material that is being deleted from or changed in the publication. Underscore is one method that is used to indicate new material being added since the previous printing. Tint, or a shaded portion, is another method used to show new material being added to the publication. Tint is also used to show material that has been greatly reorganized since the last printing.

---

# Contents (Listed by paragraph number)

## Chapter 1
## General

Purpose • 1–1
References • 1–2
Explanation of abbreviations and terms • 1–3
Responsibilities • 1–4

## Chapter 2
## Policy

General • 2–1

Sexual harassment • 2–2
Chain of command • 2–3
Staffing • 2–4
Off-post activities, on-post activities, and off-limits actions • 2–5
Procedures for processing complaints • 2–6
Housing complaints • 2–7
Evaluation report entries • 2–8
Civilian schooling • 2–9
Legal assistance • 2–10
Affirmative actions • 2–11
Training • 2–12

## Chapter 3
## Reports

Authority to collect and maintain data • 3-1
Narrative and Statistical Report on Equal Opportunity Progress (RCS CSGPA–1471(R1)) • 3–2

## Chapter 4
## Attendance at the Defense Equal Opportunity Management Institute

General • 4–1
Selection requirements • 4–2

# Chapter 1
## General

### 1-1. Purpose

*a.* This regulation establishes the Department of the Army (DA) Equal Opportunity (EO) Program. The objective of the EO Program is to formulate, direct, and sustain a comprehensive effort that ensures fair treatment of all soldiers based solely on merit, fitness, capability, and potential, which supports readiness. Specifically, this effort is designed to—

(1) Provide EO for military personnel and their family members both on and off-post.

(2) Contribute to mission accomplishment, cohesion, and readiness.

*b.* This regulation does not implement the provisions of either the Age Discrimination in Employment Act of 1967 (sections 630 thru 634, title 29, United States Code) or Title VII of the Civil Rights Act of 1964 (section 2000e, title 42, United States Code).

### 1-2. References

Related publications are listed in appendix A.

### 1-3. Explanations of abbreviations and terms

Abbreviations and special terms used in this regulation are explained in the glossary.

### 1-4. Responsibilities

*a. Heads of Army Staff agencies and their field operating agencies.* These persons will ·

(1) Be responsible for Army-wide policies and plans pertaining to the Army EO Program.

(2) Be responsible for overall evaluation and assessment of the Army EO Program.

(3) Formulate, maintain, and implement the Headquarters, Department of the Army (HQDA) Affirmative Action Plan (AAP).

(4) Establish selection criteria for Army personnel attendance at the Defense Equal Opportunity Management Institute (DEOMI).

(5) Allocate quotas among the Active Army, Army National Guard (ARNG), and U.S. Army Reserve (USAR) for training at DEOMI.

*b. Chief, National Guard Bureau (CNGB) and Chief, U.S. Army Reserve (CAR).* The CNGB and CAR will—

(1) Monitor and evaluate implementation of EO policies and programs in their respective components.

(2) Establish sufficient staff positions in their respective offices and make sufficient resources available to adequately carry out EO Program requirements.

(3) Select Army Reserve Component (RC) personnel to attend the DEOMI.

(4) Develop management information and reporting requirements to determine progress toward affirmative action goals.

(5) Establish EO training consistent with HQDA policy and command needs.

*c. Commanding General, U.S. Army Forces Command (CG, FORSCOM).* The CG, FORSCOM will—

(1) Supervise and evaluate the unit EO training program conducted by USAR troop program units.

(2) Coordinate with the Office of the Chief, Army Reserve (OCAR) in conducting EO seminars for U.S. Army Reserve (USAR) general officers on a continuing basis.

(3) Establish adequate compliance monitoring procedures to assure the attainment of program objectives for the USAR.

*d. Commanding General, U.S. Army Training and Doctrine Command (CG, TRADOC).* The CG, TRADOC will—

(1) Develop EO doctrine.

(2) Develop EO instruction and associated training materials for use in the training base and throughout the Army.

(3) Maintain liaison with DEOMI in developing training doctrine and materials.

(4) Conduct required EO education and training in TRADOC service schools and training centers.

(5) Provide assistance and instructional materials to service schools not under the jurisdiction of TRADOC. These service schools include the Judge Advocate General School, U.S. Army Health Services Command school, and the U.S. Army War College.

(6) Monitor the instruction presented by DEOMI and evaluate how well the DEOMI meets Army requirements including service-specific instruction.

(7) Develop and provide Army-unique EO instruction through correspondence courses available to all Army personnel.

*e. Commanders of major Army commands (MACOMs).* These commanders will—

(1) Monitor execution of the EO program in all commands, installations, agencies, and activities under their jurisdiction.

(2) Establish EO training consistent with HQDA policy and command needs.

(3) Provide support, as appropriate, for EO matters in host and tenant agreements developed according to AR 5–8, paragraph 5c.

(4) Ensure that EO programs for military personnel and EEO programs for civilian personnel complement each other.

(5) Provide personnel, funding, and other resources to carry out the EO Program.

*f. Commanding General, U.S. Army Military Personnel Center (CG, MILPERCEN).* The CG, MILPERCEN will—

(1) Develop statistical data concerning race and gender for personnel management purposes when required by HQDA.

(2) Select personnel, in coordination with HQDA(DAPE–HRI.–E), to attend DEOMI.

(3) Control DEOMI student quotas (military and civilian) for the Army.

(4) Distribute Active Army personnel who are EOAs based upon command authorizations.

*g. Commanders at all levels.* The commanders are EO officers and, as such, are assisted by EO advisers and other members of the staff who can advise on EO matters in their areas of responsibility. These commanders will—

(1) Develop and implement EO programs for their organizations.

(2) Identify discriminatory practices affecting soldiers and their families and initiate corrective actions to include followup.

(3) Promote EO and interpersonal harmony for all military personnel, their family members, and civilian employees.

(4) Conduct EO training on a continuing basis for commanders, and for civilian and military staff personnel that is consistent with requirements established by HQDA, the MACOM, and this regulation.

(5) Monitor and assess the execution of EO programs and policies at all levels within their areas of responsibility.

(6) Ensure prompt followup and appropriate action to resolve allegations of discrimination by soldiers or their family members.

(7) Ensure involvement of public affairs personnel at every level of command in planning, executing, and monitoring equal opportunity programs.

# Chapter 2
## Policy

### 2-1. General

*a.* The policy of the United States Army is to provide equal opportunity and treatment for uniformed members~~soldiers~~ and their families irrespective of race, color, religion, gender, or national origin and to provide an environment free of sexual harassment. This policy—

(1) Applies both on and off post.

(2) Extends to soldiers and their families.

(3) Applies to soldiers' working, living, and recreation environments (including both on- and off-post housing).

*b.* Soldiers will not be accessed, classified, trained, assigned, promoted, or be otherwise managed on the basis of race, color, religion, gender, or national origin except—

(1) As the direct combat probability coding policy applies to women. (See AR 611–101, AR 611–112, and AR 611–201.)

(2) As necessary to support established affirmative actions goals.

*c.* Nothing in this regulation will be interpreted to limit the prerogatives of the Chief of Chaplains to carry out responsibilities in AR 10–5, paragraph 2–35a.

### 2-2. Sexual harassment

Sexual harassment is an unwelcome form of sex discrimination. It is not limited to the work environment and can occur at almost any place. Sexual harassment violates acceptable standards of integrity and impartiality required of all Army personnel and interferes with mission accomplishment and unit cohesion. Many of the acts and neglects

that constitute sexual harassment are pro-hibited and punishable under civil and military law as criminal acts of a sexual nature (para 17, Part IV, MCM, 1984), and should be treated as such. Army leaders at all levels are responsible for taking both preventive and appropriate corrective action to combat this unacceptable form of behavior. Any ~~military member~~soldier or civilian employee is engaging in sexual harassment who—

a. Through behavior of a sexual nature attempts to control, influence, or affect the career, pay, or job of a ~~military member~~soldier or civilian employee.

b. Makes deliberate or repeated verbal comments or gestures of a sexual nature that are offensive to the person to whom addressed.

c. Makes abusive physical contact of a sexual nature.

## 2-3. Chain of command
The chain of command, whether military or civilian, is the primary channel for correcting discriminatory practices and for communications on EO matters.

## 2-4. Staffing
a. *Minimum staffing requirements.*

(1) Staff military personnel with EO as a primary duty will be assigned to assist commanders at installations, organizations, and agencies down to and including brigade-level and equivalent commands. Assignment as an EOA will not be a collateral or part-time duty at brigade-level or higher commands. Personnel may be assigned additional duty in EO at battalion-level and lower. Primary duty positions are specified in applicable manning documents. Minimum grades for EO advisers are—

(a) Officer: Captain (O3).

(b) Enlisted: Sergeant First Class/Platoon Sergeant (E7).

(2) One full-time enlisted EOA will be available to each brigade-level or equivalent commander, and one full-time officer EOA will be available to ~~each division-level or equivalent commander. Staffing at higher levels (corps, MACOM) will be commensurate with EO program management requirements.~~the commander of each major combat formation (division, corps, Army) and at each MACOM. Staffing should, as a minimum, provide a sergeant major and either a lieutenant colonel or major at each large MACOM such as U.S. Army, Europe and Seventh Army; FORSCOM; and TRADOC. ~~There will be at least one officer and one enlisted EO position authorized at each large installation and for each level of command above division or equivalent. Installations will have at least one enlisted EO position authorized unless covered by one of the above criteria.~~Additionally, one full-time officer EOA will be available to the commander of each major Army training center. Minimum staffing at the installation level will be at least one enlisted EOA (E7) at small installations and at least two enlisted EOAs (E8, E7) at large installations. Civilian substitutions for these minimum staffing requirements are not authorized. Any staffing authorized beyond these minimum requirements may be either military or civilian. EOAs or DA civilian employees who are officially assigned such duties. Assignment of equal opportunity duties to DA civilians must be in strict accord with applicable position classification standards and guidelines.

b. *Command and staff relationship.* The principal EOA will have direct access to the commander at all times. So long as the above condition is met, where the EO office is placed within the organization is a matter of local command discretion or other applicable directives.

c. *The EO Program and the Equal Employment Opportunity (EEO) Program relationship.* The EO program for military personnel and the EEO program for civilian personnel are separate and distinct. EOAs will not supervise EEO personnel, nor will EEO personnel supervise EOAs. However, integrating EO/EEO training, seminars, discussions, and shared use of training materials and facilities is encouraged when doing so promotes understanding, efficiency, economy, and the common interests of both programs. Staff personnel assigned to positions having EO as a primary duty will not be assigned further duties in other human development functions such as drug and alcohol abuse, Army Community Services, chaplains' programs, CHAMPUS, or weight control.

d. *Roles and duties of EOAs.* The actual duties of EOAs and relative emphasis on each duty will vary according to type of unit or level of command, and unit composition and location. Typical roles and duties of EOAs are as follows:

(1) Understands and articulates Department of Defense (DOD) and Army policies concerning equal opportunity as stated in this regulation.

(2) Recognizes and assesses indicators of institutional and individual discrimination in organizations.

(3) Recognizes sexual harassment in both overt and subtle forms.

(4) Recommends remedies appropriate to reduce or prevent discrimination and sexual harassment.

(5) Collects, organizes, and interprets demographic data concerning all aspects of EO climate assessment.

(6) Assists commanders in the development of realistic affirmative action plans, and to monitor progress of plans.

(7) Trains equal opportunity representatives (EORs) to conduct classes, discussions, and seminars at the unit level.

(8) Conducts training sessions pertaining to equal opportunity, discrimination, and prevention of sexual harassment.

(9) Plans and conducts executive seminars on affirmative action plans, equal opportunity, discrimination, and prevention of sexual harassment.

(10) Receives and acts upon individual complaints.

(11) Assists in the planning and conduct of ethnic observances. (See chap 5.)

## 2-5. Off-post activities, on-post activities, and off-limits actions
a. *Off-post activities.* Title II of the Civil Rights Act of 1964 addresses the practice of discrimination and segregation in public accommodations. This includes privately owned establishments such as hotels, restaurants, gasoline stations, theaters, and places of entertainment. The commander concerned will ensure that the facts surrounding allegations of discriminatory practices are fully developed. The commander will also ensure that individuals and organizations alleged to practice such discrimination are given a full and fair opportunity to challenge the particular allegations. If all reasonable efforts and alternatives fail to eliminate off-post discriminatory practices in public accommodations, commanders are authorized to place the facilities off-limits. (See AR 190-24, para 2-7.) Military personnel outside the United States are not protected under Title II of the Civil Rights Act of 1964 while off-post. Nonetheless, the commander concerned will take whatever actions are available and appropriate to attempt to eliminate discriminatory practices in public accommodations outside the United States that affect members of his or her command and their families. Commanders will promote awareness of the laws of the nation that pertain to this issue. All cases of discrimination and resultant action by commanders, which result in the imposition of off-limits sanctions, will be reported to the HQDA(DAPE-HRL-E), WASH DC 20310-0300.

b. *Off-limits sanctions.* Off-limits sanctions may be appropriate for establishments that falsely claim to be private clubs, fraternal or otherwise, and public accommodations with discriminatory policies and practices. If discriminatory practices off-post are found to be directed at selected members of ~~soldiers~~ in a command and if all efforts at conciliation prove unsuccessful, off-limits sanctions will be considered in accordance with AR 190-24.

c. *Off-limits sanctions and private establishments.* A commander ordinarily may not apply off-limits sanctions to a bona fide private establishment, club, activity, or organization. However, such an entity may be placed off-limits if all the following conditions are met:

(1) It is open to ~~service members~~soldiers in general, or to ~~service members~~soldiers who meet specific objective criteria (such as E5 and above), but segregates or discriminates against other ~~service members~~soldiers on the basis of race, color, religion, gender, or national origin when they otherwise meet the general or specific criteria.

(2) It is not primarily political or religious in nature.

(3) The commander, in consultation with the Inspector General, Staff Judge Advocate, and the EOA, determines that the

available Case 4:07-cv-02388-RMW   Document 17-6   Filed 11/02/2007   Page 4 of 20

lawful discrimination after affording the management of the establishment, club, activity, or organization a full and fair opportunity to challenge or refute allegations.

(4) Reasonable efforts by the commander to bring about voluntary termination of the discriminatory practices are unsuccessful.

(5) The commander determines that continued discrimination by the establishment, club, activity, or organization will undermine the morale, discipline, or loyalty of ~~service members~~ soldiers in the command.

*d. On-post activities.* All on-post facilities and official activities must be open, as appropriate, to all DOD personnel and family members irrespective of race, color, religion, gender, or national origin. Installation commanders have the responsibility for ensuring that an organization taking advantage of or using on-post facilities (whether on a reimbursable basis or otherwise) does not engage in unlawful discriminatory practices. It is not enough to depend solely on the published by-laws or the constitution of the organization. The commander must assess the organization's actual membership practices and its effect upon the command. In cases where questionable practices exist or allegations of discrimination are made, the burden of proof rests with organization members. The organization must convince the commander that it does not engage in de facto discrimination. Failure to substantiate absence of discriminatory practices will result in denial of use of on-post facilities.

## 2–6. Procedures for processing complaints

*a.* Individuals will be encouraged to use command channels for redress of grievances. Commanders will ensure that ~~members~~ soldiers are fully aware of procedures for obtaining redress of complaints including those against members of the chain of command. These procedures will be in writing and will be displayed at all times where all unit ~~members~~ soldiers have access to them.

*b.* Individuals may present such complaints to the chain of command, inspectors general, or equal opportunity advisers. How and by whom the complaint is formally processed is a command responsibility. It is the responsibility of the chain of command or staff agency receiving the complaint to conduct an informal inquiry into the allegations, determine if the complaint has merit, and, if so, assist the commander in resolving the complaint at the lowest appropriate level. When, in the course of an informal investigation or fact finding inquiry, the EOA suspects that the person being interviewed has violated the UCMJ (for example, any case of alleged sexual harassment punishable under Articles 93, 117, 120, 125, 128, or 134 UCMJ), the EOA should terminate the inquiry and notify the appropriate member of the chain of command. EOAs will not conduct informal investigations or inquiries of criminal matters. Such issues must be referred to proper command authority.

quiry by the commander or agency receiving the complaint, the facts indicate that a formal investigation is warranted, a recommendation will be made to the commander having the authority to direct such an investigation. Those commanders will then review the facts presented and if they determine that a formal investigation is appropriate they will cause the appointment of a disinterested officer under the provisions of AR 15–6, the Uniform Code of Military Justice, or other applicable authority to conduct the investigation. It may be inappropriate for equal opportunity advisers or their immediate supervisors who conduct the informal inquiry to formally investigate that same complaint within an organization.

## 2–7. Housing complaints

Complaints of discrimination involving unequal treatment because of race, color, religion, gender, or national origin will be forwarded to the local housing referral office for processing. (See AR 210–51.)

## 2–8. Evaluation report entries

When evaluating personnel, rating officials will consider the extent and effectiveness of leadership and support in EO and EEO matters according to this regulation. (See AR 623–105, para 4–13; AR 623–205, para 6–5; and DA Pam 690–25 for reporting procedures.)

## 2–9. Civilian schooling

*Army* personnel pursuing an education program at an institution that unlawfully discriminates in the admission or subsequent treatment of students will not be financially assisted from appropriated fund resources. Exceptions to this policy will be considered when the applicant has previously attended the institution in question and will suffer personal hardship through loss of earned credits if a transfer is required. Requests for exception *will be* sent to HQDA(DAAG-ED), WASH DC 20310–0300.

## 2–10. Legal assistance

Within the framework of the legal assistance program, legal officers may be provided so that members of the Armed Forces who are denied federally protected rights are accorded due process of law. If the civil rights of members of the Armed Forces seem endangered and an appearance in court or other legal action beyond the authority of the legal assistance officer is required, the matter will be reported to The Judge Advocate General (HQDA(DAJA-LT), WASH DC 20310–0300) for possible referral to the Department of Justice. (See AR 27–40.)

## 2–11. Affirmative actions

Affirmative actions will be comprised of planned, achievable steps to eliminate practices that deny equal opportunity to soldiers and their families. These steps are as follows:

mented by heads of Army Staff agencies and their field operating agencies and by each MACOM, installation, separate unit, agency, and activity down to and including brigade or equivalent level. Plans will include conditions requiring affirmative action, remedial action steps (with goals and milestones as necessary), and a description of the end-condition sought for each condition included. AAPs will be reviewed at least annually to assess the effectiveness of action steps, to initiate new actions, and to sustain goals already achieved. Subjects for affirmative action plans will be as prescribed by this headquarters plus those deemed necessary by the responsible commander.

*b.* Each commander required to develop an AAP will provide a copy to the next higher commander.

*c.* Commanders of battalions and lower level units are not required to have AAPs.

## 2–12. Training

*a.* Minimum DA criteria for local unit training programs are as follows:

(1) Members of the chain of command (including supervisors) will participate in unit EO sessions as discussion leaders or as resource persons for answering questions concerning policies and practices. At company and battery-level, a representative of the leadership structure (such as platoon sergeant) will normally be the unit discussion leader.

(2) The commander will incorporate EO training into the overall training plan for the unit. Unit training will focus on the following:

*(a)* Army policies on EO, affirmative actions, and sexual harassment.

