IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAWRENCE S. EPSTEIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 07-0688 (RMU) |
| | ) | |
| PETE GEREN, | ) | |
| Secretary of the Army, | ) | |
| | ) | |
| Defendant. | ) | |

UNOPPOSED MOTION OF PROPOSED *AMICUS CURIAE,*
JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA
<u>FOR LEAVE TO FILE BRIEF IN SUPPORT OF THE PLAINTIFF</u>

The Jewish War Veterans of the United States of America [JWV], by their undersigned

National Judge Advocate, Allen E. Falk, Esq. (admitted *pro hac vice*), move this Court for leave to

file a brief *amicus curiae* in support of LTC Epstein. The proposed brief is attached. Both parties

were contacted and neither oppose the motion for leave to submit a brief *amicus curiae.*

Mindful of the caution expressed in <u>Cobell v. Norton</u>, 246 F.Supp.2d 59, 63 (D.D.C.2003),

proposed *amicus curiae* does "not simply repeat plaintiff's arguments." Rather, the JWV brings a

special perspective to assist the Court and parties. Firstly, it is a congressionally chartered veterans

advocacy organization, and the oldest active veterans association in the nation. Its record confirms

over 110 years in a leadership role that has prompted public and legal awareness towards abolishing

barriers to equal treatment among minorities in the military. Secondly, the JWV places <u>Epstein</u>

within the broader historical interrelationship between the military's evolving anti-discrimination

doctrine and civilian jurisprudence. This exposes what military EO values are at stake. The JWV

concern is that the departure here from the military's enviable legacy of equal treatment, enshrined

in Truman's 1948 desegregation mandate, will have implications beyond the parties in this

litigation.

Although the positions of Epstein and *amicus curiae* eventually coincide, the proposed brief

demonstrates an approach along a different path. As the *amicus curiae* argues in its proposed brief,

1

because of the military's *sui generis* need to function in cohesive units in combat without "prejudice to good order and discipline," it could not afford to distinguish among the various types of discriminatory treatment on the basis of race, religion, ethnic origin or gender. But in methodic fashion, the Army in <u>Epstein</u> rearranges the military's longstanding EO policies to fit civilian employment doctrines. The result is that without proof of subsequent tangible "economic" injury (as in civilian Title VII cases), then disparaging comments by commanders in wartime against their minority service-members and openly made among other members, never rise to discrimination. Their interpretation appears systemic and not arbitrary. A real potential exists for an impact beyond the private parties; to diminish or confuse the distinctive military guarantee to protect "equality of treatment" for all minority service-members.

Thirdly, the JWV as an *amicus curiae* will not delay the present proceedings. The organization's attached proposed brief is submitted in accordance with briefing schedule date of November 27, for plaintiff's filing of its dispositive motion and opposition. If JWV submits later a reply brief, it will follow the schedule for plaintiff's reply pleading. Lastly, the proposed brief is only 11 pages in length.

<u>The specific grounds of interest in support of the motion are as follows</u>:

1. The Jewish War Veterans of the United States of America, is the oldest active veterans association in the United States, founded by Civil War Veterans in 1896. It is dedicated to those programs that support the needs of our veterans, community, to combat anti-Semitism and bigotry, to support American youth through scouting, scholarships and anti-drug programs, and assists oppressed Jews worldwide. In legal cases the JWV acts upon these principles and policies while historically drawing from constitutional, statutory and regulatory provisions. The goal is to ensure within armed forces equality of treatment, religious freedom, and protection against discrimination.[1]

---

[1] *E.g.* <u>Jewish War Veterans of the United States of America v. United States</u>, 695 F.Supp 3 (D.D.C.1988)(65-foot lighted Latin Cross symbolizing Christianity that was erected by military as "the War Memorial for all US service-members" in Marine Corps base violates establishment clause); similar pending case in <u>Jewish War Veterans of the United States of America v. Gates</u>,

2.  The JWV supports equal treatment for <u>all</u> active duty and retired military members.  It is a member of "The Military Coalition" [TMC], a group of over 30 military associations and veterans organizations representing the interests of over 5 million active duty, reserve, and retired military service members.  For example on March 7, 2007, as part of the TMC, the JWV's National Commander Norman Rosenshein testified before the U.S. Senate Committee on Veterans Affairs supporting various initiatives.   Concern for equal treatment is also demonstrated in the JWV 2007 Resolutions that include, among others:  granting retroactive equal benefits to members of the Merchant Marine who served during WWII because they faced daily potential hostile fire from enemy ships and submarines; urging Congressional passage of tax relief to extend the date allowing amended tax returns for disabled veterans; and reaffirms its strong positions that the military must more widely recognize the contributions of women in the military.

3.  Anti-Semitism rises around the globe.  Our veterans have returned from past and now current conflicts.  The JWV stands ready to ensure that those who have fought our nation's battles receive the treatment and the respect that they deserve from a grateful nation.

4.   For example, in September 23, 2005, President Bush awarded former Army Corporal Tibor Rubin the Medal of Honor for heroism during the Korea War.  Rubin was the first Jewish-American awarded the medal from the Korean War, and although nominated four times, was refused by anti-Semitic superiors.  The *Washington Post* reported that Cpl Rubin's superiors during the War even assigned him to dangerous missions hoping he would get killed.[2]  But Rubin's past nominations only got their just due after Congress passed the "Jewish War Veterans Act of 2001." [3]

_____

Sec'y of Defense, 06-1728 (S.D.Ca.)(to remove Mt. Soledad Cross as the only veterans war memorial), related proceedings 506 F.Supp.2d 30 (D.D.C. 2007)(partial grant to compel discovery).

[2] Washington Post, Sept. 24, 2005, at A3 ("Jewish Vet gets Medal of Honor 55 years on").

[3] National Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, div. A, title V, §§ 552, Dec. 28, 2001, 115 Stat. 1115 (Secretary of each military department shall review the service records of each Jewish American war veteran or Hispanic American war veteran described to determine whether that veteran should be awarded the Medal of Honor.  For purposes of this section, the term ''Jewish American war veteran'' means any person who served in the Armed Forces during World War II or a later period of war and who identified himself or

5.    The Jewish War Veterans Act of 2001 compelled the Army to review all servicemen of the Jewish faith or extraction whose nominations may have been derailed because of anti-Semitism. Because of this past anti-Semitism in the military (and society in general), and resistance <u>even today</u> within the military, the Act became necessary.   The JWV was instrumental in passage of this Act because of the organization unique perspective with a legacy as an advocate of Jewish service-members, and historical understanding of military's anti-discrimination policies.  Bringing public awareness of the larger societal issues at stake, the entire nation benefits.