*(b)* Objectives of the Army EO program.

*(c)* Objectives of affirmative actions.

*(d)* Behavioral characteristics and other indicators of EO problems.

*(e)* The impact of individual and institutional discrimination on mission accomplishment.

*(f)* Identifying and countering sexual harassment.

*(g)* Legal consequences applicable to individuals participating in acts of sexual harassment.

*(h)* Individual responsibilities concerning equal opportunity and prevention of sexual harassment.

*(i)* The importance of honest and open interpersonal communications in promoting a healthy equal opportunity climate.

(3) EORs are unit ~~members~~ soldiers trained to assist commanders to carry out the EO program within units. Commanders authorized EOAs will see that each unit (company and battery-level) has an EOR. EOAs who are graduates of the Defense Equal Opportunity Management Institute 16-week course *will train* EORs structuring the training to meet local conditions. Instruction in other subject areas related to or supportive of EO objectives may be provided by personnel from other agencies or program areas.

Title of address: Sergeant Major
Abbreviation: SMA

Grade of rank: Command Sergeant Major [2]
Pay grade: E9
Title of address: Sergeant Major
Abbreviation: CSM

Grade of rank: Sergeant Major [3]
Pay grade: E9
Title of address: Sergeant Major
Abbreviation: SGM

Grade of rank: First Sergeant
Pay grade: E8
Title of address: First Sergeant
Abbreviation: 1SG

Grade of rank: Master Sergeant
Pay grade: E8
Title of address: Sergeant
Abbreviation: MSG

Grade of rank: Platoon Sergeant and Sergeant First Class
Pay grade: E7
Title of address: Sergeant
Abbreviation: PSG/SFC

### Junior Noncommissioned officers and Specialist [4]

Grade of rank: Staff Sergeant
Pay grade: E6
Title of address: Sergeant
Abbreviation: SSG

Grade of rank: Sergeant
Pay grade: E5
Title of address: Sergeant
Abbreviation: SGT

Grade of rank: Corporal
Pay grade: E4
Title of address: Corporal
Abbreviation: CPL

Grade of rank: Specialist Four
Pay grade: E4
Title of address: Specialist
Abbreviation: SP4

### Privates

Grade of rank: Private First Class
Pay grade: E3
Title of address: Private
Abbreviation: PFC

Grade of rank: Private
Pay grade: E2
Title of address: Private
Abbreviation: PV2

Grade of rank: Private
Pay grade: E1
Title of address: Private
Abbreviation: PV1

Notes:
1. Other abbreviations authorized for use in correspondence with the general public and agencies outside Department of Defense (DOD), on identification (ID) cards, and in personal correspondence are listed in AR 310–50.
2. Personnel formally selected by DA for participation in the Command Sergeants Major Program.
3. All E9s not formally selected for the Command Sergeants Major Program.
4. Specialist Four will rank immediately below Corporal. This does not require or justify change to table of organization (TOE) or table of distribution and allowances (TDA).

**4**

## Chapter 2
## Command and Other Channels

### 2–1. Chain of command

*a.* The chain of command is the most important organizational technique used by the Army. It is the succession of commanders, superior to subordinate, through which command is exercised. It extends from the President, as Commander-in-Chief, down through the various grades of rank, to the enlisted persons leading the smallest Army elements. This is also known as the command channel. Staff officers and administrative noncommissioned officers (NCOs) are not in the chain of command.

*b.* A simple and direct command channel helps send orders from the highest to the lowest levels in a minimum of time and with the least chance of misinterpretation. The command channel extends upward in the same manner for matters requiring official communication from subordinate to superior.

*c.* Each person in the chain of command is delegated sufficient authority to accomplish assigned duties. Every commander has two basic responsibilities; the mission and care for personnel and property. Normally, accomplishing the mission efficiently will help satisfy the responsibility for personnel welfare.

*d.* A superior in the chain of command holds subordinate commanders responsible for everything their command does or fails to do. A commander cannot delegate responsibilities to superiors. However a commander subdivides responsibility and authority and assigns portions of both to various subordinate commanders and staff members. In this way, a proper degree of responsibility becomes inherent in each command echelon. The need for a commander or staff officer to observe proper channels in issuing instructions or orders to subordinates must be recognized.

*e.* Constant and continuous use of the chain of command is vital to the readiness of any Army unit. Every effort must be made to acquaint all personnel with its existence and proper function.

### 2–2. Staff or technical channels
Another important Army organizational technique for communication is the staff or technical channel. The term "staff" or "technical" channel is used to describe the vertical or horizontal channel between a staff section at one headquarters and a similar staff section at another echelon (or at a parallel headquarters). It is sometimes used for routing reports, information, or instructions that do not involve variations from command policy and directives.

### 2–3. Noncommissioned officer (NCO) support channel
The NCO support channel begins with the commander of a major unit, post, or State headquarters. It extends from the commander's command sergeant major through subordinate unit command sergeants major

to unit first sergeants and then to other NCOs and enlisted personnel of the units. Commanders will define responsibilities and authority of their NCOs to their staffs and subordinates. This NCO support channel is responsible for supporting the chain of command and assisting in the accomplishment of the important tasks below.

*a.* Administering the NCO professional development program.

*b.* Establishing and maintaining the professional standards of the NCOs corps.

*c.* Supervision of unit operations within established policy guidelines.

*d.* Care of individual soldiers and their families.

*e.* Training of enlisted soldiers in their military occupational specialty (MOS) as well as in the basic skills and attributes of a soldier.

*f.* Proper wear of the uniform.

*g.* Appearance and military courtesy of enlisted personnel.

*h.* Care of individual arms and equipment of enlisted personnel.

*i.* Care of living quarters of enlisted personnel.

*j.* Area maintenance tasks.

*k.* Operation of recreational and other facilities for the primary use of enlisted personnel.

## Chapter 3
## Command Policies and Procedures

### 3–1. Command of installations, activities, and units

*a. Responsibility.* The senior regularly assigned officer present for duty has responsibility for the command of units, platoon level and above, except as exempted under paragraphs 3–11 or 3–12. Further policy guidance is outlined below.

(1) An installation will be assigned to the subordinate command whose mission and organization on the installation is best equipped to perform installation management. The organization that is "best equipped" will be determined by the following criteria:

(a) Capable of performing installation management most efficiently and economically in terms of staff and other overhead costs.

(b) The subordinate command can administer base operations functions most efficiently and economically.

(c) Employs and/or commands the largest number of military and civilian personnel in performing mission activities.

(d) Uses the greatest amount of building square footage and/or acreage in performing mission activities.

(e) Has been traditionally associated with the installation.

(f) Having the commander senior in grade.

(2) Except for commanders of type A installations, Army commanders or general

i. *Equal opportunity representatives/leaders (EORs/EOLs) Responsibilities.* EORs will assist commanders at the battalion-level or equivalent and below in carrying out the EO Program within their units. EORs serve a special duty at small unit level. Commanders must appoint EORs in their units who are members of the chain of command in the rank of SSG through 1LT. Soldiers who are graduates of DEOMI and have been awarded enlisted Skill Qualifying Identifier (SQI) Q or officer Additional Skill Identifier (ASI) 5T are still available to perform as additional unit EORs after successful completion of their special duty tour as an EOA. Brigade or higher headquarters' EOAs are available to train unit EORs using the 80 hour Training Support Package (TSP) published by the EO Proponency Office, Soldier Support Institute. EOAs are authorized to supplement that training package to meet local needs and conditions. Instruction in other subject areas related to, or supportive of EO objectives, such as the Consideration of Others Program, may be provided by personnel from other agencies or program areas during this training. Typical roles and duties of EORs are as follows-

(1) Assist commanders in the recognition of detractors from a healthy unit EO climate.

(2) Continuously assist commanders in the conduct of unit climate assessments.

(3) Prepare and assist the commander in the conduct of EO training.

(4) Establish and maintain liaison with other EORs and with the EOA at higher headquarters.

(5) Assist commanders and assigned project officers in preparing and conducting ethnic observances and special commemorations.

(6) Assist complainants by referring them to an appropriate agency for assistance. Complaints referred to another agency will be reported to the EOA. EORs may not conduct investigations and are not trained to fully advise AR 15-6 investigating officers in their conduct of EO complaint investigations. Any commissioned officer performing the additional duty of an EOR, may be asked (in the capacity of a commissioned officer and as a disinterested, third party) to conduct investigations. Yet, those situations should not concern EO complaints within their organization.

(7) Serve as a resource person for EO matters in the unit.

## 6-3. Equal Opportunity Policy

a. The U.S. Army will provide equal opportunity and fair treatment for military personnel, family members and DA civlians without regard to race, color, gender, religion, or national origin, and provide an environment free unlawful discrimination and offensive behavior. This policy-

(1) Applies both on and off post, during duty and non-duty hours.

(2) Applies to working, living, and recreational environments (including both on and off-post housing).

b. Soldiers will not be accessed, classified, trained, assigned, promoted, or otherwise managed on the basis of race, color, religion, gender, or national origin. The assignment and utilization of female soldiers is partially governed by federal law. AR 600-13, Army Policy for the Assignment of Female Soldiers, prescribes policies, procedures, responsibilities, and the position coding system for female soldiers.

c. Rating and reviewing officials shall evaluate each member's commitment to elimination of unlawful discrimination and/or sexual harassment and document significant deviations from that commitment in evaluation reports. Substantiated formal complaints require a "Does not support EO" on the NCOER or the OER. This documentation includes administering appropriate administrative, disciplinary, or legal action(s) to correct inappropriate behavior.

d. This chapter does not implement the provisions of either the Age Discrimination in Employment Act of 1967 (Sections 630 through 634, Title 29, United States Code) or Title VII of the Civil Rights Act of 1964 (Section 2000e, Title 42, United States Code). Physical disability and age controls are not addressed due to overriding concerns of medical fitness and deployability of military personnel.

**6-4. Staffing**

a. *Minimum military staffing requirements.*

(1) EOAs will be assigned to the personal or coordinating staff of commanders at installations, organizations, and agencies that are brigade-level (or equivalent) and higher. Assignments will not be as collateral or part-time duty. Primary duty position authorizations and requirements that comply with this guidance are to be documented in applicable personnel management authorization documents. Authorized positions will not be eliminated without prior approval by the Secretary of the Army.

(2) Active duty military staffing.

(a) Each brigade-level or equivalent unit will have, as a minimum, one full-time EOA with the rank of SFC or higher. Each division will have four EOAs: one officer (LTC) and three noncommissioned officers (NCOs) (one MSG and two SFC). Corps staff will have one officer (LTC) and three NCOs (one SGM, one MSG and a SFC). At most Major Army Commands (MACOM), there will be three EOAs: one officer (LTC) and two NCOs (one SGM and one MSG or SFC). FORSCOM, TRADOC and USAREUR will have an additional NCO in the grade of SFC. At HQDA there will be four officers (LTC and three MAJs) and four NCOs (one SGM and three SFCs) At the Soldier Support Institute (SSI) there will be three EOAs: one officer (LTC) and two NCOs (one SGM and one MSG).

(b) In addition to the above-stated unit staffing requirements, small installations (less than 10,000 soldiers) or base support battalions (BSBs) are authorized one enlisted EOA (SFC). Large installations (greater than 10,000) and area support groups (ASGs) are authorized two enlisted EOAs (MSG and SFC).

(c) Installation EOAs will provide geographic support for units without a dedicated EOA in their specific region. Installation commanders will establish Memoranda of Agreement with tenant units without EOA support to ensure that those tenant units receive EOA support from the installation. Installation EOAs will also support non-deploying soldiers whose unit EOA deployed with their unit.

# Chapter 6
# The Equal Opportunity Program in the Army

## 6–1. Purpose

The Equal Opportunity (EO) program formulates, directs, and sustains a comprehensive effort to maximize human potential and to ensure fair treatment for all persons based solely on merit, fitness, and capability in support of readiness. EO philosophy is based on fairness, justice, and equity. Commanders are responsible for sustaining a positive EO climate within their units. Specifically, the goals of the EO program are to—

*a.* Provide EO for military personnel and family members, both on and off post and within the limits of the laws of localities, states, and host nations.

*b.* Create and sustain effective units by eliminating discriminatory behaviors or practices that undermine teamwork, mutual respect, loyalty, and shared sacrifice of the men and women of America's Army.

## 6–2. Equal opportunity policy

*a.* The U.S. Army will provide EO and fair treatment for military personnel and family members without regard to race, color, gender, religion, national origin, and provide an environment free of unlawful discrimination and offensive behavior. This policy—

(1) Applies both on and off post, during duty and non-duty hours.

(2) Applies to working, living, and recreational environments (including both on and off-post housing).

(3) Additionally, in some circumstances, the Equal Employment Opportunity Complaint system in AR 690–600 may provide guidance.

*b.* Soldiers will not be accessed, classified, trained, assigned, promoted, or otherwise managed on the basis of race, color, religion, gender, or national origin. The assignment and utilization of female Soldiers is governed by federal law. AR 600–13, Army Policy for the Assignment of Female Soldiers, prescribes policies, procedures, responsibilities, and the position coding system for female Soldiers.

*c.* Definitions

(1) *Discrimination.* Any action that unlawfully or unjustly results in unequal treatment of persons or groups based on race, color, gender, national origin, or religion.

(2) *Disparaging terms.* Terms used to degrade or connote negative statements pertaining to race, color, gender, national origin, or religion. Such terms may be expressed as verbal statements, printed material, visual material, signs, symbols, posters, or insignia. The use of these terms constitutes unlawful discrimination.

(3) *Equal opportunity.* The right of all persons to participate in, and benefit from, programs and activities (for example, career, employment, educational, social) for which they are qualified. These programs and activities will be free from social, personal, or institutional barriers that prevent people from rising to the highest level of responsibility possible. Persons will be evaluated on individual merit, fitness, and capability, regardless of race, color, sex, national origin, or religion.

(4) *Gender discrimination.* The action taken by an individual to deprive a person of a right because of their gender. Such discrimination can occur overtly, covertly, intentionally, or unintentionally.

(5) *National origin.* An individual's place of origin or that of an individual's ancestors. The term also applies to a person who has the physical, cultural, or linguistic characteristics of a national group.

(6) *Prejudice.* A negative feeling or dislike based upon a faulty or inflexible generalization (that is, prejudging a person or group without knowledge or facts).

(7) *Race.* A division of human beings identified by the possession of traits transmissible by descent and that is sufficient to characterize persons possessing these traits as a distinctive human genotype.

(8) *Race and ethnic code definitions.* The minimum categories for data on race and ethnicity for Federal statistics, program administrative reporting, and civil rights compliance reporting are defined as follows:

*(a) American Indian or Alaska Native.* A person having origins in any of the original peoples of North and South America (including Central America) and who maintains tribal affiliation or community attachment.

*(b) Asian.* A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinents including, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

*(c) Black or African American.* A person having origins in any of the black racial groups of Africa. Terms such as "Haitian" or "Negro" can be used in addition to "Black" or "African American".

*(d) Native Hawaiian or other Pacific Islander.* A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

*(e) White.* A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

*(f) Hispanic or Latino.* A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture of origin, regardless of race. The term "Spanish origin," can be used in addition to "Hispanic or Latino."

# *SUMMARY of CHANGE*

AR 600–20
Army Command Policy

This rapid action revision, dated 7 June 2006--

o  Clarifies policy on command tour length (para 2-5e(2)).

o  Makes administrative changes throughout.

This major revision, dated 1 February 2006-

o  Provides policy guidance on installation command and control within the
   Installation Management Agency (para 2-5).

o  Provides policy guidance on the duties of Active Guard Reserve personnel
   (para 2-5j).

o  Provides policy on the Army well-being process (chap 3).

o  Clarifies policy on relationships between Soldiers of different ranks
   involving dual status military technicians in the Army National Guard (para
   4-14).

o  Clarifies policy on marriages between officer and enlisted members and of
   relationships between enlisted members when one of the members becomes an
   officer (para 4-14).

o  Provides policy guidance on conducting substantial investigations involving
   homosexual conduct (para 4-19).

o  Provides policy guidance on government travel cards (para 4-22).

o  Clarifies policy on the Domestic Violence Amendment to the Gun Control act of
   1968, "The Lautenberg Amendment" (para 4-23).

o  Sets forth policy on human relations readiness training proponency and
   training elements (para 5-13).

o  Gives additional policy guidance on Equal Opportunity and Prevention of
   Sexual Harassment programs (chap 7).

o  Provides policy guidance on the Army Sexual Assault Prevention and Response
   Program (chap 8).

Field Manual
No. 101-5

Headquarters
Department of the Army
Washington, DC, 31 May 1997

# STAFF ORGANIZATION AND OPERATIONS

## CONTENTS

|  | Page |
|---|---|
| **Preface** | vii |
| **Chapter 1  COMMAND AND STAFF RELATIONSHIPS** | 1-1 |
| Command and Control | 1-1 |
| Command | 1-1 |
| Control | 1-2 |
| Command and Control (C²) System | 1-2 |
| The Staff's Role | 1-3 |
| Battlefield Visualization | 1-3 |
| **Chapter 2  STAFF ORGANIZATION** | 2-1 |
| Basis for Staff Organizations | 2-1 |
| Factors Affecting Staff Organizations | 2-1 |
| Authorization for Staff Organizations | 2-2 |
| Basic Staff Structure Model | 2-2 |
| Chief of Staff (Executive Officer) | 2-2 |
| Coordinating Staff Group | 2-2 |
| Special Staff Group | 2-3 |
| Personal Staff Group | 2-3 |
| Staff Models | 2-3 |
| Major Commands (G Staffs) (Corps and Division) | 2-4 |
| Staffs of Smaller Units (S Staffs) (Regiments, Brigades, and Battalions) | 2-4 |
| **Chapter 3  CHARACTERISTICS OF A STAFF OFFICER** | 3-1 |
| Characteristics | 3-1 |
| Competence | 3-1 |
| Initiative and Judgment | 3-1 |
| Creativity | 3-2 |
| Flexibility | 3-2 |
| Confidence | 3-2 |
| Loyalty | 3-2 |
| Team Player | 3-2 |
| Effective Manager | 3-3 |
| Effective Communicator | 3-3 |
| **Chapter 4  STAFF RESPONSIBILITIES AND DUTIES** | 4-1 |
| The Commander-Staff Relationship | 4-1 |
| Deputy or Assistant Commander-Staff Relationship | 4-1 |
| Chief of Staff (Executive Officer)-Staff Relationship | 4-2 |
| Staff Activities | 4-3 |
| Common Responsibilities and Duties | 4-3 |
| Advising and Providing Information to the Commander | 4-3 |

---

**DISTRIBUTION RESTRICTION:** Approved for public release; distribution is unlimited.
*This publication supersedes FM 101-5, 25 May 1984.

A coordinating staff officer's authority is limited to advising, planning, and coordinating actions within his field of interest. He also coordinates and integrates appropriate special staff officer activities into operations. The commander might also give a coordinating staff officer added authority to act on specific matters within his field of interest.

Directors have staff and line authority. For example, the director of logistics operations might be responsible for operating support activities in addition to his normal responsibilities. Typically, a commander might delegate significant responsibility and authority to a director to enable him to accomplish specific functions.