6.    In 2004, the JWV issued a press release condemning the anti-Semitic incidents at  the Air Force Academy, which include harassment of Jewish cadets.  The JWV urged all the U.S. military academies to adopt as part of their curricula course in cultural, religious, and ethnic "diversity" to fight bigotry and hatred.   The JWV was intimately involved with Air Force and the Academy subsequently revised their internal procedures to issue guidelines towards ensuring freedom of religious expression.

7.    In the Summer of 2006 the leadership of JWV and its counsel reviewed the entire case file.  On November 11, 2006, the organization made a decision to file an *amicus* brief.   Thereafter, the National Commander Norman Rosenshein released a statement supporting the federal court claim of LTC Epstein.


WHEREFORE, proposed *amicus curiae* respectfully request that this Court grant leave to file a brief in support of plaintiff LTC Larry Epstein.


/s/  Allen E. Falk, Esq. (admitted *pro hac vice*)
National Judge Advocate,
Jewish War Veterans  of the United States of America
Healy & Falk, Attorneys at Law
P.O. Box #70, 569 Highway 36
Belford N.J. 07718
732 495-1200 phone
732 495-5329 fax

herself as Jewish on his or her military personnel records.")

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE S. EPSTEIN          )
                            )
    Plaintiff,              )
                            )
    v.                      )          Case Number: 1:07CV00688 (RMU)
                            )
PETE GEREN,                 )
Acting Secretary of the Army, )
                            )
    Defendant.              )
_____ )

## ORDER

    Upon consideration of unopposed motion by Jewish War Veterans of the United States of

America for leave to file a brief *amicus curiae* in support of plaintiff LTC Epstein, and the entire

record, it is hereby

    **ORDERED** that the motion is **GRANTED**,


Dated this _____ day of _____, 2007.


                                  _____
                                  Ricardo M. Urbina
                                  United States District Judge


Copies to:
Counsel for Parties via ECF

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAWRENCE S. EPSTEIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 07-0688 (RMU) |
| | ) | |
| PETE GEREN, | ) | |
| Secretary of the Army, | ) | |
| | ) | |
| Defendant. | ) | |

BRIEF *AMICUS CURIAE* OF THE JEWISH WAR VETERANS OF THE
UNITED STATES OF AMERICA, IN SUPPORT OF THE PLAINTIFF

This brief is submitted by the Jewish War Veterans of the United States of America [JWV],

through its National Judge Advocate, Allen E. Falk, Esq (admitted *pro hac vice)*.  Both parties were

contacted and neither oppose the motion for leave to submit this brief.  Submitted in support is a 6

page "*Amicus* Appendix" of excerpted military regulations: A.Reg. 600-20 *Command Policy*

(1988); Operational Naval Instruction OPNAVINST 5354.1E *Navy Equal Opportunity Policy*

(2001); Air Force Instruction AFI 36-2706 *Military Equal Opportunity Program* (2004).

The JWV urges the Court to grant LTC Epstein's cross-motion for summary judgment, and

to set aside his Officer Evaluation Report for the period 22 October 1990– 5 March 1991.

Interest of *Amicus Curiae*

The Jewish War Veterans of the United States of America is the oldest active veterans

association in the United States, founded by Civil War Veterans in 1896.   It is dedicated to those

programs, including legal cases, that support the needs of our veterans and community, combats

anti-Semitism and bigotry, supports American youth through scouting, scholarships and anti-drug

programs, and assists oppressed Jews worldwide.  In legal cases we act upon these principles and

policies while drawing from constitutional, statutory and regulatory provisions to protect against

discrimination within the armed forces.

In 2006 the leadership of JWV and its National Judge Advocate reviewed the entire case file. On November 11, 2006, the JWV decided to file an *amicus* brief.  The National Commander Norman Rosenshein issued a statement supporting this federal claim of Mr. Epstein.

## STATEMENT OF THE CASE

The JWV finds acceptable Epstein's regulatory background discussing the pertinent provisions dealing with Officer Evaluation Reports (OER) and Equal Opportunity policies.

## I.     LTC Epstein is entitled to summary judgment

<u>Background</u>

On September 23, 2005, Army Public Affairs announced that President Bush awarded former Army Corporal Tibor Rubin the Medal of Honor for heroism during the Korea War.  Rubin was the first Jewish-American awarded the medal from the Korean War, and although nominated four times, was refused by anti-Semitic superiors.  The *Washington Post* on September 24, 2005, reported that Cpl Rubin's superiors during the War even assigned him to dangerous missions hoping he would get killed.  But Rubin's past nominations only got their just due after Congress passed the "Jewish War Veterans Act of 2001." [1]  Over military resistance, that law compelled the Army to review all servicemen of the Jewish faith or extraction whose nominations may have been derailed because of anti-Semitism.  The JWV was an instrumental advocate for this Act.

In 2004, the JWV also issued a press release condemning the anti-Semitic incidents at the Air Force Academy, which include harassment of Jewish cadets.  The JWV urged all the U.S. military academies to adopt as part of their curricula course in cultural, religious, and ethnic "diversity" to fight bigotry and hatred.   The Air Force Academy subsequently revised their internal procedures to towards ensuring freedom of religious expression.

---

[1] Citation appears in the motion for leave to submit brief *amicus curiae,* at 2.

2

The JWV again brings to the Court's attention the tragic case of Cpl Rubin's overdue recognition not to draw heroic parallels. But rather to demonstrate how far the Army has come from the days of blatant anti-Semitism, and yet how far still it must go in light of the mistreatment of LTC Epstein. His case demonstrates that anti-Semitism lingers beneath the surface.

In this case there is a troubling perception that anti-Semitism was only recast into bureaucratic window-dressing as part of the Army's "comprehensive effort to ensure fair treatment of all soldiers." A.Reg. 600-21 ¶ 6-1 (EO Policy, 1988). The primary flaw was to depart from the military's policy since 1948 that has banned as discriminatory treatment of its soldiers based on race, national origin, religion, and recently on gender. Instead, officials here appeared to borrow from or adopt the narrow civilian doctrine of employment discrimination under Title VII that requires tangible changes in military status or economic benefits. This dictated the result so that a commander's openly disparaging remarks, along with an overall perception of prejudice, never constituted "discrimination."