Normally, coordinating staff officers have a direct interest in other staff officers' fields of interest. Therefore, a clear definition of staff responsibilities is necessary to ensure coordination and to eliminate conflict. Unit SOPs or organization and functions manuals give procedures that specify primary responsibilities and requirements for coordination.

Coordinating staff officers are responsible for acquiring information and analyzing its implications for and impact on the command. More important, coordinating staff officers must provide timely and accurate recommendations to the commander to help him make the best possible decisions. While doing so, coordinating staff officers must often request and receive information and recommendations from special staff officers. However, they must be sure to inform all other coordinating staff officers, as required.

NOTE: A coordinating staff officer working for a general officer is normally designated as a "G"staff officer. For example, the ACofS for operations, G3, normally is at corps, corps support command (COSCOM), and division levels. At division support command (DISCOM), regiment, brigade, and battalion levels, the operations officer is designated as the S3.

### Special Staff Group

Special staff officers help the commander and other members of the staff in their professional or technical functional areas. The specific number of special staff officers and their duties vary at each level of command. Special staff sections are organized according to functional areas. For example, the fire support coordinator (FSCOORD) is the staff officer whose functional area is fire support and artillery. In some cases, a special staff officer is a unit commander, for example, a division

artillery commander or an engineer brigade commander at division or corps.

The commander assigns responsibilities to specific coordinating staff officers for each of the special staff functions. Although special staff sections may not be integral to a coordinating staff section, there are usually areas of common interest and habitual association. Therefore, a coordinating staff officer might be responsible for coordinating a special staff's actions. For example, at division level the G3 coordinates all matters relating to fires and engineers with the FSCOORD, the engineer coordinator (ENCOORD), the air/naval gunfire liaison company (ANGLICO) commander, the aviation coordinator (AVCOORD), and the air liaison officer (ALO).

Other special staff officers may deal routinely with more than one coordinating staff officer. For example, provost marshal (PM) functions are operationally aligned under the G3, but he coordinates with the G1, G2, G4, and G5.

### Personal Staff Group

Personal staff members work under the commander's immediate control. They also may serve as special staff officers as they coordinate actions and issues with other staff members. When performing their duties as special staff officers, these personal staff officers may work through the CofS and under a specific coordinating staff officer for coordination and control purposes. Members of the personal staff include—

• Personnel the TOE or TDA specifically authorizes as personal assistants, such as aides-de-camp.

• Personnel the commander desires to supervise directly.

• Personnel who by law or regulation have a special relationship to the commander.

Typical personal staff members include the command sergeant major (CSM), chaplain, inspector general (IG), public affairs officer (PAO), surgeon, dentist, and staff judge advocate (SJA). Members may perform some duties as personal staff officers and some as special staff officers or members of a coordinating staff section. For example, the SJA is also responsible for his staff section's operations.

## STAFF MODELS

All Army staff organizations at corps through battalion levels use a basic model to begin the organization of

**FM 101-5**

their staffs (Figure 2-1). Each commander then tailors his staff according to his specific needs. Whether the staff is called a G staff or an S staff depends on who is in command. A unit commanded by a general officer has a G staff. A unit commanded by a colonel or below has an S staff.

### Major Commands (G Staffs)
### (Corps and Division)

Figure 2-2 shows the typical staff organization for a corps or division. The staff of a major command has each of the major staff groups: coordinating, special, and personal staff officers. (See Chapter 4 for the duties and responsibilities of each of these officers.)

In a corps or division, the deputy or assistant commander extends the commander's span of control in areas and functions as the commander designates. The deputy or assistant commander's specific duties

vary from corps to corps and division to division, but typically include rear operations or a special operation in conjunction with close operations.

A division normally has two assistant division commanders (ADCs) to extend the division commander's control in designated areas and functions. The ADC's specific duties also vary from division to division. Typical duties might include being the ADC for maneuver or operations or the ADC for support.

### Staffs of Smaller Units (S Staffs)
### (Regiments, Brigades, and Battalions)

The staffs of smaller units are organized according to the basic staff model. Their coordinating staff officers control functional areas of interest more suited to their unit's mission. The staffs of units smaller than division must meet unit requirements. Figure 2-3 depicts a typical smaller-unit staff structure. (See Chapter 4 for the duties and responsibilities of each staff officer.)



**Figure 2-2. Typical corps or division staff structure**



NOTES:  For brigades and battalions not authorized a specific special staff officer, the commander appoints an officer to perform the function as an additional duty, if required. The command may form other staff groups when DA or the theater commander authorizes.

1.  In CSS units, the functions of the S2 and S3 are usually consolidated.
2.  In units where the TOE or TDA does not authorize an S5, the commander gives an officer (usually the S3) the responsibility for civil-military operations (CMO) functions.
3.  In support battalions, a support operations officer is added to the coordinating staff.

**Figure 2-3.  Typical smaller-unit staff structure (brigade and battalion)**

Smaller-unit staff functions are generally the same as those for larger staffs. However, the operational nature of smaller units might require some modification. For example, staff activities, such as advising, planning, coordinating, and supervising, are more informal at small units than at higher levels. The functional area of interest should remain, however, even when the function is absent.

Chapter 4

# STAFF RESPONSIBILITIES AND DUTIES

The commander's staff must function as a single, cohesive unit—a professional team. Each staff member must know his own duties and responsibilities in detail and be familiar with the duties and responsibilities of other staff members.

The staff must establish and maintain a high degree of coordination and cooperation, both internally and with staffs of higher, lower, and adjacent units. The staff's efforts must always focus on supporting the commander and on helping him support his subordinate units. Commanders can minimize risks by increasing certainty. The staff supports the commander by providing better, more relevant, timely, and accurate information; making estimates and recommendations; preparing plans and orders; and monitoring execution.

This chapter describes the responsibilities and duties commonly performed by staff officers assigned to the headquarters of Army units in the field from battalion through corps. Information about the responsibilities and duties of the DA staff is contained in AR 10-5. Information about the responsibilities of installation staffs is contained in AR 5-3.

This chapter first discusses the relationship and the responsibility the commander, deputy commander, and chief of staff have with and to the staff. Next, it discusses the common duties and responsibilities of staff officers. Finally, it describes the specific responsibilities and duties commonly performed by coordinating staff officers, special staff officers, and personal staff officers.

## THE COMMANDER-STAFF RELATIONSHIP

The commander makes and communicates decisions to several people, but this manual describes his communication of decisions and intentions to his staff. He also provides his staff leadership, direction, and guidance. The commander may personally communicate his intent or decisions, either verbally or in writing, or he may relay information to his staff through orders, commander's guidance, and other means.

*The commander is responsible for all that his staff does or fails to do.* He cannot delegate this responsibility. The final decision, as well as the final responsibility, remains with the commander. The commander must foster an organizational climate of mutual trust, cooperation, and teamwork.

When the commander assigns a staff member a mission, he also delegates the necessary authority for the staff member to accomplish the mission. Having delegated the authority to the staff member, the commander must provide the staff member with the guidance, resources, and support necessary to accomplish the mission.

The commander is responsible for training the staff. He may delegate routine staff training to the chief of staff, but the commander must train the staff to relay information and perform the mission to conform to his leadership style. The staff is an extension of the commander. The staff must know his leadership style and understand his intent to best support him, and subordinate, adjacent, and higher headquarters.

## DEPUTY OR ASSISTANT COMMANDER-STAFF RELATIONSHIP

### (Corps, Division, Regiment, and Separate Brigades)

The relationship between the deputy or assistant commander and the staff is unique. Staff members do not work for the deputy or the assistant commanders unless the commander directs this relationship. Each commander must describe his deputy or assistant commander's roles, duties, and relationships with the CofS, the staff, and the commanders of subordinate units. Normally, he assigns specific fields of interest and responsibility to his assistants to decentralize decision making while maintaining overall command.

Because deputy or assistant commanders must be able to assume command at any time, the commander must inform them of his battlefield vision and intent. The CofS must continually provide them with information concerning staff actions.

**FM 101-5**

Deputy or assistant commanders normally do not have coordinating or special staffs. When they have specific responsibilities, the headquarters staff assists them as the commander prescribes. Deputy or assistant commanders give orders to the CofS (or the staff) within limits the commander prescribes. They may go to the CofS at any time for staff assistance. If a deputy or assistant commander needs a staff, the commander may detail officers from the headquarters or subordinate units to help him or make a subordinate unit's headquarters available to him.

At corps and major support command levels, there is normally only one deputy or assistant commander. At division level, there are normally two assistant commanders—the assistant division commander for maneuver (ADCM) or operations (ADCO), and the assistant division commander for support (ADCS). At regiment, brigade, and battalion levels, the executive officer is normally the commander's deputy or assistant commander. At this echelon of command, the executive officer also leads the staff. Along with the duties as the second in charge, he has the duties and responsibilities of the chief of staff, discussed next.

# CHIEF OF STAFF (EXECUTIVE OFFICER)-STAFF RELATIONSHIP

The CofS (XO) is the commander's principal assistant for directing, coordinating, supervising, and training the staff, except in areas the commander reserves. The commander normally delegates executive management authority (equivalent to command of the staff) to the CofS. The CofS frees the commander from routine details and passes pertinent data, information, and insight from the staff to the commander and from the commander to the staff.

The value of a close and special relationship between the commander and the CofS cannot be overstated. The CofS must be able to anticipate battlefield events and share with the commander a near-identical battlefield vision of operations, events, and requirements. He must understand the commander's intent better than, or at least as well as, subordinate commanders. The CofS must understand the commander's personality, style, and instincts as they affect the commander's intentions. Staff members must inform the CofS of any recommendations or information they pass directly to the commander or of instructions they receive directly from the commander.

The CofS helps the commander control subordinate units in their preparing for future employment. He monitors their combat readiness status and directs actions that posture subordinate units for use by the commander. Under special conditions or missions, the commander may give the CofS temporary command of a portion of the force (such as in deployments, retrograde operations, and obstacle crossings, or when the commander and deputy or assistant commanders are unable to command).

A CofS is located at corps, division, and major support command echelons and other units commanded by a general officer. The XO, performing the duties of the CofS, is located in units not commanded by a general officer (regiment, brigade, and battalion). Listed below are the areas and activities that are the responsibility of the chief of staff or executive officer in the role as supervisor of the staff. The CofS (XO) is responsible for—

• Integrating and synchronizing the warfighting plans.

• Managing the commander's critical information requirements (CCIR).

• Establishing, managing, and enforcing the staff planning time line in accordance with the commander's guidance.

• Supervising the targeting, deep operations, and other cross-forward line of troops (FLOT) planning cells.

• Integrating deception planning and fratricide countermeasures into the plan.

• Determining liaison requirements, establishing liaison information exchange requirements, and receiving liaison teams.

• Directly supervising the main command post (CP) and headquarters cell, including displacement, protection, security, and communications.

• Monitoring staff's discipline, morale, and combat and mobilization readiness.

• Organizing, planning, and conducting staff training.

• Supervising all tasks assigned to the staff.

Headquarters
Department of the Army
Washington, DC
16 November 2005

*Army Regulation 27–10

Effective 16 December 2005

Legal Services

# Military Justice

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
General, United States Army
Chief of Staff

Official:

*Sandra R. Riley*

SANDRA R. RILEY
Administrative Assistant to the
Secretary of the Army

**History.** This is a major revision.

**Summary.** This regulation implements, in part, the Department of Defense Reorganization Act; changes to the Manual for Courts-Martial, 2005; Department of Defense Directive 5525.7 (delineating the areas of responsibility for investigating and prosecuting offenses over which the Departments of Defense and Justice have concurrent jurisdiction); Public Law 97–291 (Victim and Witness Protection Act of 1982); Public Law 98–473 (Victims of Crime Act of 1984); Public Law 101–647 (Victims' Rights and Restitution Act of 1990); Public Law 102–484 (National Defense Authorization Act for Fiscal Year 1993); Public Law 103–160 (National Defense Authorization Act for Fiscal Year 1994); Department of Defense Instruction 1325.7 (notifying States regarding sexually violent offenses and offenses against minors); and Department of

Defense Directive 1030.1 (victim and witness assistance) and includes changes on matters of policy and procedure pertaining to the administration of military justice within the Army.

**Applicability.** This regulation applies to the Active Army, the Army National Guard of the United States/Army National Guard, and the United States Army Reserve, unless otherwise stated.

**Proponent and exception authority.** The proponent of this regulation is The Judge Advocate General of the Army. The Judge Advocate General of the Army has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include a formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions but does not identify key

management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Criminal Law Division (DAJA–CL), Office of The Judge Advocate General, HQDA, 1777 North Kent Street, Rosslyn, VA 22209–2194.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Criminal Law Division (DAJA–CL), Office of The Judge Advocate General, HQDA, 1777 North Kent Street, Rosslyn, VA 22209–2194.

**Distribution.** This publication is available in electronic media. Special distribution of this publication in paper was made in accordance with initial distribution (IDN) 092038, intended for commands levels C, D, and E for the Active Army, the Army National Guard of the United States, and the United States Army Reserve.

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1,*page 1*
References • 1–2,*page 1*
Explanation of abbreviations and terms • 1–3,*page 1*

*This regulation supersedes Army Regulation 27–10, dated 13 June 2005.

recorded on the present DA Form 2627 in block 11. The Soldier concerned and the imposing commander will be informed of the filing of the DA Form 2627 in the performance section.

*c.* The filing of a record of nonjudicial punishment imposed upon a member of another armed service will be done in a manner consistent with the governing regulations of that member's parent Service (see Manual of The Judge Advocate General, Navy (JAGMAN) 0101 for Navy and Marine Corps personnel; Air Force Instruction (AFI) 51–201, for Air Force personnel; and U.S. Coast Guard Military Justice Manual (MJM), COMMANDANT INSTRUCTION (COMDTINST) M5810.1D, for Coast Guard personnel).

## Section II
## Authority (para 2, part V, MCM)

### 3–7. Who may impose nonjudicial punishment

*a. Commanders.* Unless otherwise specified in this regulation or if authority to impose nonjudicial punishment has been limited or withheld by a superior commander (see *d*, below), any commander is authorized to exercise the disciplinary powers conferred by Article 15.

(1) The term commander, as used in this chapter, means a commissioned or warrant officer who, by virtue of that officer's grade and assignment, exercises primary command authority over a military organization or prescribed territorial area, that under pertinent official directives is recognized as a command.

(2) The term imposing commander refers to the commander or other officer who actually imposes the nonjudicial punishment.

(3) Commands include the following:

*(a)* Companies, troops, and batteries.

*(b)* Numbered units and detachments.

*(c)* Missions.

*(d)* Army elements of unified commands and joint task forces.

*(e)* Service schools.

*(f)* Area commands.

(4) Commands also include, in general, any other organization of the kind mentioned in (1), above, (for example, a provisional unit designated under AR 220–5), the commander of which is the one looked to by superior authority as the individual chiefly responsible for maintaining discipline in that organization. Thus, an infantry company, whether or not separate or detached (R.C.M. 504(b)(2)), is considered to be a command. However, an infantry platoon that is part of a company and is not separate or detached is not considered to be a command. Although a commissioned or warrant officer exercising command is usually designated as the commander, this position may be designated by various other titles having the same official connotation; for example, commandant, chief of mission, or superintendent. Whether an officer is a commander is determined by the duties he or she performs, not necessarily by the title of the position occupied.

*b. Multi-Service commanders and officers in charge.* A multi-Service commander or officer in charge, to whose command members of the Army are assigned or attached, may impose nonjudicial punishment upon such Soldiers. A multi-Service commander or officer in charge, alternatively, may designate one or more Army units and will for each such Army unit designate an Army commissioned or warrant officer as commanding officer for the administration of discipline under the UCMJ, Article 15. A copy of such designation will be furnished to Criminal Law Division, ATTN: DAJA–CL, Office of The Judge Advocate General, HQDA, 1777 North Kent Street, Rosslyn, VA 22209–2194. A multi-Service commander or officer in charge, when imposing nonjudicial punishment upon a military member of their command, will apply the provisions of this regulation (see para 3–8c).

*c. Delegation.* The authority given to a commander under Article 15 is an attribute of command and, except as provided in this paragraph, may not be delegated. Pursuant to the authority vested in the SA under the provisions of the UCMJ, Article 15(a), the following rules with respect to delegation of powers are announced:

(1) Any commander authorized to exercise GCM jurisdiction or any commanding general may delegate that commander's or commanding general's powers under Article 15 to one commissioned officer actually exercising the function of deputy or assistant commander. A commander may instead of delegating powers under Article 15 to a deputy or assistant commander, delegate such powers to the chief of staff of the command, provided the chief of staff is a general officer, or frocked to a general officer grade. An officer in command who is frocked to the grade of brigadier general is not a general officer in command as defined in para 2c, part V, MCM, and lacks the authority to impose some punishments, including forfeitures and arrest upon commissioned and warrant officers. (See paragraph 5(b)(1)(B), part V, MCM, table 3–1B (Maximum Punishment for Commissioned and Warrant Officers that may be imposed by a general officer in command or GCMCA), and AR 600–8–29, paragraph 6–1*a*, figure 6–1 (limitations of frocked officers).

(2) Authority delegated under *c* (1), above, may be exercised only when the delegate is senior in grade to the person punished. A delegate need not, when acting as a superior authority on an appeal, be senior in grade to the imposing commander.

**Headquarters**
**Department of the Army**
**Washington, DC**
**8 March 2007**

*Army Regulation 600–100

Effective 22 March 2007

Personnel—General

# Army Leadership

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

JOYCE E. MORROW
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a major revision.

**Summary.** This regulation establishes Army leadership policy and sets forth responsibilities for all aspects of leadership and leader development policy, doctrine, training, and research.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. This regulation also applies to the Department of the Army civilians. During mobilization, the proponent may modify chapters and policies contained in this regulation.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions, but does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from Headquarters, Department of the Army, ATTN: DAPE–HRI, 300 Army Pentagon, Washington, DC 20310–0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Deputy Chief of Staff, G–1, ATTN: Human Resources Policy Directorate (DAPE–HRI), 300 Army Pentagon, Washington, DC 20310–0300.

**Distribution.** This publication is available in electronic media only and is intended for command levels A, B, C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

# Contents (Listed by paragraph and page number)

## Chapter 1
**General,** *page 1*
Purpose • 1–1,*page 1*
References • 1–2,*page 1*
Explanation of abbreviations and terms • 1–3,*page 1*
Leadership overview • 1–4,*page 1*
Army Culture and leadership • 1–5,*page 1*
Core leader competencies • 1–6,*page 3*
Leadership levels • 1–7,*page 3*
Leader development • 1–8,*page 4*

*This publication supersedes AR 600–100, 17 September 1993.

**UNCLASSIFIED**

*b.* Integrate Army leadership and leader development doctrine in all training programs in service schools and training centers for commissioned and warrant officers, NCOs, and Army civilians at progressive and sequential phases of career development.

*c.* Serve as proponent for FM 6–22.

*d.* Manage all leadership and leader development education and training programs of instruction, to include development and implementation of leadership assessment policy, in TRADOC service schools and training centers.

*e.* Monitor the development and implementation of Developmental Leadership Assessment training products, materials, and tools for officer, warrant officer, NCO, and Army civilian leadership training programs.