From this starting point, the Army's appellate bureaucracy from 1991 through the BCMR in 2003, found ways to give short shrift to anti-Semitism from Epstein's commander. Investigators seemed to almost welcome the commander's convenient blame-shifting tactic— the "joke defense." In the portrayed spirit of jest, Epstein as an orthodox Jew repeatedly encouraging the disparaging and mocking remarks to target himself, his culture, his faith. With investigators provided this escape hatch, anti-Semitism suddenly disappeared. It was then translated into innocuous psycho-babble, like "inadvertent insensitivity, unfortunate organizational climate, antagonism between clashing personalities." This defanging of the anti-Semitism allowed Army officials to accept as normal routine the commander's rampage of venom beginning with summary dismissal. This was followed by a shocking OER overflowing with disloyalty, dishonesty, poor people skills, zero experience, a top-secrets revealer, and nutty saboteur of unit cohesion and morale in wartime. Then with impunity, the commander before the Defense Investigative Service, assassinated Epstein's character as an unstable officer unworthy of any security clearance. Within a four-month period ending in his firing as a deputy commander, LTC Epstein stellar career had turned upside down. He

had gone from a highly regarded officer selected for the War College as "destined among Army's future leaders," to *persona non grata.*

The misapplication of the Army's anti-discrimination policies ultimately detoured it recognizing that the rater of LTC Epstein's OER had become disqualified under ¶ 5-30b(1)a, A.Reg. 623-105. Instead, a disturbing pattern emerged to continue the discriminatory treatment. Throughout this investigative and appellate odyssey, the Army seemed to subtly congratulate itself; its efficient EO processes discovered anti-Semitism was not really anti-Semitism because there was no other discrimination. This allowed the Army to fortuitously uncover a derelict, unstable officer.

**A.     Army officials found no discrimination by improperly equating LTC Epstein's EO case to civilian standards under Title VII doctrine for "employment discrimination" that requires tangible or economic status change, such as hiring, firing, or demotion.**

    1.   Encompassed within the broader mandate of the 1948 Executive Order against race discrimination in the military, are bans against discriminatory harassment, ridicule, and insult on the basis of race, religion, national origin, and gender.

The military's policies banning racial, ethnic, and sexual harassment are connected to broader mandates against race and sex discrimination. The ban on racial harassment is subsumed within the larger prohibition on race discrimination. This was first embodied in President Truman's 1948 executive order which broadly guaranteed without distinction, to be treated equally <u>and</u> given equal opportunity:

> WHEREAS, it is essential that there be maintained in the armed services of the United States the highest standards of democracy, * * * It is hereby declared to be the policy of the President that there shall be equality of treatment and opportunity for all persons in the armed services without regard to race, color, religion or national origin.

Exec. Order No. 9981 (July 26, 1948). The ban on race discrimination has since been reinforced by a variety of provisions. The extensive reach of these provisions have never treated racial harassment and race discrimination separately; rather racial harassment is considered a form of

4

prohibited race discrimination.  The Army's EO policy that rests upon the expansive Truman

mandate derives from the special needs of military units that are distinct from civil society:

> a comprehensive effort that ensures fair treatment of all soldiers based solely on merit,
> fitness, capability, and potential. * * * Specifically designed to.....Contribute to mission
> accomplishment, cohesion, and readiness.

Pl.Appx 1A-2A, A.Reg. 600-21, *Equal Opportunity Policy* (1986) ¶ 1-1; Pl.Appx. 47, *Command*

*Policy*, (1988)¶ 6-1 (identical language); Id at *Amicus* Appx. ¶ 4-1 (military discipline manifested in

units by cohesion, bonding, spirit of teamwork; mutual respect between senior and subordinate

personnel... fairness, justice, and equity for all soldiers regardless of race, ethnic origin, or religion).

Subsection ¶2-1*a* of the EO regulation may be considered the broad Truman mandate.  And

along with the integration of women, this paragraph prohibited harassment [emphasis added]:

> To provide equal opportunity <u>and</u> treatment for soldiers and their families without regard
> to race, color, religion, and environment free of sexual harassment or national origin.
> * * * Sexual harassment is an unwelcome form of sex discrimination [¶ 2-2]

The next subsection ¶2-1*b* equates closely to the civilian Title VII Civil Rights Act of 1964.

Both are concerned with the tangible economic injuries from personal and institutional

discrimination—"soldiers are not accessed, classified, trained, promoted, or managed on the basis

of race, color, religion, and gender."  <u>Compare</u>  42 U.S.C. § 2000e-2(a) (unlawful to limit,

segregate, or classify employees, fail or refuse to hire or discharge any person with respect to terms,

condition, or privileges of employment because race, color, religion, sex, or national origin).


<u>Military's enforceable code of conduct  vs.  Civilian unenforceable code of civility</u>

These EO polices indicate another reason why the military has not followed in lock step

behind the evolving legal doctrines under Title VII; the military's separate code or rules of conduct

imposed to fight in combat conditions.   To the contrary, civilian courts often point out that Title

VII's harassment law is not intended to be a "general code of civility" to prohibit all verbal

harassment, ridicule, or abusive environments, in the workplace.  <u>Oncole v. Sundowner Offshore</u>

<u>Services</u>, 523 U.S. 75, 77 (1998).  Rather, it only protects the right to work in an environment free

from 'discriminatory' intimidation, ridicule, and insult, that rises to a hostile workplace. <u>Meritor</u>

<u>Savings Bank v. Vinson</u>, 477 U.S. 57, 65 (1986).  The doctrine under Title VII imposes its own

varying standards to prove actionable discriminatory harassment.  The EEOC standard is typical:

> Harassment, ethnic slurs, racial jokes, offensive or derogatory comments based on a
> person's race/color constitutes unlawful harassment if the conduct creates an intimidating
> hostile or offensive work environment, or interferes with the person's work performance.

<u>See</u> EEOC, Race/Color Discrimination, available at http://www.eeoc.gov/types/race.html.  But this

can only be determined by looking at all the circumstances; <u>Harris v. Forklift Systems</u>, 510 U.S. 17

(1993)(psychological harm standard unnecessary, flexible standard under all the circumstances).