*f.* Conduct and participates in leadership, leadership research, and leader development conferences.

*g.* Monitor the integration of leader development requirements into the Cadre Training Course (CTC), Home Station, and Institutional Training Master Plans.

*h.* Monitor the integration of lessons learned into all leader development courses.

*i.* Monitor the development and maintenance of specific proponent career maps under the TRADOC area of responsibility.

## 2–9. Commanding General, U.S. Army Accessions Command/Deputy Commanding General, Initial Military Training

The Commanding General, U.S. Army Accessions Command (USAAC)/Deputy Commanding General, Initial Military Training (DCG–IMT) (under TRADOC) will—

*a.* Provide integrated command and control of the recruiting and initial military training for the Army's officer, warrant officer, and enlisted forces to meet the Army's manpower and readiness requirements and standards.

*b.* Conduct Basic Officer Leader Course pre-commissioning leadership instruction for the U.S. Military Academy (USMA), Reserve Officer Training Corps (ROTC), Officer Candidate School (OCS), and Warrant Officer Candidate School (WOCS).

*c.* Conduct leadership instruction for Junior ROTC and the National Defense Cadet Corps.

*d.* Establish and provide IMT policy and execution guidance to TRADOC commanders and staff outside the IMT chain of command. Embeds the Army culture and leadership in all facets of IMT.

*e.* Establish, and is the approving authority for, the Basic Officer Leader Courses (BOLC) I, II, and III common core task lists, in coordination with the USMA.

*f.* Establish accreditation policy and provide guidance and quality assurance for the execution of all officer and enlisted IMT programs in TRADOC schools (BOLC I, II, and III; and IET); and IMT assessment/assistance visits policy and guidance for all officer and enlisted IMT installations.

*g.* Conduct and participate in leadership, leadership research, and leader development conferences.

*h.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–10. Commanding General, Combined Arms Support Command

The Commanding General, Combined Arms Support Command, (CG CASCOM) (under TRADOC) will—

*a.* Conduct leadership training.

*b.* Conduct and participate in leadership, leadership research, and leader development conferences.

*c.* Provide results or an executive summary of all leader, leadership, and leader development studies to the CAL.

## 2–11. Commanding General, Combined Arms Center/Commandant, U.S. Army Command and General Staff College

The Commanding General, Combined Arms Center (CG, CAC)/Commandant, U.S. Army Command and General Staff College (ACGSC) (under TRADOC) will—

*a.* Serve as the TRADOC proponent for Leader Development and Education, Professional Military Education (officer, warrant officer, NCO, and civilian) and Army doctrine.

*b.* Provide guidance and support for leadership, leader development, and leadership research conferences.

*c.* Conduct instruction in leadership and ethics for the Intermediate Level Education (ILE), Pre-Command Course, Division Commander/Assistant Division Commander Course, and other courses as directed.

*d.* Coordinate closely with service schools, training centers, the U.S. Army War College (USAWC), Army Management Staff College, U.S. Army Reserve schools, Army National Guard state military academies, and pre-commissioning schools (USMA, ROTC, OCS, and WOCS) to achieve an integrated, progressive, and sequential leadership and ethics instruction program.

*e.* Assist in the integration of approved leadership and leader development doctrine into Army-wide programs of instruction.

*f.* Establish and maintain close coordination with service schools, the research community, the civilian academic community, other services, and services of other countries to monitor and evaluate research and studies in ethics and cohesion.

- Establishes and executes policy, leads people, and manages programs, projects, and Army systems.
- Focuses on integrating collective, leader, and individual training.
- Operates, maintains, administers, and manages Army equipment and support, research, and technical activities.
- Concentrates on DA civilian individual and organizational effectiveness and readiness.

**Figure A-1.  Roles and Responsibilities of Commissioned, Warrant, Noncommissioned, and DA Civilian Leaders**

# AUTHORITY

A-7.  Authority is the legitimate power of leaders to direct subordinates or to take action within the scope of their positions. Military authority begins with the Constitution, which divides it between Congress and the president. (The Constitution appears in Appendix F.) Congress has the authority to make laws that govern the Army. The president, as commander in chief, commands the armed forces, including the Army. Two types of military authority exist:  command and general military.

## Command Authority

A-8.  Command is the authority that a commander in the armed forces lawfully exercises over subordinates by virtue of rank or assignment. Command includes the authority and responsibility for effectively using available resources to organize, direct, coordinate, employ, and control military forces so that they accomplish assigned missions. It also includes responsibility for health, welfare, morale, and discipline of assigned personnel.

A-9.  Command authority originates with the president and may be supplemented by law or regulation. It is the authority that a commander lawfully exercises over subordinates by virtue of rank or assignment. Only commissioned and warrant officers may command Army units and installations. DA civilians may exercise general supervision over an Army installation or activity; however, they act under the authority of a military supervisor. DA civilians do not command. (AR 600-20 addresses command authority in more detail.)

A-10.  Army leaders are granted command authority when they fill command-designated positions. These normally involve the direction and control of other soldiers and DA civilians. Leaders in command-designated positions have the inherent authority to issue orders, carry out the unit mission, and care for both military members and DA civilians within the leader's scope of responsibility.

Headquarters
Department of the Army
Washington, DC
1 May 1989

*Army Regulation 635–100

Effective 1 June 1989

Personnel Separations

# Officer Personnel

This UPDATE printing publishes a revision of this publication. Because the publication has been revised the changed portions have not been highlighted.

By Order of the Secretary of the Army:

CARL E. VUONO
General, United States Army
Chief of Staff

Official:

MILTON H. HAMILTON
Administrative Assistant to the
Secretary of the Army

**Summary.** This regulation provides policies and procedures for separating officers (to include non-disability retirement) from active duty. It also implements DOD Directive 1332.20 and DOD Directive 1332.30.

**Applicability.** This regulation is applicable to all Regular Army officer personnel and Reserve Component officer personnel on active duty, or, if specified by particular provisions of this regulation, active duty for training, United States Army Reserve (USAR), or the Army National Guard (ARNG). Unless otherwise specifically provided, the provisions of this regulation are binding on field commanders but not on Headquarters, Department of the Army (HQDA). Nonstatutory exceptions to the provisions of this regulation will be approved by the Assistant Secretary of the Army for Manpower and Reserve Affairs or his or her designated representative.

**Impact on New Manning.** This regulation does not contain information that affects the new manning system.

**Internal control systems.** This regulation is subject to the requirements of AR 11–2. It contains internal control provisions but does not contain checklists for conducting internal control reviews. These checklists are being developed and will be published at a later date.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the U.S. Total Army Personnel Command (TAPC–OPP–M), Alexandria, VA 22332–0418.

**Interim changes.** Interim changes to this regulation are not official unless they are authenticated by the Administrative Assistant

to the Secretary of the Army. Users will destroy interim changes on their expiration date unless sooner superseded or rescinded.

**Suggested improvements.** The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Cdr, PERSCOM (TAPC–OPP–M), Alexandria, VA 22332–0418.

**Distribution.** Distribution of this publication is made in accordance with the requirements on DA 12–09–E, Block number 3569, intended for command level A for Active Army, B for ARNG, and A for USAR.

**Contents** (Listed by paragraph number)

**Chapter 1
General**
Purpose • 1–1
References • 1–2
Explanation of abbreviations and
    terms • 1–3
Responsibilities • 1–4
Discharge certificates • 1–5
Character of service • 1–6
Report of Separation from Active Duty
    (DD Form 214) • 1–7
Action required before the involuntary
    separation of officers with access to
    special intelligence, other compartmented
    information, or sensitive programs • 1–8

**Chapter 2
Separation of Officers in Foreign
    Countries**
Scope • 2–1
Officers confined pursuant to the sentence
    of a foreign court • 2–2
Separation while under investigation or
    sentenced but not confined by foreign
    courts • 2–3
Personnel eligible for return from overseas
    for discharge or release from active
    duty • 2–4

**Chapter 3
Release from Active Duty of Non-
    Regular Commissioned and Warrant
    Officers**

*Section I
General*
Scope • 3–1
Statutory authority • 3–2

Separation approval authority • 3–3
Years of service • 3–4
Adverse matters • 3–5
Officers under investigation • 3–6
Travel • 3–7
Medical/dental care required, or sick in
    hospital when period of service
    expires • 3–8
Officers on active duty for training
    (ADT) • 3–9
Investigation of court-martial charges or
    trail by court-martial pending • 3–10
Indebtedness • 3–11
Dual status officers • 3–12
Medical examination • 3–13
Leave • 3–14
Status on and after separation • 3–15
Processing applications • 3–16
Assignment of personnel to transfer
    activities • 3–17

### 3–46. Procedures

~ *a.* Provisions of paragraph 3–16 apply as appropriate.

·, *b.* Applications from officers otherwise eligible to receive readjustment pay will include the following statement: "I understand that this request for early release from active duty, if approved will constitute release under voluntary conditions and will preclude my entitlement to readjustment pay."

## Section XI
### *Expiration of Active Duty Commitment*

### 3–47. General

Officers who decline to request extension of service under AR 135–215 and officers whose requests for extension of service have been disapproved by HQDA, will be released from active duty in sufficient time to arrive at their home not later than 2400 hours on the day of completion of their tours of service. This section is also applicable to six months active duty for training personnel.

### 3–48. Authority

*a.* Separation approval authorities will ensure that officers under their jurisdiction are released as scheduled except officers serving in dual status who will be reported to Cdr, PERSCOM (TAPC–PDT–RS) according to paragraph 3–14.

*b.* Officers not under the jurisdiction of a commander having separation approval authority will be reported to Cdr, PERSCOM (TAPC–PDT–RS) not later than 60 days prior to scheduled date of release from active duty for issuance of orders for assignment to a transfer activity according to paragraph 3–17.

*c.* The authority for separation will be cited as follows:

(1) Officers serving with their consent, who decline further service: AR 635–100, para 3–48c(1) and SPD in AR 635–5–1.

(2) Officers serving without their consent, who decline further service: AR 635–100, para 3–48c(2) and SPD in AR 635–5–1.

(3) Expiration of active duty commitment due to disapproval of voluntary indefinite service: AR 635–100, para 3–48c(3) and SPD in AR 635–5–1.

## Section XII
### Involuntary Release from Active Duty

### 3–49. General

Officers will be involuntarily released from active duty on the recommendation of the DA Active Duty Board (DAADB) for misconduct, moral or professional dereliction and/or when their degree of efficiency and manner of performance or the needs of the service require such action. The CG, PERSCOM will operate the DAADB.

*a.* Whenever evidence reveals that—

(1) An officer has committed a significant act of misconduct or moral or professional dereliction.

(2) The officer's degree of efficiency and manner of performance require release from active duty or elimination from the service, action will be taken as stated in *b* and *c* below.

*b.* The records of the officers together with all available evidence, will be obtained by the CG, PERSCOM, The Judge Advocate General, or the Chief of Chaplains, as appropriate, and forwarded without recommendation to Cdr, PERSCOM (TAPC–OPP–M).

*c.* The CG, PERSCOM (TAPC–OPP–M) will forward these records and evidence, without recommendation, to the DAADB for consideration for release from active duty and elimination from the service, in the prescribed guidance and criteria.

*d.* Officer records will be screened annually by the CG, PERSCOM. The Judge Advocate, or the Chief of Chaplains, as appropriate, to determine whether any officers other than those referred to in *b* and *c* above should be considered for release from active duty, or elimination from the service for the reasons stated in *a* above.

(1) If it is determined that any officers should be considered by a DAADB, the records and evidence will be forwarded, without recommendation, by the CG, PERSCOM, The Judge Advocate or

the Chief of Chaplains, as appropriate, to the CG, PERSCOM (TAPC–OPP–M).

(2) The CG, PERSCOM (TAPC–OPP–M) will forward these records and evidence, without recommendation, to the DAADB for consideration for release from active duty or elimination from the service, in the prescribed guidance and criteria.

*e.* On initiation of an action by an agency (*b*, *c* or *d* above) a DA Form 268 (Report to Suspend Favorable Personnel Actions) will be prepared and distributed according to AR 600–8–2.

*f.* Actions on officers *in a* through *c* above which are recommended by the DAADB for release from active duty and elimination from the service will be released from active duty by HQDA, and will be processed for consideration for elimination under the provisions of AR 135–175 or NGR 635–101, as appropriate.

_.*g.* When budgetary or authorization limitations require a reduction of officer strength, a DAADB will be convened to determine which officers will be released from active duty. The CG, PERSCOM, The Judge Advocate General, Chief of Chaplains, or any of these offices, using prescribed criteria may be required to forward officer records, without recommendation, for consideration by the Board. Officers designated for release under this paragraph are not considered ineffective or substandard in duty performance. Their release is dictated by the needs of the Service.

*h.* Each officer considered under *a* through *c* above will be notified in writing that his or her records and any other available evidence are being transmitted to the DAADB for consideration and will be informed of the criteria which his or her records were submitted. The letter of notification will outline the criteria furnished the Board for guidance in selecting officers for separation. Each officer will have the right to submit appropriate written material for the DAADB's consideration regarding his or her case, and the officer concerned or a designee will be afforded the opportunity to review all of the officer's personnel records and any other written material which will be submitted to the DAADB for evaluation.

*i.* The decisions of these boards are final. ~ '* ' */ * /

*j.* Officers designated for release under this section may be released from active duty on any date between the date of notification and the 90th day after receipt of notification by the officer concerned. The officer will not be released prior to the 90th day without his or her consent. Notwithstanding the foregoing, any officer designated for release by reason of a finding which includes misconduct, moral or professional dereliction will be released not earlier than five days nor later than 14 days after receipt by the command of the notification that the officer is to be released. The statement in figure 3–2 will be completed and signed by the officer concerned and placed in his or her DA Form 201 (US Army Military Personnel Records Jacket) as a permanent document.

*k.* Officers who will complete 18 or more years of active Federal service on their scheduled release date will not be processed under this section, unless such action is approved by the Secretary of the Army, but will be retained on active duty until the last day of the month following the month they complete 20 years of active Federal service.

*l.* Release from active duty under this section is involuntary; therefore, release prior to the 90th day after notification will have no effect on entitlement to separation pay.

*m.* Notwithstanding the above provisions, an officer who is found guilty, or action is taken which is tantamount to a finding of guilty, by any Federal or State court will be released by the Secretary of the Army from active duty immediately when the offense—

(1) Is punishable under the Uniform Code of Military Justice by a maximum penalty of death or confinement for one year or more. If the offense is not listed in the Manual for Courts-Martial, 1984, Table of Maximum Punishments, or is not closely related to an offense listed therein, the maximum punishment authorized by The United States Code or the District of Columbia Code, whichever is lesser, applies; or

(2) Involves moral turpitude, regardless of the sentence received or maximum punishment permissible under any code. The release of officers under this provision who have completed 18 or more years of active Federal service on the date the officer is

found guilty, must be approved by the Secretary of the Army. If the finding of guilty is subsequently set aside, the officer may, with *his or her consent and the approval of the Secretary of the Army,* be returned to active duty.

### 3-50. Action by commanding officers

a. Commanders at all echelons will submit actions on officers, whose manner of performance of duty when compared with their contemporaries, indicates a lack of justification for retention on active duty, through channels to Cdr, PERSCOM (TAPC-OPP-M), The Judge Advocate General, the Chief of Chaplains, as appropriate. An action may be submitted at any time and will be accompanied with details of the reasons for recommendation of the officer for release from active duty.

b. On initiation of an action, the commander will prepare and distribute DA Form 268 according to AR 600-8-2.

c. On receipt in PERSCOM, actions will be processed according to paragraph 3-49d(2) or (3), as appropriate.

d. Prior to forwarding a recommendation, the initiating commander will refer the action for comment or rebuttal to the officer being recommended for release from active duty. (See AR 600-37.) Specific reasons for the recommendation will be presented in writing to the officer concerned. No reasons will be added after the officer's review, without further referral to the officer.

e. Heads of staff agencies may when appropriate, initiate a recommendation for an officer's release from active duty under this section. On initiation of an action, a DA Form 268 will be prepared according to AR 600-8-2. This provision also applies to officers who are pregnant and whose substandard performance of duty is not solely attributable to the condition of pregnancy; for example:

(1) Failure to perform prescribed duties due to defective attitude rather than physical limitation.

(2) Failure to report to duty without medical or military authorization.

(3) Refusal of CONUS reassignment during the first six months of pregnancy.

### 3-51. Authority

a. Commanders specified in paragraph 3-3 are responsible to effect the timely separation of officer notified of involuntary release from active duty under this section.

b. Separation approval authorities are authorized to effect earlier release, with the consent of the officer concerned. This authority may not be further delegated.

c. The authority for separation is AR 635-100, paragraph 3-49a, b, and g, as applicable and SPD shown in AR 635-5-1 will be cited.

### 3-52. Procedures

Officers to be released from active duty under this section will be notified through appropriate commander by PERSCOM (TAPC-PDT-RS).

### Section XIII
### Failure of Selection for Permanent Reserve Promotion

### 3-53. General

a. The provisions of this section do not apply to commissioned officers on the active duty list (AR 624-100 and 10 USC 620). Except as indicated in b through e below, the following officers will be released from active duty and discharged on the 120th day after receipt of involuntary release notification, unless earlier release is voluntarily requested, or transferred to the Retired Reserve, if requested and eligible under AR 140-10. Officers with a remaining service obligation will be transferred to the Ready Reserve.

(1) Reserve commissioned officers serving on active duty as commissioned officers, who fail a second time to be selected for promotion to permanent Reserve grade of captain, major, or lieutenant colonel.

(2) Reserve warrant officers serving on active duty as warrant officers who fail a second time to be selected for promotion to permanent grade of W3 or W4.

b. Reserve commissioned officers holding the permanent Reserve grade of second lieutenant and serving on active duty as commissioned officers who are not promoted to the permanent Reserve grade of first lieutenant on or before date of completion of three years promotion service will be released from active duty and discharged on date of completion of such service unless they have a service obligation. Those serving on an obligated period of active duty will be retained on active duty until completion of this obligation.

c. Reserve warrant officers holding the permanent Reserve grade of W1 and serving on active duty as warrant officers who are not promoted to the permanent grade of W1 and serving on active duty as warrant officers who are not promoted to the permanent Reserve grade of W2 on or before date of completion of three years promotion service, will be released from active duty and discharged on date of completion of such service unless they have a service obligation. Those serving an obligated period of active duty will be retained on active duty until completion of obligation.

d. Officers who are within two years of qualifying for retirement under chapter 4 (20 years active Federal commissioned service) on their scheduled release date, and who can so qualify prior to attaining maximum ages specified in this chapter, section VI, will be retained on active duty until the last day of the month following the month they qualify for such retirement.

e. An officer eligible for retirement under chapter 4 may apply *for retirement to be effective not later than the first day of the* month following the month which release is directed.