Finally, the progression of Title VII harassment law significantly lags behind President's

Truman's 1948 segregation mandate of equal treatment.  It was only within the last 30 years that

civilian legal doctrine under Title VII first recognized racial or ethnic harassment as unlawful

discrimination because such conduct produces discriminatory effects.  This is because racial

harassment impedes the personal advancement of minorities, and sends a message to members of

these groups that they do not belong.  Thus banning harassment in the civil society furthers the goal

of ending discrimination of an individual in the workplace.  This was traced back to <u>Rogers v.</u>

<u>EEOC,</u> 454 F.2d 234, 238 (5th Cir. 1971) (Title VII broad enough to eradicate noxious practices that

create work environment heavily charged within ethnic or racial discrimination to affect emotional

and psychological stability), <u>cert denied</u> 406 U.S. 957 (1972).

But the military has always imposed higher demands under a code of conduct for all service

members that form a unit.   This contains two parts, both fairly contained within the Truman anti-

discrimination mandate:  criminal code of conduct, and non-punitive standards or policy.  The

former is punished under the UCMJ, the latter by commanders through administrative discipline.

 Administrative standards of conduct include the Army's comprehensive EO polices.   They

strike at the entire spectrum of disparate treatment among soldiers, to include a discriminatory work

environment.  The affects on good order and discipline are at stake rather than the civilian standards

to measure a hostile work environment.  The need for sweeping up far more disparaging speech that

would otherwise be protected, was best expressed in Mr. Justice Holmes historic assertion

> In the armed forces some restrictions exists for reasons that have no counterpart in the
> civilian community.  Disrespectful and contemptuous speech...is tolerable in the civilian
> community for it does not directly affect the capacity of the Government to discharge its

responsibilities....The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately invoking the security of the Nation.  Speech that is protected in the civil population may nonetheless undermine the effectiveness of the response to command.

United States v. Priest, 45 C.M.R. 338, 344 (1972)(quoting Schenk v. United States,  249 U.S.C. 47, 52 (1919)).

The EO regulation banning discrimination is criminally non-punitive by relying on implementation and enforcement by local commanders.  Pl.Appx. 2, A.Reg. 600-21 ¶ 2-3 (chain of command primary channel to correct of discriminatory practices); Id 44 (A.Reg. 600-20, *Command Policy* ¶ 6.2g (commander's identify discriminatory practices affecting soldiers and take corrective action).  Military EO regulations across the services make no distinction among discriminatory practices.  Pl.Appx. A.Reg. 600-20 ¶ 6-2c (disparaging or negative remarks pertaining to race or religion constitute unlawful discrimination); Air Force Regulation AFR 30-21 ¶ 6-3 (1986) (prohibiting arbitrary discrimination based on color, national origin, ethnic group, religion, and includes "disparaging terms, personal discrimination, institutional discrimination");[2] *Amicus* Appx. 6 (Air Force Instruction AFI 36-2706, *EO Policy* (2004) ¶ 1.1.1 ("Air Force recognizes that all written or verbal communications degrading individuals on the basis of race, color, national origin, religion, or sex, remains a form a unlawful discrimination [emphasis added]"); *Amicus* Appx. 4 (Navy EO Policy, OPNAVINST 5354.1E ¶ 4d (2001)("Incidents of unlawful discrimination cover a wide range of behavior from verbal comments to physical acts, and may be subtle or overt").

In addition to EO policies, the Uniform Code of Military Justice (UCMJ) contains a variety of provisions to address such behavior.  Punitive action from disparaging remarks may be brought, but rely on traditional military criminal law well before Title VII.   Below are three examples.

Article 117 prohibits "provoking or reproachful" words.  In the military context the amount of provocation that can lead to breach of the peace is rather low.  The words need not be a challenge to do violence, but instead merely must have a tendency to lead to quarrels, fights or other disturbances.  "With such a low standard, many workplace remarks would seem to fall within the

---

[2] AFR 30-21 quoted in LCDR Richard Chema, "Arresting Tailhook: Prosecuting Sexual Harassment in the Military," 40 Mil.L.Rev.1, n.6  (1993)[hereafter "Arresting Tailhook"].

ambit of this statute." Chema <u>Arresting Tailhook</u> at 53-54, n. 228 <u>citing</u> <u>United States v. Linyear</u>, 3 M.J. 1027 (N.MC.R.)(male sailor called female sailor "a swine"and walked away. The court held that such language was sufficient to state an offense) <u>pet denied</u> 5 M.J. 269 (C.M.A. 1978).

Article 93 (Maltreatment) can proscribe speech. This is defined as physical, or mental pain, suffering or abusive, or otherwise unwarranted or unnecessary for any lawful purpose. <u>United States v. Hanson,</u> 30 M.J. 1198 (A.F.C.M.R.1989) (rejected accused's "joke defense" for sexually explicit remarks to subordinates, court noting that maltreatment proscribing speech is general intent crime and "occurs when treatment is viewed objectively"), <u>aff'm</u> 32 M.J. 309 (C.M.A).

Finally, Article 134 is the "catch-all" provision criminalizes conduct that is "service discrediting or prejudicial to good order and discipline." The Article has been defined as having two categories of conduct: (1) that which is illegal under the common law statutes, and (2)

> that which-however eccentric or unusual, is not unlawful in a civilian community but becomes service discrediting solely because in the military context its effect is to prejudice good order and discipline, or to discredit the service.

<u>United States v. Guerrero</u>, 33 M.J. 295, 297 (C.M.A. 1991) <u>cert denied</u>, 112 S.Ct. 1173 (1992).

Consistent with Article 134's "catch-all" provision under category 2, it is observed that several of the military services in the past 6-7 years have uniformly strengthened the enforcement tools for their EO policies. It appears they criminalized significant deviations from EO discriminatory behavior previously disciplined non-punitively. For example, in 2004 the Air Force changed the language in AFR 30-21 so that disparaging remarks at a member's religious practices formerly called "arbitrary discrimination" now are "a form a <u>unlawful</u> discrimination [emphasis added]." *Amicus* Appx 6. Although EO policies for all services still encourage commanders to resolve EO violations at the lowest level administratively, these changes suggest past discriminatory behaviors may now qualify as criminal offenses.

<u>Instructive: Army EO policy defines sexual harassment as discrimination</u>.