### 3-54. Authority

a. Commanders specified in paragraph 3-3 will ensure necessary action is taken to effect release from active duty and discharge or transfer to the Ready or Retired Reserve, on scheduled date of release, of officers notified of mandatory release under this section. Dual status officers will be reported to Cdr, PERSCOM (TAPC-PDT-RS) according to paragraph 3-12.

b. Separation approval authorities are authorized to take final action on requests for earlier release, except on requests from officers serving in dual status will be forwarded to Cdr, PERSCOM (TAPC-PDT-RS) as required by paragraph 3-12. This authority may not be further delegated.

c. The authority for separation will be cited as follows:

(1) Officers released and transferred to Ready or Retired Reserve: AR 635-100, chapter 3, section XIII and SPD shown in AR 635-5-1.

(2) Officers released and discharged: AR 635-100, chapter 3, section XIII and SPD shown in AR 635-5-1.

### 3-55. Procedures

Letters of notification will be dispatched by PERSCOM, to appropriate commanders. The statement will be completed by the officer concerned and dispatched immediately to the addresses indicated. One copy of the statement will be filed in the officer's DA Form 201 until his or her release from active duty or retirement, as applicable, has been effected.

### Section XIV
### Failure of Selection for Promotion of Warrant Officers on the Active List

### 3-56. General

a. Except as indicated in b through g below, the following warrant officers will be released from active duty on the 90th day after receipt of involuntary release notification unless earlier release is requested:

(1) Reserve warrant officers serving on active duty as warrant officers who are twice reported by a DA Promotion Selection Board as not recommended for promotion to temporary AUS

14    **AR 635-100 • UPDATE**

*(Letterhead)*

EXT-ORDERS 5121-23                                          *(DATE)*

### Announcement of Retirement

The retirement of Colonel John J. Smith, *(duty position)*, is announced with the deepest regret but with the greatest appreciation for his long and distinguished career of 30 years.

Colonel Smith was born in July 1937 in Fort Hayes, Ohio. Commissioned in the Field Artillery on graduation from the United States Military Academy in 1959, he attended Airborne School and was assigned to the 82d Airborne Division for two years. Colonel Smith subsequently served for three years in Panama, followed by a transfer to the 173d Airborne Brigade for a year of combat command and staff duty. Service in Vietnam was followed by a three year instructorship assignment at the United States Air Force Academy and subsequent return to Vietnam for duty with the 198th Infantry Brigade. Between troop duty assignments Colonel Smith graduated from the Armed Forces Staff College.

A two-year tour at Fort Benning, Georgia with the United States Army Combat Arms Training Board ended in 1974. Colonel Smith then joined the 101st Airborne Division (Air Assault) where he served as the Division Artillery operations officer and commanded the 1st Battalion, 321st Field Artillery. Colonel Smith was next posted to Headquarters, Department of the Army in the office of the Chief, Army National Guard Bureau. 1980 saw Colonel Smith deploy to the Republic of Korea for a four-year assignment as the Chief of the Operational Plans Divisions of both the Republic of Korea/United States Combined Forces Command and Headquarters United States Forces Korea. From 1984 to 1989, Colonel Smith was assigned to the Office of the Deputy Chief of Staff for Personnel and served in several top level management positions. Colonel Smith's last assignment found him as a member of the Headquarters, Department of the Army, Deputy Chief of Staff for Personnel Review Boards and as president of the Secretary of the Army's Conscientious Objector Review Board.

During his illustrious career, Colonel Smith has been honored for valor on the battlefield and for meritorious service in positions of great responsibility. His many awards and decorations include four Bronze Stars, two awards of the Meritorious Service Medal, three awards of the Air Medal and the Senior Parachutist's and Aircraft Crewmember's Badges. Colonel Smith's many friends and fellow soldiers join together on this day in wishing him the best of health and happiness in his well earned retirement.

PAUL A. DOE
Major General, USA
Commanding

**Figure 4–3. Sample format for announcement of retirement**

## Chapter 5
## Eliminations

### Section I
### General

#### 5–1. Scope
This chapter prescribes the means and procedures to eliminate officers from the Army for substandard performance of duty, misconduct, moral or professional dereliction, or in the interest of national security. This chapter applies to all officers (commissioned and warrant) in the Active Army.

#### 5–2. Statutory provisions
The provisions of law stated in *b* through *i* below (from Title 10, USC, unless otherwise indicated) pertain to the elimination of commissioned and warrant officers.

*a.* Section 266 provides that boards convened for the discharge of officers of the Reserve components will include at least one member of the Reserve (the exact number to be prescribed by the

Secretary of the Army) and specifies seniority requirements for these officers.

*b.* Section 1162 provides for discharge of Reserve commissioned officers by the President and other Reserves under regulations promulgated by the Secretary of the Army.

*c.* Section 1163 provides for involuntary separation of officers of Reserve components with 3 or more years of commissioned service on the approved recommendation of a board of officers.

*d.* Section 1165 provides for termination of appointment of RA warrant officers within 3 years subsequent to acceptance of appointment.

*e.* Section 1166 provides for elimination of RA warrant officers under regulations prescribed by the Secretary of the Army.

*f.* Section 602 governs the temporary appointment of warrant officers by Secretary of the Army.

*g.* Section 1181 et seq., provides for separation of commissioned officers from the RA for substandard performance of duty, misconduct, moral or professional dereliction, or in the interest of national security.

*h.* Section 630 provides for the discharge of RA commissioned officers with less than five years of active commissioned service or found not qualified for promotion to first lieutenant.

*i.* Section 3820 and Title 32, USC, section 323, provide for withdrawal of Federal recognition and discharge of ARNG officers from appointment as Reserve officers.

*see chapter 18*

## Section II
## Considerations

### 5–3. Double jeopardy

*a.* No officer will be considered for elimination pursuant to paragraph 5–10 or 5–11 because of conduct which has been the subject of judicial proceedings resulting in an acquittal based on the merits or an action having the effect.

*b.* Except as expressly provided in *d* below, no officer will be considered for elimination for the reasons stated in paragraph 5–10 and 5–11, because of conduct which has been the subject of administrative elimination proceedings which resulted in a final determination that the officer should be retained in the service. For purposes of this paragraph, an officer will be considered to have been the subject of elimination proceedings only if the allegations against the officer were acted on by a Board of Inquiry or a DA Selection Board convened under this chapter.

*c.* No officer who has been the subject of a DAADB action under paragraph 3–49*a* resulting in a determination that the member should be retained in the service will be considered for elimination for reasons stated in paragraph 5–10 and 5–11 because of the same conduct. However, an officer may be considered for elimination when additional substantial evidence is discovered which warrants considering the officer for elimination pursuant to this chapter under the following circumstances:

(1) For substandard performance of duty at any time one year after the date the officer was retained by the DAADB. *See chg 18*

(2) *For misconduct, moral or professional dereliction or in the interest of national security at anytime subsequent to the date the officer was retained by the DAADB.*

*d.* The limitations set forth in *a* above are not applicable when—

(1) Substantial new evidence is discovered, which was not known at the time of the original proceedings despite the exercise of due diligence, which would probably produce a result significantly less favorable for the officer at a new hearing.

(2) Subsequent conduct by the officer warrants considering him or her for discharge. Such conduct need not independently justify the officer's elimination, but must be sufficiently serious to raise a substantial question as to the officer's potential for further useful military service. However, this exception does not permit further consideration of conduct which the officer has been absolved in a prior final factual determination, based on the merits, by a judicial body.

(3) An express exemption has been granted by HQDA on a determination that, due to the unusual circumstances of the case, administrative separation should be effected.

*e.* Under the following circumstances an officer who has been considered for elimination and retained on active duty may be required to again show cause for retention because of lack of proficiency or recurrent misconduct subsequent to the earlier consideration, or because of misconduct which occurred prior to that alleged in the earlier proceedings but was not sooner discovered despite the exercise of due diligence:

(1) An officer who has been considered for *elimination for substandard performance of duty and retained may again be considered for elimination for substandard performance of duty at any time* after the prior case has been closed.

(2) An officer may be considered for elimination for misconduct, moral or professional dereliction, or in the interests of national security, at any time subsequent to the closing of the prior case, which resulted in the officer's retention on active duty. However, an officer may not again be required to show cause for retention on active duty solely because of conduct which was the subject of the previous proceedings, unless the findings and recommendations of the Board of Inquiry or Board of Review that considered the case are determined to have been obtained by fraud or collusion. The grounds for elimination in the earlier case may be joined with new grounds in the later case provided the earlier elimination proceedings does not include a factual determination specifically absolving the officer of the allegations then under consideration. If the grounds for elimination in the earlier proceedings are joined, the additional grounds considered in the subsequent proceeding need not independently justify the officer's discharge, but must be sufficiently serious to raise a substantial question as to the officer's potential for further useful military service.

*f.* Punishment resulting from trial by court-martial or under the provisions of Article 15, UCMJ, for misconduct and subsequent use of this fact in support of elimination under this regulation does not constitute double jeopardy.

### 5–4. Assignment of officer while elimination action is pending

When elimination action is initiated, the officer concerned will remain in his or her current major command until the case is closed, *unless specific instructions to the contrary are issued by PER-SCOM.* See AR 600–8–2.

### 5–5. Second failure of selection for promotion

Separation of RA and USAR officers for second failure of selection for promotion is governed by this regulation, chapters 3 and 4 and AR 635–120.

### 5–6. Reporting requirements of AR 190–10

When separation action is taken under the provisions of this chapter, the case file of the individual will be reviewed by CG, PERSCOM to determine whether the reporting requirements set forth in AR 190–10 are applicable. When conditions exist in any officer's case file, the report required by AR 190–10 will be submitted.

## Section III
## Medical Processing

### 5–7. Medical condition

Officers will not be processed under this regulation if, at the time of the conduct which is the basis of the proceedings, they were not so far free from mental defect, disease, or derangement with respect to the conduct in question as to be able to distinguish right from wrong, or entertain the specific intent which may be required by the conduct at issue, and additionally, to adhere to the right. If appropriate, they will be processed through medical channels. Further, officers recommended for elimination for substandard performance of duty will be processed through medical channels rather than under this regulation if the conduct which their elimination would be based is the product of a physical condition, or mental condition less than insanity, which is deemed to medically incapacitate them for further military duty. An officer will not be required to appear before a board of inquiry if, at the time, he or she *does not possess sufficient mental capacity to understand* the nature of the proceedings against them, and intelligently conduct or cooperate in their own defense. In such circumstances proceedings will be delayed until the officer recovers, or be or she will be processed through medical channels. Should a physical or·mental condition develop subsequent to the forwarding of a recommendation that an officer be eliminated, or the completion of the proceedings of a board of inquiry, the appropriate commander will immediately notify Cdr, PERSCOM (TAPC–OPP–M). When it is considered that the officer's mental condition has contributed to his or her military inefficiency or unsuitability as specified, the medical evaluation will include a psychiatric study of the officer, when appropriate. When a psychiatric report is included, it will indicate whether the officer was able to distinguish right from wrong and adhere to the right at the time of the conduct under investigation, and whether he or she currently has the mental capacity to understand board and judicial proceedings and participate in

his or her own defense. If it is determined that the officer is suffering from an incapacitating mental illness, the examiner should indicate whether that illness was probably the cause of the conduct under investigation.

## 5-8. Medical evaluation when homosexuality is involved

a. Medical evaluation of officers considered for separation under paragraph 5-11a (6) will include a mental status evaluation, to be accomplished by the examining physician. DA Form 3822-R (Report of Mental Status Evaluation) will be used for this purpose. A psychiatric study of the officer is not required unless:

(1) Specifically requested by the officer.

(2) Deemed appropriate by the examining physician.

(3) Specifically requested by the commander who recommended separation or by the selection board or board of inquiry, as applicable.

(4) Psychiatric diagnosis, including an opinion whether the officer was able to distinguish right from wrong and adhere to the right at the time of the conduct under investigation, and whether he or she currently has the mental capacity to understand board and judicial proceedings and participate in his or her own defense. If it is determined that the officer is suffering from an incapacitating mental illness, the examiner should indicate whether the illness was probably the cause of the homosexual conduct under investigation.

b. A copy of the medical evaluation, to include the psychiatric study (if any), will be filed with the individual's health record. The medical treatment facility commander will forward the original of this evaluation report to the unit commander.

## Section IV
## Reasons which Authorize Elimination

## 5-9. General

Retention of officers who are substandard in performance of duty or conduct, deficient in character, wanting in professional qualifications or status, or otherwise unsuited for military service cannot be justified in peace or war. The same standards of efficiency and conduct are applicable to officers regardless of component.

## 5-10. Substandard performance of duty

While not all-inclusive, existence of one of the following or similar conditions, unless successfully rebutted, authorizes elimination of an officer due to substandard performance of duty.

a. Downward trend in overall performance resulting in an unacceptable record of efficiency or a consistent record of mediocre service.

b. Failure to keep pace or to progress with contemporaries as demonstrated by a low record of efficiency when compared with other officers of the same grade, and competitive category (AR 624-100). An officer who is identified by an active duty list promotion board (convened according to 10 USC 611a) as "not fully qualified" for promotion will be recommended for elimination under this paragraph, as provided for by the Secretary of the Army in the memorandum of instructions to the promotion board.

c. Failure to exercise necessary leadership or command expected of an officer of his or her grade.

d. Failure to assimilate technical proficiency required of his or her grade and competitive category (AR 624-100).

e. Failure to discharge properly assignments commensurate with his or her grade and experience.

f. Apathy, defective attitudes, or other character disorders to include inability or unwillingness to expend effort.

g. Failure to respond to rehabilitation efforts regarding an alcohol or other drug problem in a reasonable length of time.

h. Failure to conform to prescribed standard of dress, personal appearance, and military deportment.

## 5-11. Misconduct, moral or professional dereliction or in interests of national security

a. While not all inclusive, existence of one of the following or similar conditions, unless successfully rebutted, authorizes elimination of an officer due to misconduct, moral or professional dereliction or in the interest of national security:

(1) Discreditable or intentional failure to meet personal financial obligation.

(2) Mismanagement of personal affairs detrimentally affecting the performance of duty of the officer concerned.

(3) Mismanagement of personal affairs to the discredit of the service.

(4) Intentional omission or misstatement of fact in official statements or records, for the purpose of misrepresentation.

(5) Acts of personal misconduct (including, but not limited to, acts committed while in a drunken or drug intoxicated state).

(6) Homosexuality (see sec XIV).

(7) Intentional neglect of or failure to perform duties.

(8) Conduct unbecoming an officer.

(9) Conduct or actions resulting in the loss of a professional status, such as withdrawal, suspension of abandonment of professional license, endorsement, or certification which is directly or indirectly connected with the performance of one's military duties and necessary for the performance, including withdrawal of clinical privileges for Army Medical Department (AMEDD) officers.

(10) Acts or behavior not clearly consistent with the interest of national security (see AR 604-10 for substantive criteria).

(11) Conduct or actions by a warrant officer resulting in the loss of special qualifications (such as withdrawal/revocation of CID accreditation, revocation of marine qualification license, removal from the Personnel Reliability Program (PRP), withdrawal of clinical privileges or loss of flying status) which directly or indirectly precludes a warrant officer from performing in his or her MOS and is necessary for the performance. Elimination based on the reasons may not be utilized if reclassification action is feasible and in the best interest of the service or if loss of special qualifications was due to medical reasons beyond the control of the warrant officer.

(12) Failure to respond to rehabilitation efforts regarding repeated acts of child/spouse maltreatment or abuse and/or other acts of family violence in a reasonable length of time.

b. When one or more of the reasons enumerated in a (1) through (7) above is alleged, if the circumstances which form the basis indicate that the reason in item (8) also is involved, it will constitute additional reason for requiring elimination.

## 5-12. Derogatory information

a. Any one of the following or similar reasons gives rise to serious doubt as to the advisability of permitting the officer concerned to retain a commission or warrant and requires a review of his or her overall record. This is to determine if such derogatory information, when viewed in conjunction with other aspects of his or her record, warrants recommendation for elimination.

(1) Punishment under Uniform Code of Military Justice, Article 15.

(2) Conviction by court-martial.

(3) Denial of security clearance (see para 5-33b).

(4) An officer evaluation report (OER) under AR 623-105, paragraph 5-18 or 5-25.

(5) Adverse information filed in the OMPF according to AR 600-37.

(6) Failure by a RA officer of a course at a service school. For failure by a Reserve Component officer, see chapter 3, section II.

b. Standing alone, one of these conditions may not support elimination. On the other hand, it may combine with other known deficiencies to form a pattern which, when viewed in relation to an individual's overall record, requires elimination.

34 (I) Failure to achieve security 2-1
(J) When nonmedical not thly Je/
Securely Jie t Requirement

Case 1:07-cv-00688-RMU  Document 17-10  Filed 11/22/2007  Page 7 of 30
Copy 2

# PERSONNEL SECURITY CLEARANCE

# DEPARTMENT OF THE ARMY
# PERSONNEL SECURITY PROGRAM
# REGULATION

Pentagon Library (ANR-PL)
ATTN:  Military Documents Section
Room 1A518, Pentagon
Washington, DC  20310-6050

**HEADQUARTERS, DEPARTMENT OF THE ARMY**
**FEBRUARY 1984**

# CHAPTER II
# POLICIES

## Section 1
## STANDARDS FOR ACCESS TO CLASSIFIED INFORMATION OR ASSIGNMENT TO SENSITIVE DUTIES

**2–100   General**

a. Only United states citizens shall be assigned to sensitive duties or granted access to classified information unless an authority designated in Appendix F has determined that, based on all available information, it is in the national interest, considering special expertise, to assign an individual who is not a citizen to sensitive duties or grant access to classified information. Non-U.S. citizens may be employed in the competitive service in sensitive civilian positions only when specifically approved by the Office of Personnel Management (reference(i)). Only in rare circumstances shall a non-U.S. citizen be granted access to classified information. Non-U.S. citizens issued clearances or assigned to sensitive duties prior to the issuance of this Regulation may continue in that status in accordance with this Regulation.

b. **No person is entitled to knowledge of, possession of, or access to classified defense information solely by virtue of the person's office, position, grade, or security clearance. Such information will be entrusted only to those persons whose official military or other governmental duties require this knowledge or possession and who have** been investigated and cleared for access under the minimum standards prescribed by this regulation. Security clearances indicate that the persons concerned are eligible for access to classified information should their official duties require it.

**2–101   Clearance and Sensitive Position Standard**

The personnel security standard that must be applied to determine whether a person is eligible for access to classified information or assignment to sensitive duties is whether, based on all available information, the person's loyalty, reliability, and trustworthiness are such that entrusting the person with classified information or assigning the person to sensitive duties is clearly consistent with the interests of national security.

**2–102   Military Service Standard**

The personnel security standard that must be applied in determining whether a person is suitable under national security criteria for appointment, enlistment, induction, or retention in the Armed Forces is that, based on all available information, there is no reasonable basis for doubting the person's loyalty to the Government of the United States.