In 1986, the Army added to its guarantee of equal treatment to all soldiers by defining sexual harassment as "a type of sexual discrimination. Pl.Appx 1A-2A, A.Reg. 600-21, ¶ 2-2

(through deliberate or repeated verbal comments or gestures of sexual nature offensive to the person to whom addressed). The Army's 1986 EO policy adding sexual harassment followed the 1985 publication of guidelines by the Equal Employment Opportunity Commission. <u>Meritor Savings Bank v. Vinson</u>, 477 U.S.57, 64 (1986)(<u>citing</u> EEOC rule 29 C.F.R. 1604.11(a) (1985)); <u>see</u> LCDR Chema, <u>Arresting Tailhook</u> at 7 (military began implementing EO policies against sexual harassment about the same time as EEOC guidelines).

Also in 1986, the Supreme Court in a sexual harassment case followed the <u>Rogers</u> doctrine that found racial harassment as discrimination. <u>Meritor Savings</u> held that sexual harassment is discrimination under Title VII, whether or not it was linked to tangible or economic injury. <u>Id</u> 64.

When the Army EO policy in 1986 added discriminatory "sexual harassment" to its prohibited practices, this was consistent with the goal integrating blacks and ethnic minorities. It did not grant women greater rights or legal privileges, but enforced equality of treatment. It banned as discriminatory conduct disparaging remarks and gestures on the basis of gender or of a sexual nature. Like other minorities during the Truman mandate, women "were not accepted as full fledged members of the established group...where [their] value and worth to the organization is perceived to be in doubt." LCDR Chema, <u>Arresting Tailhook</u> at 11 (citing research in sexual harassment in the Navy in the 1980s).

**2. Army officials ignored that when LTC Epstein's two EO complaints substantiated discriminatory treatment by the rater, Army regulation required his disqualification.**

(a) When the rater was formally disciplined for repeated inappropriate remarks against LTC Epstein's Jewish practices, this was a "significant deviation" from a commitment to eliminate discriminatory treatment. A.Reg. 600-20 ¶ 6-3c.

It has been demonstrated above that since 1948, that the military's authority to recognize and prohibit "discrimination" solely on the basis of race and religion, has much greater reach that the "economic" or "tangible" effects akin to Title VII employment discrimination. The latter applies to but one aspect of Army EO policy under subsection ¶2-1*b* that "soldiers are not...classified, promoted, or managed on the basis of race, color, religion, and gender."

Discrimination in the military has never been restricted to analogous civilian-type harassment claims where the soldier has the burden to also prove a hostile work, personal or institutional discrimination. But in under this restrictive civilian template, Army officials reviewing this case sharply ended their inquiry and remedial actions after finding no discrimination.

The bright line thresholds here are twofold. LTC Epstein's brief already sets forth the first— repeated disparaging remarks by a commander in the presence of others, along with an overall poor EO climate insensitive to minorities, that fueled the reasonable perception of prejudice and unequal treatment. The second bright line threshold is whenever there is that a "significant deviation" from the EO commitment to eliminate unlawful discrimination. Such deviations require "documentation," that includes administrative or disciplinary action "to correct inappropriate behavior." Pl.Appx 5, A.Reg. 600-20 (1999) ¶ 6-3c. This 1999 verison administratively acknowledges existing EO practices and customary usage. Or, it requires that if such departures from EO policy have not been formally recorded, then future deviations demand it. And along with the 2006 revision of AR 600-20 adding "unlawfulness" to all discrimination, then significant deviations under the circumstances, may qualify under Article 134 as "service discrediting".

The 1991 adverse 'letter of caution' issued to LTC Hudson as result of LTC Epstein's EO complaint, qualified as EO "documentation" within ¶ 6-3c. It was a remedial action to correct the aberrant behavior of the rater, who as the unit commander was also in an influential position to set the stage to adversely affect the overall EO climate, unit cohesion, and morale. The letter of caution was to avoid future remarks that were "insensitive and inappropriate" concerning Epstein's religion and dietary habits. Furthermore on a wider scale, because these remarks were made in the presence of other unit members *by the* unit commander, it warned him to be "especially sensitive to the reactions of the perceptions of others" — meaning the overall perception of anti-Semitic treatment within the unit by the commander. Sup.AR 1. So having documented this action to correct unacceptable behavior, this today would meet the criminal threshold as a "significant deviation" from the rater's commitment to eliminate unlawful discrimination. This does not mean that LTC Hudson's actions in 1991 were clearly criminal, but today could be measured under a

punitive standard.  At a minimum in 1991, the actions violated the EO policies against discriminatory treatment based on religion and ethnic origin.  And under the rater disqualification provisions, the documented "significant deviation" was certainly a substantiated finding from an official investigation.  A.Reg. 623-105 ¶ 5-30b(1).

It is disturbing that despite "documentation" to correct discriminatory behavior by the commander, Army officials borrowed or equated to inappropriate civilian employment standards.  This distanced the Army and the intelligence unit from the stigma or embarrassment of what could be called anti-Semitic practices during the Gulf War (with our Israeli ally).  The subjective intent of the person using ethnic slurs is irrelevant when as here, it was admitted that the reasonable perception of anti-Semitic prejudice was so serious that the rater was formally disciplined.  In other words, an EO offense requiring only general intent.

Beyond subjective intent, Epstein will also rewrite the services' EO policies that reaffirmed anti-discrimination standards against disparaging or negative statements:  when such comments or remarks pertain to race, color, national origin, or religion, they constitute unlawful discrimination only if there is additional tangible economic employment injury, such as discharge, demotion, or denial of favorable personnel actions such of promotion, assignment, awards, reenlistment, etc.

Repeatedly disparaging anti-Semitic remarks here during war-time, by a senior commander openly among fellow soldiers against his Deputy, violates the intent and letter of the Truman guarantee that it is militarily "essential to maintain...in the highest standards...equality of treatment" without regard to religion or ethnic origin.  Such behavior is not entitled to expedient second-guessing as discrimination to insulate the command or commanders from OER disqualification as raters.  The Army's approach has superficial appeal by writing-out such disruptive behavior at high levels from it's EO and OER prohibitions.  This falls woefully short of the Army's unwavering EO policy declarations to provide a comprehensive effort that ensures equal treatment for all soldiers.