## Section 2
## CRITERIA FOR APPLICATION OF SECURITY STANDARDS

**2–200   Criteria for Application of Security Standards**

The ultimate decision in applying either of the standards set forth in paragraph 2–101 and 2–102 above must be an overall commonsense determination based on all available facts. Failure to satisfy these standards shall be based upon, but not necessarily limited to, the following criteria:

a. Commission of any act of sabotage, espionage, treason, terrorism, sedition, or attempts thereat or preparation therefor, or conspiring with or aiding or abetting another to commit or attempt to commit any act of sabotage, espionage, treason, terrorism, or sedition.

b. Establishing or continuing a sympathetic association with a saboteur, spy, traitor, seditionist, anarchist, terrorist, or revolutionist, or with an espionage or other secret agent or representative of a foreign nation whose interests are inimical to the interests of the United States, or with any person who advocates the use of force or violence to overthrow the Government of the United States by unconstitutional means.

c. Advocacy of use of force or violence to overthrow the Government of the United States or of the alteration of the form of Government of the United States by unconstitutional means.

d. Knowing membership with the specific intent of furthering the aims of, or adherence to and active participation in, any foreign or domestic organization, association, movement, group, or combination of persons that unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the United States or subdivision thereof by unlawful means.

e. Performing or attempting to perform one's duties, or otherwise acting, so as to serve the interests of another government in preference to the interests of the United States.

f. Close continuing association with persons or organizations whose activities are of the type described in a. through e. above.

AR 604–5                                                                 1 February 1984

g. Conduct of the nature described in Appendix E in prior military service or civilian employment.

h. Excessive indebtedness.

i. Criminal or dishonest conduct.

j. Deliberate false statement, deception or fraud in applying for enlistment or appointment or in providing information in connection with a security clearance or assignment to a sensitive position.

k. Habitual or episodic use of intoxicating beverages to excess.

l. Abuse of, or addiction to, narcotics, drugs, or other controlled substances.

m. Any facts, circumstances, or conduct that furnishes reasons to believe that the person concerned may be subject to coercion, influence, or pressure that could cause him to act contrary to the national security. Such facts or circumstances may include the pressure of an immediate family member, friend, or associate residing in a nation whose interests may be inimical to the interests of the United States or in satellites or occupied areas of such a nation. Immediate family includes parents, brothers, sisters, children, and spouse.

n. Any facts, circumstances, or conduct that indicates poor judgment, unreliability, or untrustworthiness thereby suggesting that the person concerned might fail to safeguard classified information, deliberately or inadvertently, or may not be suitable for assignment to sensitive duties.

o. Any illness, including any mental condition, of a nature which in the opinion of competent medical authority may cause significant defect in the judgment or reliability of the person concerned, with due regard to the transient or continuing effect of the illness and medical findings in such case.

p. Wanton or reckless disregard of public law, statutes, Executive orders, or willful disregard of security regulations.

q. Refusal or intentional failure to provide material facts in a personal history statement or security form or otherwise intentionally failing or refusing in the course of an investigation, interrogation or hearing, to answer or to authorize others to answer, any material questions regarding the matters set forth in a. through p. of this paragraph.

## Section 3
## TYPES AND SCOPE OF PERSONNEL SECURITY INVESTIGATIONS

**2–300  General**

The types of personnel security investigations authorized below vary in scope of investigative effort required to meet the purpose of the particular investigation. No other types are authorized. The scope of a PSI may be neither raised nor lowered without the approval of the Deputy Under Secretary of Defense for Policy Review.

**2–301  National Agency Check**

Essentially, a NAC is a record check of designated agencies of the Federal Government that maintain record systems containing information relevant to making a personnel security determination. An ENTNAC is a NAC (scope as set forth in Appendix B) conducted on inductees and first-term enlistees. A NAC is also an integral part of each BI, SBI, and Periodic Reinvestigation (PR). The Office of Personnel Management (OPM), formerly the Civil Service Commission (CSC), conducts NACs and written inquiries (NACIs) for all departments and agencies of the Federal Government, pursuant to Executive Order 10450 (reference (e)). NACs or NACIs conducted by the OPM meet the NAC investigative requirements of this Regulation. Chapter III prescribes when a NAC is required.

**2–302  Background Investigation**

A BI includes a NAC and consists of local record checks as well as interviews with potentially knowledgeable personal sources. It will normally cover the 5 year period immediately preceding the investigation;

however, certain of the record checks may provide information considerably beyond the 5-year period when the record examined is itself older than 5 years. Chapter III prescribes when a BI is required.

**2–303  Special Background Investigation**

a. Any SBI is essentially a BI providing additional coverage both in period of time as well as sources of information, scoped in accordance with the provisions of DCID 1/14 (reference (j)). While the kind of coverage an SBI provides is the investigative requirement of DCID 1/14 for determining eligibility for access to SCI, DoD has adopted this coverage for certain other Special Access programs. Chapter III prescribes when an SBI is required.

b. The OPM, FBI, Central Intelligence Agency (CIA), Secret Service, and the Department of State conduct specially scoped BIs under the provisions of DCID 1/14. Any investigation conducted by one of the above-cited agencies under DCID 1/14 standards is considered to meet the SBI investigative requirements of this Regulation.

c. The detailed scope of an SBI is set forth in Appendix B.

**2–304  Special Investigative Inquiry**

a. A Special Investigative Inquiry is a personnel security investigation conducted for either of the following purposes:

(1) To supplement a BI, SBI, or PR that has been closed out to the requester but subsequently

found to be incomplete.

(2) To prove or disprove allegations relating to the criteria set forth in paragraph 2–200 of this Regulation, except current criminal activities (see para **2–402d**), that have arisen concerning a person upon whom a personnel security determination has been previously made and who, at the time of the allegation, holds a security clearance or otherwise occupies a position that requires a trustworthiness determination. (This includes investigations referred to in previous years as "complaint" investigations, now also referred to as "post-adjudicative investigations.")

b. Special Investigative Inquiries are scoped as necessary to address the specific matters requiring resolution in the case concerned and generally consist of record checks and/or interviews with potentially knowledgeable persons, including the subject of the investigation.

c. In those cases when there is a disagreement between Defense Investigative Service (DIS) and the requester as to the appropriate scope of the investigation, the matter may be referred to the Deputy Under Secretary of Defense for Policy Review for resolution. **Requests for resolution will be forwarded through command channels to HQDA(DAMI–CIS) WASH, DC 20310.**

2–305   Periodic Reinvestigation

a. General. Nationally originated directives require that certain prescribed investigations be conducted periodically as described in paragraph 3–700. While the scope of a PR varies, it consists basically of updated checks of a limited number of records. Chapter III prescribes when a PR is required.

b. The detailed scope of a PR is set forth in Appendix B.

2–306   Personal Interview

Investigative experience over the years has demonstrated that, given normal circumstances, the subject of a personnel security investigation is the best source of accurate and relevant information concerning the matters under consideration. Further, restrictions imposed by the Privacy Act of 1974 (reference (k)) dictate that Federal investigative agencies collect information to the greatest extent practicable directly from the subject when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs. Accordingly, personal interviews are an integral part of the DoD personnel security program and shall be conducted in accordance with the requirements set forth in the following paragraphs of this section.

a. Resolving Adverse Information. A personal interview of the subject shall be conducted by a DIS agent (or, when authorized, by investigative personnel of other DoD investigative organizations designated in

this Regulation to conduct personnel security investigations) as part of each Special Investigative Inquiry as well as during the course of initial or expanded investigations to resolve any potential adverse information.

b. Hostage Situation. A personal interview shall be conducted by a DIS agent (or, when authorized, by investigative personnel of other DoD investigative organizations designated in this Regulation to conduct personnel security investigations) in those instances in which an individual has immediate family members or other persons bound by ties of affection or obligation who reside in a nation whose interests are inimical to the interests of the United States. (See 2–403.)

c. Applicants/Potential Nominees for DoD Military or Civilian Positions Requiring Access to SCI. A personal interview of the individual concerned shall be conducted, to the extent feasible, as part of the selection process for applicants/potential nominees for positions requiring access to SCI. The interview shall be conducted by a designee of the Component to which the applicant or potential nominee is assigned. Clerical personnel are not authorized to conduct these interviews. Such interviews shall be conducted utilizing resources in the order of priority indicated below:

(1) Existing personnel security screening systems (e.g., Air Force Resource Evaluation Program, Naval Security Group Personnel Security Interview Program, U.S. Army Personnel Security Screening Program); or

(2) Commander of the nominating organization or such official as he or she has designated in writing (e.g., Deputy Commander, Executive Officer, Security Officer, Security Manager, S–2, Counterintelligence Specialist, Personnel Security Specialist, or Personnel Officer); or

(3) Agents of investigative agencies in direct support of the Component concerned.

d. Contractor Personnel Nominated for SCI Access. Contractor personnel nominated for SCI access shall be interviewed by the DIS as a preliminary step in conducting the SBI, except for those programs for which other procedures have been approved by the Deputy Under Secretary of Defense for Policy Review.

(1) When the interview conducted by DIS develops potentially disqualifying information, DIS will report the results of the interview to the requesting organization which will advise DIS regarding the continuation of the investigation; and

(2) When the personal interview develops no potentially disqualifying information, DIS will continue the investigation and report the results of the personal interview as part of the completed investigation.

e. Administrative Procedures

(1) The personal interview required by para-

# APPENDIX E
# REPORTING OF NONDEROGATORY CASES

BIs shall be reported as devoid of significant adverse information unless they contain information listed below:

1. Incidents, infractions, offenses, charges, citations, arrests, suspicion or allegations of illegal use or abuse of drugs or alcohol, theft or dishonesty, unreliability, irresponsibility, immaturity, instability or recklessness, the use of force, violence or weapons or actions that indicate disregard for the law due to multiplicity of minor infractions.

2. All indications of moral turpitude, homosexuality, heterosexual promiscuity, abberant, deviate, or bizarre sexual conduct or behavior, tranvestitism, transexualism, indecent exposure, rape, contributing to the delinquency of a minor, child molestation, wife-swapping, window peeping, and similar situations from whatever source. Unlisted full-time employment or education; full-time education or employment that cannot be verified by any reference or record source or that contains indications of falsified education or employment experience. Record or testimony of employment, education, or military service where the individual was involved in serious offenses or incidents that would reflect adversely on the honesty, reliability, trustworthiness, or stability of the individual.

3. Foreign travel, education, visits, correspondance, relatives, or contact with persons from or living in Communist-dominated countries or areas designated as terrorist-oriented only.

4. Mental, nervous, emotional, psychological, psychiatric, or character disorders/behavior or treatment reported or alleged from any source.

5. Excessive indebtedness, bad checks, financial difficulties or irresponsibility, unexplained affluence, bankruptcy, or evidence of living beyond the individual's means.

6. Any other significant information relating to the criteria included in a. through p. of paragraphs 2-200 of this Regulation.

**Department of the Army**
**Pamphlet 350–20**

Training

# Unit Equal Opportunity Training Guide

Headquarters
Department of the Army
Washington, DC
1 June 1994

**UNCLASSIFIED**

# FOREWORD

## INTRODUCTION

This country was founded on the basic values of freedom, dignity, respect, and opportunity for all. In an ongoing struggle to ensure that these rights are enjoyed by all citizens, we must continue to educate ourselves and our soldiers on the importance of equal opportunity (EO). Through this education we can better appreciate the cultural diversity that has helped make this country great. Through education we can create an environment in which soldiers can excel.

Equal opportunity and treatment are given to all soldiers, their families, and Department of the Army (DA) civilians. This is done without regard to race, color, gender, religion, or national origin. To uphold this policy, the chain of command has a continuing challenge; it must provide a command climate that fosters attitudes and behavior about equal opportunity which lead to cohesion and mission accomplishment.

Values, attitudes, and prejudices gained before enlistment or commissioning do not automatically dissolve or change when someone puts on an Army uniform. Too often these values, attitudes, and prejudices can lead to the misunderstanding, frustration and suspicion of others. Knowing and accepting this will help you to understand the impact of EO training on command climate.

A positive, proactive EO environment helps units' effectiveness. It promotes morale, teamwork, and results in a high degree of unit cohesion and esprit de corps. People perform most efficiently in an atmosphere free of intergroup friction and discord. Therefore, a healthy EO environment is a key factor in developing and maintaining unit readiness.

## PURPOSE OF THIS PAMPHLET

This pamphlet provides lesson plans for conducting unit EO training as specified in Chapter 6, AR 600–20. These lesson plans are for use in officer and NCO professional development sessions.

Each plan offers important information which gives soldiers and DA civilians the knowledge to improve unit harmony, effectiveness, and mission accomplishment. The key to successful training with these EO lesson plans is the same as with any other program: command support and participation.

## LESSON PLAN STRUCTURE

Although numbered sequentially, each lesson plan is independent of the others in this publication. To maintain this independence, repetition of subject matter among the

lesson plans exists. Lesson plans containing additional or more completely developed explanations of a concept or topic being discussed will be referenced in an instructor note.

Administrative data are listed at the start of each plan, and practical exercises are present where applicable. Also, acronyms and abbreviations are defined in each lesson plan.

## LESSON PLAN USE

These lesson plans have been designed to provide comprehensive topical information about equal opportunity. Decide what information your soldiers and DA civilians need, and choose the lesson plans that contain that information. Use them in total, expand them, tailor them, or sequence them based upon your needs.

## INSTRUCTIONAL TECHNIQUES

The following are recommended teaching techniques to use with these lesson plans:

• Use this material in small group sessions limited to no more than 20 to 25 people. Small group discussion is highly desirable; it encourages the sharing of ideas and derives maximum benefits from the experiences of each group member. Larger groups placed auditorium-type settings restrict interpersonal communication.
• Unit commanders should be involved in this vital training. At a minimum, they should make opening comments.
• The unit chain of command should lead and take part in all discussions.

## APPLICABILITY

The contents of this pamphlet apply to all members of the US Army, DAC workforce, US Army Reserve, and the Army National Guard.

## EO TRAINING MATERIAL

Various training support packages (TSPs) on equal opportunity are available for use in the TRADOC service schools and NCO academies. These TSPs contain much of the same material as found in this pamphlet.

Training Circular 26–6, Commander's Equal Opportunity Handbook, serves as a "tool-kit" for the commander in implementing Army EO policy.

The proponent of this publication is the Adjutant General School. Send comments and recommendations on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Commandant, Adjutant General School (ATZI–AGP–P) Bldg 401–C, 8899 East 56th Street, Indianapolis, IN 46216–5530.

## Chapter 14
## Lesson Plan 14—Identification of Current Army Equal Opportunity Issues

### 14–1. OVERVIEW

*a. TASK:* Identify and discuss current Army equal opportunity (EO) issues.

*b. CONDITIONS:* In a classroom environment.

*c. STANDARDS:* Identify and discuss current Army EO issues.

*d. TARGET AUDIENCE:* Senior NCOs and all officers and warrant officers.

*e. RECOMMENDED TIME:* 20 minutes.

*f. INSTRUCTOR REQUIREMENTS:* One instructor per class of no more than 20 to 25 students.

*g. EQUIPMENT NEEDED FOR THE INSTRUCTION:* Overhead projector, overhead transparencies (OTs), chalk-board and chalk or butcher paper and magic markers.

*h. TOPICS COVERED:* Racial and cultural differences, sexual harassment, women in the military, and taking appropriate and timely actions.

### 14–2. INTRODUCTION

EO issues are always present. If we are not sensitive to their importance, they can have an adverse impact on unit cohesion and readiness.

*Note.* Ask students, "Based on recent news media coverage and your own observation, what are the most pressing EO issues in Army units today?" Write the responses on a chalkboard or butcher paper, and channel them into four issues: racial and cultural differences, sexual harassment, women in military service, and taking appropriate and timely actions. When the list is developed, draw on the students' unit experiences. Discuss how these issues have affected their home and working environments. Structure the discussion on each issue using the three questions shown in OT 14–1.

*Note.* Show OT 14–1, QUESTIONS ABOUT ARMY EO ISSUES.

---

### QUESTIONS ABOUT ARMY
### EO ISSUES

- What is the Army's policy on this issue?
- What problems are units experiencing with this issue?
- What is this issue's impact on command climate and unit readiness?

**Figure 14–1. Questions About Army EO Issues**

---

### 14–3. RACIAL AND CULTURAL DIFFERENCES

*a.* The branches of American military service are probably the most culturally, ethnically, and racially diverse organizations in our country. Often for the first time in their lives, young soldiers have to adapt to differences including appearance, behavior, speech, and dress. Therefore, a leader who is aware of the cultural and racial differences of the soldiers assigned to his unit is better able to develop and maintain unit cohesion and readiness.

*b.* The goal of the Army's EO policy on this issue is to create an environment that will enable all people to reach their full potential regardless of racial or cultural differences. What problems are units having which could block this goal? Also, how might these problems affect unit readiness?

*Note.* Listen to and discuss the responses. Read Lesson Plan 3 and 9 for more details on this issue.

### 14–4. SEXUAL HARASSMENT

*a.* The Army defines sexual harassment as a form of sex discrimination. In brief, it involves unwelcome sexual advances, requests for sexual favors, and other types of gender-based verbal, nonverbal, or physical contact.

*Note.* Show OT 14–2, SEXUAL HARASSMENT. Give the students time to read these viewgraphs.

Department of Army Training Circular TC 26-6 (1992)

# Commander's Equal Opportunity Handbook

## CONTENTS

|  | Page |
|---|---|
| PREFACE | iv |
| | |
| CHAPTER 1: THE ARMY'S EQUAL OPPORTUNITY PROGRAM | |
| Historical Background | 1-2 |
| Concept | 1-3 |
| EO Policy | 1-3 |
| Principles of the Program | 1-4 |
| Related EO Elements | 1-5 |
| EO Model | 1-8 |
| | |
| CHAPTER 2: LEADER INVOLVEMENT | |
| Leader Commitment | 2-2 |
| Unit Leaders EO Responsibilities | 2-3 |
| NCO Support Channel | 2-4 |
| | |
| CHAPTER 3: TRAINING | |
| Preparing for Training | 3-1 |
| | |
| CHAPTER 4: ASSESSMENTS | |
| Assessment Requirements | 4-1 |
| Purpose of Assessments | 4-2 |
| Planning the Assessment | 4-3 |
| Assessment Strategies | 4-5 |
| Focus Groups | 4-7 |
| Indicators of Inter-group Tension and Unrest | 4-9 |
| | |
| CHAPTER 5: EQUAL OPPORTUNITY COMPLAINT PROCESSING | |
| Determining the Type of Complaint | 5-1 |
| Complaint Timelines | 5-3 |
| Inquiries and Investigations | 5-4 |
| Reprisals, Intimidation, or Harassment | 5-4 |
| Actions by the Commander | 5-5 |

Page

CHAPTER 6:  STAFFING
    Equal Opportunity Representative (EOR)          6-1
    EOR Duties and Responsibilities                6-1
    Equal Opportunity Advisor (EOA)                6-2
    EOA Duties and Responsibilities                6-2

CHAPTER 7:  ETHNIC AND SPECIAL OBSERVANCES
    Essential Elements for Ethnic/Special Observances     7-1
    List of Ethnic and Special Observances         7-2

CHAPTER 8:  AFFIRMATIVE ACTIONS
    Affirmative Action Philosophy                  8-1
    Affirmative Action Plan                        8-1
    Review and Analysis                            8-3
    Measurement/Data Collection                    8-3
    Reporting                                      8-4
    Affirmative Action Format                      8-4

CHAPTER 9:  PREVENTION OF SEXUAL HARASSMENT
    Background                                      9-1
    Definition                                     9-1
    Categories of Sexual Harassment                9-2
    Related Elements of Sexual Harassment          9-3
    Sexual Harassment Behaviors                    9-3
    Victim Impact                                  9-5
    Sexual Harassment Checklist                    9-5
    Coping Mechanisms                              9-6
    Sexual Harassment Behaviors Subject to the UCMJ     9-10
    Individual Techniques in Dealing with Sexual Harassment     9-10

CHAPTER 10:  CULTURE AND CULTURE DIVERSITY
    Background                                      10-1
    Concept of Culture                             10-1
    Attributes of Culture                          10-3
    Cross Cultural Interactions                    10-5
    Factors in the Development of Racism and Sexism     10-6
    Strategies for Combating Racism and Sexism     10-9
    Prejudice                                      10-10
    Discrimination                                 10-11

CHAPTER 11:  MANAGING DIVERSITY
    Managing Diversity                             11-1
    Making Diversity Work                          11-4
    Common Causes of Misunderstandings             11-8

# CHAPTER 10

# CULTURE AND CULTURAL DIVERSITY

The goal of the Army's EO program is to provide an environment where soldiers and DA civilians can work and live with individuals and groups of people who are culturally and ethnically different from one another. This is the challenge to Army leaders and the principles of good leadership.