The impact of Epstein does not merely make this particular officer a stranger to the safeguards of the Army's EO anti-discriminatory blanket.  Resolution of the issues will have an impact beyond the parties.  In systemic fashion, the Army applied civilian-like Title VII standards

to a war-time case of discriminatory treatment against an unblemished rising star whose career was derailed amid accusations of disloyalty, madness, and high treason.  A case that arose from grass roots investigations of unit-EO climate, to senior commanders through a Major General.  A case with the appearance of rubber-stamping by an appeal boards, then followed by the BCMR acting on behalf the Secretary.  Epstein raises fundamental questions whether the respected historical trajectory of the military's ban on all forms of minority discrimination, is at risk of veering from its path of enlightened progression.

CONCLUSION

For the foregoing reasons, the JWV respectfully urges the Court to grant Mr. Epstein's cross-motion for summary judgment, and remove his OER for the period 22 Oct 1990–5 Mar1991.

/s/  Allen E. Falk, Esq.
(admitted *pro hac vice*)
National Judge Advocate,
Jewish War Veterans  of the United States of America
Healy & Falk, Attorneys at Law
P.O. Box # 70, 569 Highway # 36
Belford N.J. 07718
732 495-1200 phone
732 495-5329 fax
HealyFalk@aol.com

12

held in, that grade. If reduction is to a higher grade than that previously held, it is the date the soldier was eligible for promotion under the promotion criteria set forth for that grade under AR 600–200, chapter 7. (See AR 140–158, chap 4 for USAR enlisted soldiers on active duty in the Active Guard Reserve (AGR) program.)

*h.* Date of rank on reduction for all other reasons is the effective date of reduction. (See AR 27–10, chap 3, when a soldier is reduced under the MCM (Article 15, UCMJ.))

*i.* The DOR on restoration to grade of rank from which reduced following successful appeal of the reduction, is the date held before reduction. (See AR 27–10, chap 3, when a soldier is reduced under the MCM, (Article 15, UCMJ.)

*j.* Date of rank for enlisted Reservists or Guardsmen restored to active duty (other than active duty for training) from the USAR or ARNG is a date preceding the date of entrance on active duty by a period spent in an active status in the grade in which ordered to active duty subject to the following conditions:

(1) Only service performed after the most recent break in service is creditable. For the purpose of this paragraph, a period during which the soldier is not a member of any component of the Armed Forces is a break in service if such period is in excess of 3 months (enlisted soldiers) or 6 months (former officers).

(2) Service performed prior to reduction to a pay grade lower than that in which a person enters on active duty is not credited.

*k.* The DOR for retired enlisted personnel who are recalled to active duty will be the DOR stated in the U.S. Total Army Personnel Agency orders placing him or her on active duty. Such DOR is computed by adding, at the time of retirement, the period of time between the date of retirement and the date of return to active duty. In case of additional periods of inactive service, the DOR is adjusted further.

*l.* The DOR for enlisted soldiers who immediately reenlist following removal from the Temporary Disability Retirement List (TDRL) is the original DOR held prior to being placed on the TDRL (section 1211, title 10, United States Code.) Soldiers who do not immediately reenlist following removal from the TDRL will have their DOR established under the provisions of *c* above.

*m.* The DOR for enlisted soldiers on restoration to the higher grade held prior to reduction to comply with requirements to attend school under an Army program will be the date of rank held prior to the reduction.

*n.* USAR and ARNG soldiers whose grades were reduced to enter on initial active duty for training (IADT) or to attend school will be restored upon satisfactory completion of training to their former grade with original DOR held prior to reduction.

*o.* The DOR of an ARNG soldier promoted to a higher grade held prior to acceptance of a reduction of one or more

grades, without prejudice, due to lack of position vacancy or unit reorganization or inactivation, will be a date preceding the promotion by a period equal to the length of time previously served in the grade to which promoted.

## Chapter 4
## Military Discipline and Conduct

### 4–1. Military discipline

*a.* Military discipline is founded upon self-discipline, respect for properly constituted authority, and the embracing of the professional Army ethic with its supporting individual values. Military discipline will be developed by individual and group training to create a mental attitude resulting in proper conduct and prompt obedience to lawful military authority.

*b.* While military discipline is the result of effective training, it is affected by every feature of military life. It is manifested in individuals and units by cohesion, bonding, and a spirit of teamwork; by smartness of appearance and action; by cleanliness and maintenance of dress, equipment, and quarters; by deference to seniors and mutual respect between senior and subordinate personnel; by the prompt and willing execution of both the letter and the spirit of the legal orders of their lawful commanders; and by fairness, justice, equity for all soldiers, regardless of race, ethnic origin, gender, or religion.

### 4–2. Obedience to orders

All persons in the military service are required to strictly obey and promptly execute the legal orders of their lawful seniors.

### 4–3. Military courtesy

*a.* Courtesy among members of the Armed Forces is vital to maintain military discipline. Respect to seniors will be extended at all times. (See AR 600–25, chap 4.)

*b.* The actions of military personnel will reflect respect to both the National Anthem and the National Colors. The courtesies set forth in AR 600–25, appendix A, should be rendered the National Color and National Anthem at public events whether the soldier is off or on duty, whether he or she is in or out of uniform. Intentional disrespect to the National Colors or National Anthem is conduct prejudicial to good order and discipline and discredits the military service.

### 4–4. Soldier conduct

*a.* Ensuring the proper conduct of soldiers is a function of command. Commanders rely upon all leaders in the Army, whether they are on or off duty or in a leave status, to—

(1) Ensure all military personnel present a neat, soldierly appearance.

(2) Take action against military personnel in any case where the soldier's conduct violates good order and military discipline.

*b.* The senior officer, WO, or NCO will act promptly, using such means as are available, to restore order.

*c.* On public conveyances in the absence of military police, the person in charge of the conveyance will be asked to notify the nearest military police and arrange to have them take custody of military personnel guilty of misconduct. If necessary, the person in charge of the conveyance will be asked to stop at the first opportunity and turn the offender over to local police. In all such cases, the local police will be advised to telephone (collect) the nearest Army post or Army headquarters. The purpose is to ensure—

(1) The accused's commanding officer is notified.

(2) The commander of the area of responsibility in which the offense occurs takes proper action.

*d.* When an offense endangering the reputation of the Army is committed elsewhere (not on a public conveyance), civilian police will be requested to take the offender into custody when military police are not available.