The Army is diverse organization in the country with an ethnic and racial makeup most reflective of American society. For many new recruits, the Army is probably the first opportunity to meet and communicate with people who are "different." These differences can be manifested through skin color, gender, religion, language, attitudes, or in simple mannerisms.

The converging of these differences can create conflict. If not properly handled, conflict and other negative behaviors based on actual or perceived differences can be detrimental to teamwork and unit cohesion. The responsibility of Army leadership is to recognize and manage these differences so that they do not interfere with the Army's mission effectiveness and ability to fight and win on the battlefield.

As a society we have made a great deal of progress in trying to peacefully resolve our differences both domestically and internationally. However, progress has not been easy nor has it been timely. As we resolve one conflict, another old or new problem will emerge to take its place. Successful leadership is meeting these challenges whenever and wherever they might surface. What Army leaders must understand is that when diverse groups come together, conflict is sure to follow.

## CONCEPT OF CULTURE

### CULTURE

**The learned and shared behaviors and perceptions of a group which have been transmitted from generation to generation through a shared symbol system.**

Figure 3-1

Culture is the sharing of learned behaviors and perceptions of a group, which is passed from one generation to another through a socialization process. What is important for commanders and subordinate leaders to acknowledge is that a soldier's culture is neither limited to, nor the condition for, existence in the organization or unit. As it is passed from one group to another some elements will change while others will not.

Our culture surrounds us and gives us identity. It supports our beliefs and values and rewards us when we reinforce them. However, when one's culture is a subculture within a more larger or dominant culture, like the Army, contrasting and conflicting identities, beliefs, values, and rewards may affect people differently.

Cultural habits such as what we eat, how we prepare meals, celebrations, what utensils we use, all can play a factor in social visibility differences.  It isn't uncommon for groups to take the position that "different means wrong."

Whoever has the power within the unit can control the limited resources and make policies to their standards.  When power is misused or abused by the group in control, a feeling of superiority can develop.  This is perceived by minority groups as unequal and if not corrected, can lead to disharmony within the organization.

Ethnocentrism may also be a factor within the unit.  Ethnocentrism is the belief one's own ethnic group is superior to all other groups.  If this group also holds the power, likely the majority, then this belief can become even more damaging to the minority groups.

Our society is very competitive.  There may only be a limited supply, but an unlimited demand for a resource.  When everyone wants a piece of the pie, some are likely to get a bigger piece than others.  Generally, it will be the group in power who gets the bigger piece.

Individuals learn their stereotypes from parents, schools, peers, and the media.  Once individuals come in contact with others, they make first impressions, and may develop stereotypes of that particular group.

In units that have soldiers of both genders, sex-role socialization is also a factor.  Sex-role socialization is the process by which males and females learn to display appropriate behavior for their sex.  In learning these roles during sex-role socialization, individuals acquire attitudes and values associated with these roles.  There is also a 'historical factor.'  Historians frequently omitted or distorted accomplishments of minorities and women's experiences and accomplishments.  This widespread omission of women is not attributable solely to the sex bias of male publishers, historians, and editors.  The reasons are more complex.  Historians of both sexes have been trained to examine the past through a traditional male perspective.  Such a perspective automatically excludes women as they were rarely generals, diplomats, explorers, or presidents.  Another reason for the omission of women is the constant use of the male pronoun to represent all of humanity.  We, as adults, recognize the male pronoun as a generalization, but unless we stop using it, it is all the children will hear.

As a product of socialization, prejudices are portrayed via the mass media.  Minorities are often portrayed as criminal and dysfunctional while females are portrayed as dependent on men for life support.

PERSONAL RACISTS AND SEXISTS BEHAVIORS

**BARRIERS TO CULTURAL INTERATION**

- Paternalism
- Ignoring
- Speaking For
- Testimonials
- Ethnic, racists, sexists jokes
- Frequent interruptions
- Stereotypical language
- Titles and ranks
- Denying opportunities
- Dubious supervision

Figure 3-5

Many of the behaviors we observe, and are recipients of, on a daily basis are actually behaviors which constitute racist and sexist behaviors. Some of the most common of these behaviors and the impact on minorities and women are:

- **Paternalism**.  This behavior takes the form of acting 'fatherly' or over-protective of someone.  Frequently, this behavior will take place toward a female, and when it does, can be a form of sexism.  It may imply that the women is incapable of doing her job, or surviving without the man taking her under his wing and helping her along.

- **Ignoring**.  This would be discounting what an individual says - not giving it credibility because they may be a minority or a female.

- **Speaking for**.  Not letting a person speak for themselves.  When someone asks a direct question of them, interrupting and answering the question yourself.  In other words,

you know the person can't possibly state what needs to be stated, so you take it upon yourself to answer for them.

- **Testimonials**.  "I am not prejudice, some of my best friends are "black" (or women or any other minority group).

- **Ethnic, racists, or sexists jokes**. This area is self-explanatory and does not require elaboration or clarification.  They only continue to reinforce stereotypes.

- **Frequent interruptions**.  This indicates that you don't take what someone is saying as being important.  You have a 'better grasp' or understanding of the points they may be making and feel compelled to make sure you make it clear what 'needs' to be said.

- **Stereotypical language**.  Speaking in terms that use statements that indicate or reinforce the stereotypes about the group you are talking about.  A statement like: "all women are just too emotional to handle the stress filled command environment."

- **Titles and ranks**.  Calling minorities and women by their first names while addressing majority members (males) by their titles or rank.  This diminishes the importance and position of those being called by their first names.

- **Denying opportunities**.  This can be blatant or indirect.  Simply put, providing more beneficial jobs, positions, or assignments to majority members than to minority members.

- **Dubious supervision**.  This is the manner of focusing on problems or crimes committed by a particular group or gender and exploiting these

explain each characteristic as appropriate:

| CHARACTERISTICS OF DISCRIMINATION |
| :-- |
| • **Overt or Hidden** |
| • **Direct or Indirect** |
| • **Intentional or Unintentional** |

Figure 3-7

- Overt:  Sign on the door of a male only club that says no women allowed.
- Hidden:  Banks or other financial institutions which red-line certain areas for personnel or business loans.
- Direct:  Acts of sexual harassment targeted at men or women in the work place.
- Indirect:  Placing a specific (and unnecessary) educational requirement for a job or a position would tend to eliminate groups who historically have had less educational opportunities than majority groups.
- Intentional:  Using discriminatory/ethnic or racial slurs.
- Unintentional:  Designing and manufacturing weapons to be fired or operated from the right side.

Commanders must be especially sensitive to and understand the direct link between discrimination and power.  Without power, discrimination is ineffective; with power, prejudiced individuals can discriminate and maintain the dominance of one individual or group over another.  We use the term power in this context to describe the expenditure of energy to control or influence others, or to control resources, to get things done.  An Army leader is given power to make decisions or rules which can effectively discriminate and define who belongs and does not.  Without power, discrimination is relatively passive.  With power, unlawful discrimination is an unethical violation of the Army's policy because it denies fair treatment or any chance for EO.

Power is the potential ability of one person in a relationship to influence the others in the relationship psychologically and/or behaviorally.  There are two types of power:

- FORMAL POWER.  Based on position, rank, and/or status, not necessarily earned.  It requires the support of the organization.
- INFORMAL POWER.  Based on ability, not necessarily position, rank, and/or status.  It cannot be conferred, and does not require the support of an organization. (Earned)

There are six bases of power that are available to leaders.  They are split between formal and informal power.  Each of these bases are important and should be maintained.

- Legitimate Power.  This is a formal type of power based on the right and privileges that are given to persons, because of the role they fulfill.  An example is Commander or First Sergeant.
- Reward Power.  This is a formal type of power based on the ability to provide something someone wants or values.  An example may is a "four day Pass."
- Coercive Power.  This is another formal type of power based on the

power to take away something someone possesses and desires to keep.

- Expert Power.  This is an informal power based one one's ability to influence other, because of knowledge and /or skills a person has or is thought to have.  Generally, this power is based on 'information' possessed by someone or the person possessing an 'expertise' in a certain area which others don't have.
- Referent Power (Charismatic Power).  This is an informal type of power based on one person's affection for or identification with another person or group. An example could be a leader who has earned respect by past actions
- Associative Power.  This is yet another informal type of power based on the ability to influence others because of who a person knows either in fact or imagined.

Power can be very beneficial when properly utilized for the good of the Army and the mission.  It is a natural product of continued service in the Army by virtue of getting promoted and inheriting more power as you progress upward through the ranks.  However, it can be very detrimental to the mission if not properly used.  If misused in connection to EO related areas, it can have a very damaging impact on the unit and morale.  If misused, it can turn to discrimination toward specific individuals and groups. We must always work to ensure this does not happen.

## INSTITUTIONAL DISCRIMINATION

Institutional discrimination is defined as actions or practices carried out by members of dominant groups or their representative which have a differential and negative impact on members of subordinate groups.  Just as with institutional racism, it is irrelevant whether the actions of the institution were intentional or not.  What matters is the negative impact suffered by members of subordinate groups. Within the military, institutional discrimination could be defined as any systemic or functional practices that discriminate or manifest disparate treatment because of race, color, national origin, religion, or gender. Unlike other forms of discrimination discussed earlier, institutional discrimination is multifaceted and more complex.

## DIRECT INSTITUTIONAL DISCRIMINATION

Direct institutional discrimination refers to socially prescribed actions, which by intention have a differential and adverse impact on members of subordinate groups.  In most instances, formal laws or informal rules that are imbedded in routine operations or functions of the institution shape direct institutional discrimination.  Today such discrimination might be more prevalent in recruiting and hiring practices that are linked to traditional sex or gender roles.

## INDIRECT INSTITUTIONAL DISCRIMINATION

Indirect institutional discrimination refers to institutional practices that have a negative or differential impact even

though the policies or regulations guiding those actions were established with no intent to do harm. What is confusing and difficult to understand is that the polices and regulations, while appearing to be normal, would produce unfair practices. Indirect institutional discrimination is characterized in two ways, "side-effect" and "past-in-present" discrimination.

Side-effect discrimination refers to practices in one institutional area, which have an adverse impact because they are indirectly linked to discriminatory practices in another institutional area. An example in the military might be the competitive advantage that is recognized for combat experience. A woman, who during her military career, was excluded from certain combat roles, would be disadvantaged for assignments and promotions at higher levels where combat training or experience gave male competitors an edge for selection. Institutions are intimately linked to one another, a situation, which reinforces the complex inter-institutional character of discrimination.

Past-in-present discrimination refers to the neutral practices of an institution (or organizational area) which inevitably reflect or perpetuated the effects of intentional discriminatory practices in the past in the same institutional (or organizational) area. The most prevalent form of past-in-present discrimination is one in which minorities or women are penalized because they lacked some ability or qualification that was denied to them in the past. One example that

receives a great deal of attention today is the seniority rule used by employers and unions who in the past intentionally discriminated against minorities or women, but no longer do so today. However, when seniority is used as the primary factor for determining who is fired or laid off, minorities and women who were last hired will be the first to go.

## ADVERSE EFFECTS OF PREJUDICE AND DISCRIMINATION

If not identified and properly managed, prejudice and discrimination can have a devastating impact on the mission effectiveness of any organization or command and on unit morale.

## DEVIANT BEHAVIOR

Leaders must be aware that prejudice and discrimination affect the perpetrator, as well as the victim. The belief has been widely held by people with dominant status that minorities furnish more than their share of sociopath behavior, such as delinquency, crime, or other pathologies. The means and severity in which one soldier takes to demean another because of race or gender does not appear as normal behavior especially in the Army. A soldier, on the other hand, who is attempting to cope with each new act of discrimination, can act out or respond in a number of ways that are also not perceived as normal behavior. One way, which is commonly used, is to avoid the unpleasant situation at all costs. Another is to directly attack the perpetrator. If

unknown, and emotions are high, then a substitute or representative (official or unofficial) can be targeted for retaliation for some other form of retribution.

## INTERGROUP TENSION AND VIOLENCE

Leaders must understand that one of the most devastating effects of prejudice and discrimination, whether perceived or real, is the potential or actual increase in the tension and hostilities between different groups. If emotions are high, intergroup tension can cause a negative form of polarization. Group members will attempt to segregate themselves from one another and dominate and control certain areas within the unit or organization as their own. They may even explicitly or implicitly deny access to those who are in disfavor. If friction continues and group members perceive competition over limited resources or favorable personnel actions, then more violent actions are more than likely to occur.

## INCONSISTENCY IN VALUES

This area poses the greatest threat to Army leadership. Policy statements on EO and fair play have little meaning if there is no demonstrated consistency in support or enforcement of those polices. Soldiers who believe they have received unfair treatment or injustices based on prejudice or discrimination will have little trust or faith in those who are charged with their care and welfare. For EO to have real meaning, it is imperative that commanders and subordinate leaders

demonstrate consistency in what they say and do by supporting Army values and policies.

## ADVERSE IMPACT ON UNIT

The impact of prejudicial attitudes and discrimination on a given unit is predictable. The first area to suffer the most damage is unit morale, which is a catalysts in unit cohesion. High unit morale means that soldiers not only feel good about the unit and their leaders, but they also feel good about themselves. Discipline can also be affected, because soldiers who feel that they are victims of unfair treatment will perceive no discipline in a unit that condones or practices discrimination. A long-term effect on the Army is the ability to attract and retain qualified personnel. If the experience and severity of discrimination or unfair treatment is consistent over soldiers' initial service obligation, it can and does affect their decision to stay in the Army. Ultimately, the greatest concern is for unit readiness. A unit that does not practice EO will undermine its ability to fight and win on the battlefield.

# *Fort Lee Commanders*

# *Equal Opportunity Handbook*

<span style="color:red">Home Run Bar</span>

CHAPTER 1 GENERAL Page

Introduction 1

Concept 1

Scope 1


CHAPTER 2 POLICY

Department of Defense Human Goals 2

Department of the Army Equal Opportunity Policy 3

Responsibilities of Commanders 3

Army Language Policy 4

Staffing 4

Accommodating Religious Practices Policy 6

Sexual Harassment 6

Racist/Sexist Language 8

Extremist Organization 8

Affirmative Actions 10


CHAPTER 3 TRAINING

(2)  Article 93:  Maltreatment of subordinates.

(3)  Article 117:  Provoking speeches and gestures.

(4)  Article 120:  Rape.

(5)  Article 125:  Sodomy.

(6)  Article 128:  Assault and battery.

(7)  Article 133:  Conduct unbecoming an officer.

(8)  Article 134:  General  (offenses include communicating a threat,  pandering,  and indecent assaults such as pinching,  and touching of private parts of the body).

## 2-8.   RACIST/SEXIST LANGUAGE:

a.  Racist or sexist language or words which a reasonable person would expect to induce a breach of the peace.  This includes jokes, remarks, slurs, gestures, or innuendoes that target certain individuals based on their race, religion, gender, color, or national origin.

b.  Much of this type behavior comes in a situation where the offender, when asked, considers the remarks or conduct only as a joke or jest.  **This does not excuse the behavior!**  Obviously, there is a certain amount of joking, banter, and good humor that takes place in any

organization.  However, the recipient or butt of the humor nearly always fails to see the humor and is insulted and humiliated by it.  This is particularly unacceptable when the offender is in the chain of command.

    c.  Do not characterize this kind of behavior as being of minor consequence.  It is improper and can lead to complaints of harassment and/or discrimination that under the circumstances may have an adverse impact on the entire organization.

    d.  Any soldier found guilty of this form of conduct can be charged under Article 117,  of the UCMJ,  for provoking speeches and gestures;  and AR 690-700,  Chapter 751,  Table of Penalties,  for civilian personnel.

## 2-9.    EXTREMIST ORGANIZATIONS:

    a.  PARTICIPATION:  Military personnel must reject participation in extremist organizations and activities.  Extremist organizations and activities are ones that:

    (1)  Advocate racial, gender, or ethnic hatred or intolerance.

    (2)  Advocate, create, or engage in illegal discrimination based on race, color, gender, religion, or national origin.

    (3)  Advocate the use of force or violence or unlawful means, to deprive individuals of their civil rights.

    b.  PROHIBITIONS:  Soldiers are prohibited from the following actions in support of extremist organizations or activities.  Violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ) and administrative.

are deployed on "all others" tours. Such soldiers, if careerists, are barred from reenlistment.

(5) Enlisted personnel unable to deploy because of parental responsibilities may be processed for separation under AR 635–200, paragraph 5–8.

(6) Officers unable to deploy because of parental responsibilities may be processed for separation under AR 635–100, paragraph 5–12.

g. Procedures for completion of DA Form 5304–R and DA Form 5305–R.

(1) During inprocessing the affected soldier will sign DA Form 5304–R after proper counseling.

(2) The soldier will be informed that must complete DA Form 5305–R within 2 months of the date of counseling or within two months of the birthdate of the child for single or dual service parents.

(3) All soldiers, officers and enlisted, who are not required to sign DA Form 5304–R or submit a DA Form 5305–R under provisions of this paragraph, will be encouraged to maintain a personal family care plan.

(4) Unit commanders may approve or disapprove required family care plans based on the following:

(a) The soldier explained, to the satisfaction of the commander, his or her plans for circumstances listed on the DA Form 5305–R and that such plans are reasonable and workable.

(b) The family care plan reflects a reasonable and workable solution for each contingency listed on the DA Form 5305–R.

(c) The soldier's status as a single parent or dual-service parent has not interfered with the performance of military duties.

(d) The soldier is available for worldwide assignment.

(5) Dual-service parents are, when practicable, counseled together.

h. Plans, approved or disapproved, will be filed in the unit files within 2 months of the date of counseling. A copy will be provided to the soldier. If a plan is disapproved, the soldier will be given a chance to submit additional documentation or evidence. When the soldier departs the unit, DA Form 5304–R and DA Form 5305–R will be held in the unit files for 90 days and then destroyed.

i. DA Form 5305–R will be recertified periodically but, at a minimum, during the anniversary of the soldier's birth month. It is revised after any change of circumstances requiring a change in family care arrangements. The commander, or designated representative, indicates recertification of approval by initialing and dating DA Form 5305–R, and ensures that correct information is provided for the Family Care Counseling Report (SIDPERS AAC–C43).

j. Comments or questions concerning reenlistment or counseling requirements under this policy may be sent to HQDA (DAPE–MPS), WASH DC 20310–0300.

k. Maximum testing of the validity of family care plans should be regularly accomplished (for example, during exercises,

alerts, and other unit activities) to ensure information on a soldier's Family Care Plan is correct.