*e.* When military police are not present, the senior officer, WO, or NCO present will obtain the name, grade, social security number, organization, and station of the offender. This information and a statement of the circumstances will be sent to the soldier's commanding officer without delay. When the offender is turned over to the civilian police, the above information will be given to the civilian police for transmittal to the proper military authorities.

### 4–5. Maintenance of order

Army and Marine Corps military police, Air Force Security Police, and members of the Navy and Coast Guard shore patrols are authorized and directed to apprehend Armed Forces members who commit offenses punishable under the UCMJ. Officers, WOs, NCOs, and petty officers of the Armed Forces are authorized and directed to quell all quarrels, frays, and disorders among persons subject to military law and to apprehend participants. Those exercising this authority should do so with judgment and tact. Personnel so apprehended will be returned to the jurisdiction of their respective Services as soon as practical. Confinement of females will be according to AR 190–38, paragraph 4c, and AR 190–47.

### 4–6. Exercising military authority

*a.* Military authority is exercised with promptness, firmness, courtesy, and justice. Resorting to trial by court-martial, or to nonjudicial punishment under article 15, Uniform Code of Military Justice will not be done for trivial offenses, except when less drastic methods of administering discipline have been unsuccessful. (See part V, para 1d, Manual for Courts-Martial, United States, 1984, and AR 27–10, chap 3, sec 1.)

*b.* One of the most effective nonpunitive, corrective measures is extra training or instruction (including on-the-spot correction).

DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

IN REPLY REFER TO

OPNAVINST 5354.1E
PERS-61
22 Jan 01

OPNAV INSTRUCTION 5354.1E

From:  Chief of Naval Operations
To:    All Ships and Stations (less Marine Corps field
       addressees not having Navy personnel attached)

Subj:  NAVY EQUAL OPPORTUNITY (EO) POLICY

Ref:   (a) DODD 1350.2 of 18 Aug 95 (NOTAL)
       (b) SECNAVINST 12720.5A
       (c) SECNAVINST 5300.26C
       (d) DODD 1325.6 of 1 Oct 96 (NOTAL)
       (e) SECNAVINST 1610.2
       (f) OPNAVINST 5370.2B
       (g) U.S. Navy Regulations, 1990
       (h) SECNAVINST 5354.1
       (i) SECNAVINST 5350.16
       (j) OPNAVINST 5354.3D
       (k) NAVPERS 15620, Resolving Conflict Booklet
       (l) SECNAVINST 5212.5D

Encl:  (1) Definitions
       (2) Sexual Harassment (SH) Guidelines and Range of
           Behaviors
       (3) Navy Guidelines for Submitting, Handling, and
           Reporting Equal Opportunity (EO) Complaints
       (4) Navy Equal Opportunity/Sexual Harassment (EO/SH)
           Formal Complaint (NAVPERS 5354/2)
       (5) Sample Situation Report (SITREP)
       (6) Guidelines for the Personal Advocate
       (7) Equal Opportunity (EO) Resources
       (8) Equal Opportunity Advisor (EOA) Roles and
           Responsibilities

1.  <u>Purpose</u>.  To implement reference (a), which directs the
Department of the Navy (DON) policy and provides guidance on
equal opportunity (EO), including prevention of unlawful
discrimination and sexual harassment (SH).  This is a complete
revision and should be reviewed in its entirety.

2.  <u>Cancellation</u>.  OPNAVINST 5354.1D and Report symbols OPNAV
5354-10 and DD-FM&P(A) 1760.

OPNAVINST 5354.1E
22 Jan 01

3.  Applicability and Scope

    a.  The provisions of this instruction apply without regard
to race, ethnicity, national origin, sex, or religion within
constraints of the law to all active duty Navy, Naval Reserve,
and assigned civilian personnel (not to supersede the provisions
of paragraph (3b)).

    b.  Policies and procedures on DON Civilian Discrimination
Complaints Program are issued as a separate instruction by
Deputy Assistant Secretary of the Navy for Civilian
Personnel/Equal Employment Opportunity (DASN CP/EEO).  DON
civilian EEO policy implements the regulatory requirements of
the Equal Employment Opportunity Commission (EEOC) Title 29 Code
of Federal Regulations (CFR) part 1614, and is provided in
reference (b).  SH policy for civilian personnel is outlined in
reference (c).  Civilian employees who raise allegations of
discrimination shall be referred to the appropriate servicing
human resources office (HRO).  Civilian personnel policy
instructions concerning EEO and SH have applicability to Navy
commands/staffs employing U.S. civilian personnel and to all
civilian employees, the commanding officer (CO), and all
military managers and supervisors of civilian personnel.

    c.  This instruction discusses only EO.  Other forms of
unacceptable conduct, such as supremacist activity, hazing, and
fraternization are addressed in references (d), (e), and (f).

4.  Discussion

    a.  Acts of unlawful discrimination and SH are contrary to
our core values of honor, courage, and commitment.  Sailors and
civilians who model Navy core values do not engage in negative
behaviors nor condone these actions in others.  Additionally,
these practices adversely affect good order and discipline,
mission readiness, and prevent our Navy from attaining the
highest level of operational readiness.


    c.  CMEO is intended to be one of many commanders' tools for
the prevention of unprofessional behavior and for ensuring EO
goals are obtained.  Leadership has the authority and

OPNAVINST 5354.1E
22 Jan 01

responsibility to ensure that our Navy core values are integrated into our daily business.

d.  Appropriate action to resolve an incident of unlawful discrimination or SH, as defined in enclosure (1), will depend upon circumstances surrounding that incident.  Incidents of unlawful discrimination or SH cover a wide range of behaviors, from verbal comments to physical acts, and can be subtle or overt per enclosure (2).  Likewise, the full range of administrative and disciplinary actions are available to address unlawful discrimination and SH.  In the case of military personnel, these include, but are not limited to, informal counseling, comments in fitness reports and evaluations, punitive measures under the Uniform Code of Military Justice (UCMJ), and administrative separation.

5.  <u>Definitions</u>.  Terms used in this policy are defined in enclosure (1).