## 5–6. Accommodating religious practices

The Army places a high value on the rights of its soldiers to observe tenets of their respective religions. It is the Army's policy to approve requests for accommodation of religious practices when they will not have an adverse impact on military readiness, unit cohesion, standards, health, safety, or discipline, or otherwise interfere with the performance of the soldier's military duties. However, accommodation of a soldier's religious practices cannot be guaranteed at all times but must depend on military necessity. (See DA Pam 600–75 for information on procedures.)

a. The DCSPER will establish policy on the accommodation of religious practices within the U.S. Army and form the Committee for the Review of the Accommodation of Religious Practices within the U.S. Army.

(1) Establishment. The Committee for the Review of the Accommodation of Religious Practices within the U.S. Army is hereby established as a continuing committee.

(2) Purpose. It will—

(a) Meet on call to evaluate the Army's policies and procedures in implementing DOD Directive 1300.17.

(b) Provide recommendations to the DCSPER—

1. Concerning any request for accommodation of any religious practice not contained in this chapter.

2. To approve or disapprove denials by commanders concerning the wear of items of religious apparel by soldiers in uniform.

(c) Provide advice as requested by commanders and soldiers.

(3) Composition. The committee consists of a representative from the following Army Staff agencies:

(a) Office of the Deputy Chief of Staff for Personnel (ODCSPER).

(b) Office of the Deputy Chief of Staff for Operations and Plans.

(c) Office of the Deputy Chief of Staff for Logistics.

(d) Office of the Chief of Chaplains.

(e) Office of The Inspector General.

(f) Office of The Judge Advocate General.

(g) Office of The Surgeon General.

(4) Direction and control. The Chief, Human Resources Division, ODCSPER, is designated to chair the committee and to act for the DCSPER as necessary. Reporting channels and tasking authority are in (2) above. Reporting requirements are as specified in AR 5–5, paragraph 3–6.

(5) Administrative support. Administrative support will be provided by the Human Resources Division, ODCSPER.

b. The following should ensure that every enlisted (to include reenlistment) cadet, warrant officer, and commissioned officer

applicant is informed of the Army's policies concerning accommodation of religious practices as set forth in this regulation:

(1) Commanding General, U.S. Army Recruiting Command (for all enlisted and Nurse Corps accessions).

(2) Commanding General, U.S. Army Training and Doctrine Command (TRADOC) (for all Reserve Office Training Corps cadets and officer and warrant officer candidates).

(3) The Surgeon General (for all AMEDD officer accessions less Nurse Corps accessions).

(4) The Judge Advocate General (for all judge advocate officer accessions).

(5) The Chief of Chaplains (for all chaplain officer accessions).

(6) Superintendent, U.S. Military Academy (for all U.S. Military Academy cadet applicants).

(7) The Deputy Chief of Staff for Personnel (for all applicants for reenlistment).

c. The applicant should acknowledge that the accommodation of religious practices cannot be guaranteed but will only be approved by commanders when the religious practice will not have an adverse impact on military readiness, unit cohesion, standards, health, safety, or discipline, or otherwise interfere with the performance of the applicant's military duties. The applicant should further be advised that the conditions of accommodation may be changed by the unit commander or other appropriate authority based on military need.

d. The Chief of Chaplains will formulate and disseminate education and training programs regarding religious traditions and practices within the U.S. Army.

e. The Commanding General, TRADOC, and other MACOM commanders will ensure that training on the provisions of this chapter is provided in appropriate instruction programs for individuals in the positions of commanders at the unit level through brigade chaplains and judge advocates.

f. Unit commanders will consider and approve or deny, as appropriate, requests for accommodation of the religious practices defined in this chapter. Wearing of religious apparel while in uniform is governed by paragraph h(4)(b) below. Unit commanders may rescind previously granted accommodations of religious practices when necessary. Any request for accommodation of religious practices not addressed by this regulation may be sent for consideration through command channels to HQDA (DAPE–MPH), The Committee for Review of Accommodation of Religious Practices within the U.S. Army, WASH DC 20310–0300.

g. Guidelines and procedures for commanders and soldiers are in DA Pam 600–75.

h. The following considerations apply:

(1) Accommodation of religious worship practices.

(a) Some religious groups have worship requirements that conflict with the soldier's

availability for duty; for example, a 25-hour sabbath, time for worship on days other than Saturday or Sunday on a normal basis, or for holy days or periods. The unit commander must determine when individuals must be available for duty. The unit commander will be charged with the creation and maintenance of unit cohesion, discipline, readiness, and operational performance. Religious worship conflicts involving these issues will be handled best at the lowest level where personal relationships and knowledge of the circumstances exist.

(b) Worship services, holy days, and sabbath observances will be accommodated except when precluded by military necessity. If the time required for religious worship is consistently during normal duty hours, the soldier may request an exception to normal duty hours. The soldier must document the need for the exception and be prepared to perform alternative duty hours to maintain individual or unit readiness requirements. Ordinary leave will be an alternative for lengthy holy periods or days.

(2) *Accommodation of religious dietary practices.*

(a) Some faith groups have religious tenets that prohibit the eating of specific foods or prescribe their preparation. These dietary restrictions are normally prohibitions against specific foods more than requirements to eat only a few select foods. Most of these needs are met in garrison with the current diet while being more difficult in a field or combat environment. Meals-ready-to-eat (MRE) should accommodate most soldiers with religious dietary concerns and may be the only ration available.

(b) A soldier with a conflict between the diet provided by the Army and the diet required by the soldier's religious practice may request an exception to policy to ration separately and take personal supplemental rations when in a field/combat environment.

(3) *Accommodation of religious medical practices.*

(a) Some religious practices conflict with normal Army medical procedures. These conflicts include the belief in self-care and prohibitions against immunizations, blood transfusions or surgery. The Army's concern is with the possible effect on the soldier's health and ability to carry out assigned tasks, on military service medical systems, and on the health of others.

(b) A soldier whose religious tenets profess self-care may request accommodation of this religious practice for nonemergency/nonlife threatening illness or injury. However, the unit commander and the medical treatment facility commander will determine the time constraints for the soldier to recuperate without requiring medical care.

(c) Soldiers who refuse to submit (or whose court-appointed guardian or other legal representative objects) to recommended medical treatment because of religious practices will be referred to a medical board. A chaplain will be appointed as a member of the board.

(d) The examining medical board's report should contain the following information:

1. Proposed treatment required to relieve the incapacity and aid the soldier's return to duty status, and expectation to do so.

2. Reasonableness of the soldier's refusal to undergo treatment as based on religious tenets. (The risks ordinarily associated with the proposed treatment and the soldier's age, general physical condition, and the reasons for refusing treatment should be considered.)

3. Need and risk of the proposed medical care refused by the soldier. Moreover, it will show the soldier was given the chance to appear in person and will indicate whether conditions permitted an appearance.

4. Evidence that the soldier was given the chance to submit a written statement explaining grounds for refusal, as well as to have representation from the soldier's religious faith group. Any statements submitted will be included with the report.

(e) Soldiers believed incompetent will be aided by an appointed counsel who may appear in their behalf. The counsel need not be legally qualified.

(f) If the examining board finds that proposed medical care is needed to protect the soldier's health or the health of others, the soldier must be informed and given the opportunity to accept the prescribed medical care. If the soldier still refuses, the medical treatment facility commander will send the medical board proceedings to TSG who will forward it to The Committee for Review of Accommodation of Religious Practices within the U.S. Army for an advisory opinion. TSG will approve or disapprove the medical board proceedings and return them to the medical treatment facility commander. If TSG approves the medical board proceedings, the soldier is again given the opportunity to accept treatment. If the soldier persists in refusing medical care, the medical treatment facility commander refers the matter to the soldier's special court-martial convening authority in accordance with paragraph 5–4 with a copy of the medical board proceedings. The special court-martial convening authority may then initiate administrative, nonjudicial, or judicial action, as appropriate.

(g) In emergency situations the medical treatment facility commander may order or the attending physician may take immediate steps to save a soldier's life regardless of religious practices.

(h) All Army personnel will receive immunizations as prescribed in AR 40–562. Persons whose religious practices conflict with the requirements of AR 40–562 may request temporary waiver of the Area I immunizations or nonessential immunizations while stationed in CONUS units that have no contingencies for deployment to areas II, IIY, or IIP. Personnel in units with deployment contingencies to areas II, IIY, or IIP will be required to maintain immunizations as appropriate. Assignment limitations will

not be granted for lack of immunizations due to religious practices.

(4) *Accommodation of religious dress and appearance practices.*

(a) Subject to temporary revocation due to health, safety, or mission requirements, soldiers may wear—

1. Religious apparel, articles, and jewelry that are not visible or apparent.

2. Visible or apparent religious articles, symbols, and jewelry under the same circumstances as authorized for nonreligious reasons. Hair and other grooming practices are governed by AR 670–1.

(b) Soldiers may wear an item of religious apparel while wearing the Army uniforms, except when wearing the item would interfere with the performance of the soldier's duties, or when the item is not neat and conservative.

1. "Religious apparel" is defined as articles of clothing worn as part of the observance of the religious faith practiced by the soldier.

2. Application of the term "neat and conservative" is not intended to limit the wear of religious apparel during worship services or other rites and rituals distinct to a faith or denominational group. However, commanders may for operational or safety reasons place reasonable limits on the wear of non-subdued items of religious apparel during worship services or other rites and rituals conducted in the field.

3. When a soldier is wearing an Army uniform outside of worship services or other rites and rituals, neat and conservative items of religious apparel are those that are discreet in style and design, and subdued in brightness or color; do not replace or interfere with the proper wearing of any prescribed article of the uniform; and are not temporarily or permanently affixed or appended to any prescribed article of the uniform.

4. The standards above serve as a basis for commanders to determine whether an item of religious apparel may continue to be worn while the soldier is in uniform.

5. Whether an item of religious apparel interferes with a soldier's military duties depends on the characteristics of the item, the circumstances of its intended wear, and the particular nature of the soldier's duties. Factors in determining whether an item of religious apparel interferes with military duties include, but are not limited to, whether the item may impair the safe and effective operation of weapons, military equipment, or machinery; pose a health or safety hazard to the wearer or others; interfere with the wearing or proper functioning of special or protective clothing or equipment (examples include but are not limited to helmets, protective clothing, flight suits, wet suits, protective masks, and crash and rescue equipment); or otherwise impair the accomplishment of the military mission.

6. A complete prohibition on the wearing of any visible item of religious apparel may be appropriate under unique circumstances in which the soldier's duties, the military

16

*f. Distribution of command information newspapers.* The distribution of command information newspapers (either Army authorized or commercial enterprise) will be governed by AR 360–81. Distribution through official channels will be authorized.

# Chapter 6
# Equal Opportunity Program in the Army

## 6–1. Concept

*a.* The Equal Opportunity Program formulates, directs, and sustains a comprehensive effort to ensure fair treatment of all soldiers based solely on merit, fitness, capability, and potential, which supports readiness. As such, EO is a responsibility of leadership and a function of command. This philosophy is based on fairness, justice, and equity. Specifically, this program is designed to—

(1) Provide EO for military personnel and their family members both on and off post.

(2) Contribute to mission accomplishment, cohesion, and readiness.

*b.* This chapter does not implement the provisions of either the Age Discrimination in Employment Act of 1967 (sections 630 through 634, title 29, United States Code) or title VII of the Civil Rights Act of 1964 (section 2000e, title 42, United States Code).

## 6–2. Responsibilities

*a. Heads of Army Staff agencies and their field operating agencies.* These persons will—

(1) Be responsible for Army-wide policies and plans pertaining to the Army EO Program.

(2) Be responsible for overall evaluation and assessment of the Army EO Program.

(3) Formulate, maintain, and implement the HQDA Affirmative Action Plan (AAP).

(4) Establish selection criteria for Army Personnel to attend the Defense Equal Opportunity Management Institute (DEOMI).

(5) Coordinate need for training seats before allocation of quotas.

(6) Allocate quotas among the Active Army, Army National Guard (ARNG), and USAR for training at DEOMI.

*b. Chief, National Guard Bureau (CNGB) and Chief, U.S. Army Reserve (CAR).* The CNGB and CAR will—

(1) Monitor and evaluate implementation of EO policies and programs in their respective components.

(2) Establish sufficient staff positions in their respective offices and make sufficient resources available to adequately carry out EO Program requirements.

(3) Select Army Reserve Component personnel to attend the DEOMI.

(4) Develop management information and reporting requirements to determine progress toward affirmative action goals.

(5) Establish EO training consistent with HQDA policy and command needs.

*c. Commanding General, U.S. Army Forces Command (CG, FORSCOM).* The CG, FORSCOM will—

(1) Supervise and evaluate the unit EO training program conducted by the numbered armies in the continental United States (CONUSA) troop program units.

(2) Coordinate with the Office of the Chief, Army Reserve in conducting EO seminars for USAR general officers on a continuing basis.

(3) Establish adequate compliance monitoring procedures to assure the attainment of program objectives for the USAR.

*d. Commanding General, U.S. Army Training and Doctrine Command.* The CG, TRADOC will—

(1) Develop EO doctrine.

(2) Develop EO instruction and associated training materials for use in the training base and throughout the Army.

(3) Maintain liaison with DEOMI to develop EO doctrine and training materials.

(4) Conduct required EO education and training in TRADOC service schools and training centers.

(5) Provide assistance and instructional materials to schools not under the jurisdiction of TRADOC. These schools include the Judge Advocate General School, Academy of Health Sciences, and U.S. Army War College.

(6) Monitor the instruction presented by DEOMI and evaluates how well the DEOMI meets Army requirements including service-specific instruction.

(7) Develop and provide Army-unique EO instruction through correspondence courses available to all Army personnel.

*e. Commanders of major Army commands.* These commanders will—

(1) Monitor execution of the EO Program in all commands, installations, agencies, activities, and USAR units under their jurisdiction.

(2) Establish EO training consistent with HQDA policy and command needs.

(3) Provide support, as appropriate, for EO matters in host and tenant agreements developed according to AR 5–8, paragraph 5c.

(4) Ensure EO programs for military personnel and EEO programs for civilian personnel complement each other.

(5) Provide personnel, funding, and other resources to carry out the EO Program.

*f. Commanding General, U.S. Total Army Personnel Agency (CG, USTAPA.* The CG, USTAPA will—

(1) Develop statistical data concerning race and gender for personnel management purposes when required by HQDA.

(2) Select personnel, in coordination with HQDA (DAPE–MPH–E), to attend DEOMI.

(3) Control DEOMI student quotas (military and civilian) for the Army.

(4) Distribute Active Army personnel who are EOAs based upon command authorizations.

*g. Commanders at all levels.* The commanders are the EO officers for their respective units and, as such, are assisted by EO advisers and other members of the staff who can advise on EO matters in their areas of responsibility. These commanders will—

(1) Develop and implement EO programs for their organizations.

(2) Identify discriminatory practices affecting soldiers and their families and initiate corrective actions to include followup.

(3) Promote EO and interpersonal harmony for all military personnel, their family members, and civilian employees.

(4) Conduct EO training on a continuing basis for commanders and civilian and military personnel that is consistent with HQDA requirements, the MACOM, and this regulation.

(5) Monitor and assess the execution of EO programs and policies at all levels within their areas of responsibility.

(6) Ensure prompt followup and appropriate action to resolve allegations of discrimination by soldiers or their family members.

(7) Ensure involvement of public affairs personnel at every level of command in planning, executing, and monitoring equal opportunity programs.

## 6–3. Equal opportunity policy

*a.* The policy of the U.S. Army is to provide equal opportunity and treatment for soldiers and their families without regard to race, color, religion, gender, or national origin and to provide an environment free of sexual harrassment. This policy—

(1) Applies both on and off post.

(2) Extends to soldiers and their families.

(3) Applies to soldiers' working, living, and recreational environments (including both on- and off-post housing).

*b.* Soldiers are not accessed, classified, trained, assigned, promoted, or otherwise managed on the basis of race, color, religion, gender, or national origin except as—

(1) The direct combat probability coding policy applies to women. The following regulations implement this policy: AR 611–101, AR 611–112, and AR 611–201.

(2) Necessary to support established affirmative action goals.

*c.* Nothing in this regulation limits the prerogatives of the Chief of Chaplains to carry out responsibilities in AR 10–5, paragraph 2–35a.

## 6–4. Sexual harrassment

Sexual harrassment is a type of sex discrimination. It is not limited to the work environment and can occur at almost any place. Sexual harrassment violates acceptable standards of integrity and impartiality required of all Army personnel and interferes with mission accomplishment and unit cohesion. Many of the acts and neglects that constitute sexual harrassment are prohibited and punishable under civil and military law as criminal acts of a sexual nature (para 17, part IV, MCM). Army leaders at all levels are responsible for taking both preventive

# Jewish War Veterans of the United States of America

*Chartered By an Act of Congress*

1811 R Street, NW • Washington, DC 20009 • (202) 265-6280 • Fax (202) 234-5662 • Email: JWV@jwv.org • www.jwv.org

October 11, 2006

To whom it may concern:

JWV National Commander Norman Rosenshein issued a statement today supporting the claim of LTC Lawrence Epstein (USAR-Ret.). Epstein has filed a complaint in the U.S. District Court for the District of Columbia. Epstein seeks to have the court order a removal of his officer evaluation report for the period from October 22, 1990, through March 5, 1991.

Prior to the time period which is the subject of the suit, Epstein had served honorably as an officer in the Army Reserves. He had obtained the rank of Lt. Col. and had been certified with a military occupational specialty in intelligence. Epstein was highly rated in July 1990 and recommended by his superiors for promotion to colonel in February 1991. He was selected to attend the Army's most prestigious education institution—the US Army War College. Contrary to Epstein's prior high ratings, promotion recommendation, and selection to the war college, Epstein was relieved of duty at his intelligence unit and transferred to an administrative position in March 1991. This action was taken by the same superior officer who had so highly rated Epstein just a few months before.

In between his favorable ratings and his relief from his intelligence duties there was one important occurrence. Epstein, who is an Orthodox Jew, had openly expressed his concerns about some insensitive religious practices in his unit. These concerns were substantiated by an investigation by an "Equal Opportunity" Unit. An admonishment was issued to the superior officer, who then changed his ratings of Epstein and relieved him.

The action against Epstein resulted in the loss of his promotion and early retirement. Many of these facts were only learned by Epstein many years later after a request for information under the Open Public Records Act. Epstein is not seeking monetary damages in his lawsuit, but only an order to remove the offending portions of his Officer Evaluation Report.

"We know Larry Epstein to be a great patriot who provided many years of quality service to the Army. We also know him to be a dedicated member of the JWV USA," said Commander Rosenshein. Rosenshein also stated that he had trust in the Federal Court and the Army to correct the injustice that LTC Epstein has suffered.