6.  <u>Policy</u>

a.  As stated in references (a) and (c), it is DOD and DON policy to prohibit unlawful discrimination and SH against persons or groups based on race, ethnicity, national origin, sex, or religion.  Service members shall be evaluated only on individual merit, fitness, and capability.

b.  EO, the prevention of SH, and all the elements thereof as defined in this instruction are gender-neutral concepts.  The focus is on the detriment to good order, discipline, and military readiness that results when our Navy's core values are not adhered to, not the sex of the members involved; therefore, discrimination, SH, threats, and other behaviors covered by this instruction involving members of the same sex are prohibited and all requirements of this instruction apply.  This includes conduct against service members on the basis of sexual orientation or homosexual conduct.

c.  As stated in reference (d) and article 1167 of reference (g), Navy personnel are prohibited from participating in organizations that support supremacist causes.  Attempting to create illegal discrimination, encouraging force or violence, or otherwise engaging in efforts to deprive others of their civil rights is prohibited.  Participating in public

3



**BY ORDER OF THE**
**SECRETARY OF THE AIR FORCE**

*AIR FORCE INSTRUCTION 36-2706*

*29 JULY 2004*

*Personnel*

*MILITARY EQUAL OPPORTUNITY (MEO)*
*PROGRAM*

## COMPLIANCE WITH THIS PUBLICATION IS MANDATORY

**NOTICE:**   This publication is available digitally on the AFDPO WWW site at:
**http://www.e-publishing.af.mil.**

OPR:  HQ AFPC/DPSFOS  (SMSgt R. Knudson)
Supersedes  AFI 36-2706, 1 December 1996.

Certified by:  HQ AFPC/DPS  (Col Dale A. Hess)
Pages:  97
Distribution: F

This Air Force Instruction (AFI) gives the requirements of the Military Equal Opportunity (MEO) program. It applies to all military personnel subject to the Uniform Code of Military Justice (UCMJ), Air Force Academy Cadets, Reserve Officer Training Corps (ROTC), Air Force Reserve and all Air Force civilian personnel subject to administrative/and or disciplinary actions under applicable directives or implementing instructions governing civilian disciplinary or adverse actions. This AFI applies to Air National Guard (ANG) personnel except as amended by current official ANG Instructions. ANG personnel are not subject to the UCMJ unless on Federal active duty status under Title 10, United States Code (U.S.C.). This document implements Air Force Policy Directive (AFPD) 36-27, *Social Actions*, 3 September 1993; AFPD 51-12, *Alternative Dispute Resolution,* 1 April 1999*;* Department of Defense (DoD) Directive (DoDD) 1325.6, *Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces*, 1 October 1996; AFI 51-903, *Dissident and Protest Activities*, 1 February 1998, DoDD 1350.2, *Department of Defense Military Equal Opportunity (MEO) Program*, 18 August 1995, with Change 1; DoD Instruction (DoDI) 1350.3, *Affirmative Action Planning and Assessment Process*, 29 February 1988; and DoDD 1300.17, *Accommodation of Religious Practices Within the Military Services*, 3 February 1988, with Change 1.

The Privacy Act of 1974 applies to this instruction. This publication requires the collecting and maintaining of information protected by the Privacy Act of 1974. The authority to collect and maintain the records prescribed in this instruction is Title 42, USC, Section 290 ee-3, et seq., and Executive Orders 9397 and 11478. System of Records Notice F036 AF DP G, *Military Equal Opportunity and Treatment*, applies. Attachment 1 contains a glossary.

Ensure that all records created by this instruction are maintained and disposed of in accordance with AF Records Disposition Schedule *(https://webrims.amc.af.mil)*. The Paperwork Reduction Act of 1995 affects this instruction. AFI 33-360, volume 2, *Content Management-Information Management Tools*, affects this instruction. Send comments and suggested improvements of this AFI on AF IMT 847, **Recommendation for Change of Publication**, to (HQ AFPC/DPSFOS), 550 C Street West Post K, Randolph AFB, TX 78150-4739. Process supplements that affect any military personnel function as shown in AFI

# Chapter 1

## ORGANIZATION ACTIONS

### Section 1A—General Information

**1.1.  Program Policy.** It is Department of Defense (DOD) and Air Force policy not to condone or tolerate unlawful discrimination or sexual harassment within the Armed Forces or in the civilian workforce. The Air Force implements five core elements to assist commanders in measuring MEO program effectiveness: policy, communications, education and training, enforcement (complaints) and assessments. The Defense Equal Opportunity Council (DEOC) Task Force on Discrimination and Sexual Harassment developed these core elements that apply to unlawful discrimination and sexual harassment.

1.1.1.  The Air Force recognizes that all written or verbal communications degrading individuals on the basis of race, color, national origin, religion, or sex remain a form of unlawful discrimination.

1.1.2.  It is unlawful to discriminate against an individual or group because of their race, color, national origin, religion, or sex. This includes discrimination based on the individual's birthplace, ancestry, culture or the linguistic characteristics common to a specific ethnic group.

1.1.3.  The operational language of the Air Force is English. Air Force personnel must maintain sufficient proficiency in English to perform their military duties. All official communications must be understood by everyone who has a need to know their content. Commanders may require Air Force personnel to use English only when such use is clearly necessary and proper for the performance of military duties. Accordingly, commanders, supervisors, and managers at all levels must not require the use of English for personal communications which are unrelated to military functions.

1.1.4.  Air Force MEO policy compliance is a function of effective leadership.

1.1.5.  Communications to MEO personnel will be released to commanders and others for official use. MEO personnel must report specific allegations of unlawful discrimination or sexual harassment to the chain of command upon discovery. For this reason, communication to MEO personnel does not have any privilege of confidentiality. **EXCEPTION:** MEO personnel have limited confidentiality when using facilitation in the resolution of informal complaints.

**1.2.  Program Objective.**

1.2.1.  The primary objective of the Military Equal Opportunity (MEO) program is to improve mission effectiveness by promoting an environment free from personal, social, or institutional barriers that prevent Air Force members from rising to the highest level of responsibility possible. Commanders and supervisors shall only evaluate members on individual merit, fitness and capability.

1.2.2.  The MEO program:

1.2.2.1.  Is a function of leadership and command based on fairness, equality, and justice.

1.2.2.2.  Seeks to eliminate unlawful discrimination and sexual harassment against military personnel, family members and retirees based on race, color, national origin, religion, or sex. Unlawful discrimination and sexual harassment are contrary to good order and discipline and counterproductive to combat readiness and mission accomplishment. The Air Force does not tol-