IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWRENCE S. EPSTEIN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case Number: 07-0688 (RMU) |
| ) | |
| PETE GEREN, ) | |
| Secretary of the Army, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Summary

Defendant's offers a superficial argument that LTC Epstein was not relieved because his OER lacks the triggering phrase "failed performance, " while his potential rating was "promote with contemporaries." Defendant overlooks decisive facts and regulatory guidance.

First, the rater's performance narrative repeats almost verbatim his earlier written promise to relieve Epstein if he failed to obey a direct order to both "cease and desist, and make amends" from intolerable performance listed as disloyalty, dishonesty and poor judgment. Because Epstein refused to heed this counseling and disobeyed the order, he failed to comply with these performance objectives. The promised threat in the OER was restated and fulfilled. Secondly, defendant turns upside-down the rules on how to prepare OERs— defendant uses the anomalous potential rating to go back and reinterpret the incongruent, derogatory performance narrative (and the direct order). This inconsistency, coupled with the rater's masquerade of Epstein's firing, invalidated the OER. The defendant adds another layer of "spin" so that Epstein's disobedience of an order, disloyalty, dishonesty, and poor judgment, are not failed performance in any way. Rather, his early removal was for benign reasons exempted from regulatory constraints on firing for failed performance— an "unwillingness to work" with his commander.

Next, Epstein concurs with *amicus* JVW: officials here could only find that anti-Semitic comments were not unlawful discrimination to disqualify the rater, by abandoning military EO policy and *sub silentio* applying civilian-like "hostile work place" EO standards.

1

**I. The January 1991 "performance objectives", and direct to order to "cease and desist"**

The rater on January 18, 1991, counseled Epstein that his behavior was not in the interests of order and discipline, sound judgment, and a breach of loyalty, integrity, and trust. The rater unusually enforced this performance counseling with a direct order: "cease and desist this behavior immediately and makes amends." He added that senior leaders must be "loyal, trustworthy, and work towards missions accomplishment, morale and esprit de corps." The rater concluded by warning that this behavior is "intolerable [and if it] continues I will have no recourse except to....provide you a relief for cause OER." Sup.AR (Vol 1) at 2; Def.Statement of Facts ¶ 6.

This January 1991 written counseling was part of the ongoing "communication process" described in the OER system. The process requires the rater throughout the evaluation period to advise rated officers "as to changes in performance objectives." A.Reg. 623-105, ¶ 3-6b; see also ¶ 4-7d (discuss new or altered objectives). Performance objectives are defined as "the most important tasks, priorities, and major areas of concern." Id ¶ 4-5c. The ultimate objective "is to improve duty performance." Id ¶ 4-5d.

A relief-for-cause OER does not require that the rater in the narrative portion use the magical terms that the rated officer "failed in performance of duty." Id ¶ 5-18a. Rather, this provision broadly defines relief as meeting a simple, two-prong test: (1) "early release" from duty, resulting from (2) failed performance after not completing assigned tasks competently, nor complying at all times with accepted professional standards. Assigned tasks are identified or changed during the communication process, while their completion is evaluated in the OER's "performance" comment section, Part Vc "*Comment on specific aspects of performance.*" Compliance with professional standards is evaluated in Part IV, also using the term *"performance evaluation— professionalism."*

The potential evaluation in an OER is not free-floating but tethered to performance of duty. Id ¶ 1-3c(2) ("performance of duty is an extremely important factor in determining an officer's potential [emphasis added]"). More importantly here, a relief is not determined by looking at the

potential box, but driven solely by whether the officer failed in performance of duty. Id at ¶ 5-18a. Finally, the rater's potential evaluation must be "consistent with" relief action. Id ¶ 5-18b(1).

Therefore, if the totality of facts (including the communication process) show that Epstein was released as a result of "not completing assigned tasks in a competent manner," or because he did not meet "at all times professional standards," then he was relieved. As the regulation therefore indicates in the next step, the potential rating "does not need further explanation" in the box at Part Vd— it "must reflect Do Not Promote." Id 5-18b(1); see also Id ¶ 4-27f. (any report must be referred as adverse "with a potential evaluation...of "Do not promote" or narrative comments to that effect from any rating official [emphasis added]").

There is another factor to consider as part of the surrounding circumstances whether Epstein's early "release" stated in the OER, was in fact a relief. Epstein is not limited to the performance narrative in Part V. To meet his burden of proof, "more weight" is given to the January 18, 1991, written counseling. That is because it constitutes a statement from "a rating official...that includes specific details of events or circumstances leading to inaccuracies, misrepresentations, or injustice at the time the report was rendered.. A.Reg. 623-105 ¶ 9-7d.

If the facts show that LTC Epstein was relieved, then the rater's assigned potential evaluation violated the regulation and must be invalidated. This makes the report not only wrong, but invalidates it entirely. Muse v. United States, 21 Cl.Ct. 592, 608, n. 27 (1990) (incongruent performance and potential marks are "unadulterated legal error and an injustice"). Accordingly, it makes no difference whether Epstein as deputy commander was "in any command position," to require general officer pre-approval. Nor any difference if is distinct due process for relief reports.[1]

To invalidate the OER, Epstein refers again in a different context to Muse, at 595-96 (OER improperly not labeled "adverse" when derogatory performance narrative was inconsistent with performance box "Superior" and with potential evaluation box "Promote with Contemporaries.").

---

[1] Epstein does not concede to the speculation of defendant's litigation counsel that no procedural differences exist between relief and referred reports. Def.Reply n. 3 ("essentially identical.")

Muse's OER was not referred and Epstein's OER was. And the predecessor A.Reg. 623-105 required symmetry between the performance narrative and box ratings for every OER relief or otherwise. But the distinction ends there. Muse still applies because the current special instructions to prepare a relief report have similar force as the predecessor rule — in Epstein, the potential box evaluations must be consistent with and follow a performance relief. Cf. Muse at 612 (despite rating officials' gross disparaging narrative, "neither recommended that Muse be promoted behind his contemporaries or not at all in Part VI [emphasis added].").[2]

A.    **Epstein was released for failed performance within ¶ 5-18a because the rater's OER performance narrative is an admission that Epstein did not complete those particular tasks, nor comply with those professional standards, as ordered on 18 January 1991.**

1. The rater's OER comments and narrative in the labeled "performance" sections (Parts IV and V), refer back to the negative counseling and direct order of January 18, 1991. A.R. 43 (OER, Part Vc: "He was unable to heed my counseling...and improve his performance, as a result, he was reassigned..."). That is the only record of negative counseling, as the BCMR concedes:

> [A]pplicant was counseled by the rater regarding...unacceptable conduct....that despite having been counseled, the applicant continued in his efforts to undermine the commander's (rater's) authority. Accordingly the rater sought to have him removed...."

A.R. 10 ¶ 5. The BCMR downplays the extent of the counseling. This counseling was not narrowed to undermining one man's authority, such as personal disloyalty. Rather, the counseling extended to the *performance of duty* fundamentals of integrity, sound judgment, trust, morale, esprit de corps, and mission accomplishment. The OER is retrospective to this pivotal counseling, and repeats these issues first at Part IV. A.R. 42 (poor judgment, questioned Epstein's loyalty and integrity). And then the rater elaborates on these counseling issues in Part Vc, A.R. 43 (seriously degraded morale and esprit de corps, seriously affected my impression of his loyalty and integrity, then implies poor judgment in causing confusion and unnecessary disruption). Even the 1992

---

[2] If the rating officials in Muse had followed mandatory guidance then the OER would have been downgraded to "marginal at best and inadequate at worst." Id 608. This failure was legal error. But compare Defendant's Main Brief at 8, ("the only thing that would have changed is that the OER would have stated it was a relief-for-cause OER.")

Commander's Inquiry found that "the rater's comments concerning loyalty and integrity were based upon performance of duty." Sup.A.R. 5 ¶ 2b.

    2. The January 18 counseling constitutes Epstein's updated objectives "to improve" this unacceptable performance or get fired. This set up the relief-qualifying criteria of failed performance within the meaning of ¶ 5-18a. In other words, disobeying the order to "cease and desist" and "to make amends" warned Epstein of the consequences of not completing certain tasks, and of not complying at all times with certain professional standards. The rater in the OER comes full circle by removing Epstein "as a result" of not heeding (and disobeying) this prior warning to cease the offending behavior and failure to make amends. The rater made good on his second threat to prevent renewal of Epstein's security clearance by concurrently raising this same behavior in April 1991 with the Defense Investigative Service.

    It makes no difference for purposes of meeting relief-qualifying criteria ¶ 5-18a whether the cease and desist order relates to "completion of assigned tasks" or "compliance with professional standards." The former equates to the performance sections of the OER (Part V), while the latter the professional ethics sections (Part IV). The rater found the behavior synonymous with both parts of the OER by repeating the lack loyalty and integrity in each section. This means that when the rater's Part V narrative stated that Epstein ignored counseling, it was because Epstein had refused the direct order to comply with the professional standards of loyalty and integrity.

    As set forth, the 18 January counseling was unique when enforced with a superior's order to "cease and desist and make amends." The OER narrative of "unable to heed" this counseling within the performance Part V, mirrors the elements of the UCMJ offense under Article 92, "dereliction of duty." This is instructive because it is defined as "wilfully, through negligence or culpable inefficiency, the <u>failure to perform</u> one's expected duties." 10 U.S.C. § 892 [emphasis added]. And yet the defendant offers quibbling— there is no relief because the OER was not pleaded in technical form stating "failed performance." Following this premise, the defendant looks to euphemisms to *post hoc* rationalize the release, *e.g.* Epstein disregarded the "obligation towards his commander," and "unwillingness to work with" his commander. Def. Reply. 6.

Adding another layer of surface appeal, defendant finally reads regulatory guidance backwards so that OER potential ratings are not really performance-based.  Instead, OER performance narratives (and the rating period's communication process), are driven by the checked potential box.

**II. Epstein concurs with *amicus* JWV: Army officials dismissed unlawful discrimination by a military commander in wartime by effectively applying higher "hostile workplace" concepts.**

Plaintiff-Epstein agrees with the arguments presented by *amicus* Jewish War Veterans. They properly place the EO and OER rater disqualification issues within the larger context to better understand how military officials veered into the civilian-like employment discrimination standards.  Moreover, Epstein supports or incorporates *amicus* arguments by herein overcoming defendant's objections.

Defendant overstates the *amicus* arguments.  JWV never "embarked on a [civilian] institutional discrimination argument," nor did it imply the agency "examined" Epstein's claim under Title VII.  Def. Reply 9-10.  Defendant misses the point.  The JWV explicitly stated that military EO policies never marched in lockstep with Title VII law, but rather the military standards have been tougher on the offender.  The evidentiary bar in the military is lower to prove discrimination or unlawful speech.  JWV argues that the way or manner in which officials here disposed of Epstein's EO complaint equates to civilian cases under narrow, employee workplace standards.  Specifically, that anti-Semitic remarks and perceived prejudice alone— without further tangible discriminatory effects on the work environment or performance— are not unlawful discrimination to disqualify the rater.  JWV only raised Title VII standards to distinguish the Army's departure from its larger EO prohibitions against any form of racial/ethnic harassment; intentional or inappropriate, arbitrary remarks.

Defendant next contends that no evidence exists in the record that investigating officers "applied Title VII standards....or that the military relied on Title VII in any way."  Def.Rep. 10-11. Defendant takes the same superficial tack as with the relief-report issue; that officials did not

6

invoke trigger words. This is not decisive because the record is rampant with officials' EO methodology so that the result looks as if LTC Epstein was treated as civilian Mr. Epstein.

The most glaring examples are actual language from the commander's inquiry and formal EO investigation. As a predicate manner, the inquiries substantiated that disparaging, negative remarks by a commander (during Gulf War) were repeatedly made to subordinate Epstein in the presence of others. Secondly, that this behavior was perceived as a form of anti-Semitic prejudice and harassment by the recipient. Sup A.R. 1 (April 1, 1991, admonishment for inappropriate remarks, stating commander was not sensitive to his choice of words, reactions and perceptions of others); A.R. 63, 69 (Formal EO; the substantiated negative comments and behavior "[A]ll were viewed as a form of prejudice and harassment by LTC Epstein."). Thirdly, that the rater's intent in the remarks was to "antagonize" Epstein with the perception of anti-Semitism (*e.g.*, defined as to incite or provoke hostility and enmity that prejudice was real). Fourthly, after investigation the commander was disciplined in writing. The record also shows that EO standards under command policy "condemn any action used to degrade or connote negative statements," such as ethnic slurs or jokes; that this constitutes unlawful discrimination; and this is particularly unacceptable by a commander. OER raters are prohibited from even "inappropriate or arbitrary remarks and speech."

And yet the Command and EO inquiries dismissed this rater's proven unlawful discrimination as not discrimination in any sense. This was because the conduct did not further produce a tangible-result of creating a truly hostile work environment, nor by interfering with the Epstein's performance (his ability or ratings). But this is no different than Title VII workplace "unlawful discrimination" claims. Title VII complainants must prove (beyond offensive remarks) that the conduct creates an intimidating, hostile, or offensive work environment, or interferes with the person's work performance. However, the military does not have the luxury to wait around for these discriminatory effects to materialize. It immediately finds such offensive remarks unlawful by presuming (since 1948) "tangible" military effects on good order and discipline, unit cohesion, esprit de corps, and mission accomplishment. Intentional, arbitrary or inadvertent disparaging

remarks based on race, gender, or ethnic origin, are unlawful discrimination *per se*. Otherwise, they send the message to affected soldiers that they do not belong, to breed unit pariahs.

The formal EO report admits "negative remarks" that offended Epstein, and carried real perception of anti-Semitic prejudice and harassment. But the EO report stumbles by next stating there was "no persona<u>l</u> or institutional <u>discriminatory practices</u>" because the subjective intent of the rater was to "antagonize rather than be anti-Semitic." A.R. 63, 69 [emphasis added]. In other words, the rater was not a sincere bigot but a surface bigot— underneath he was not personally prejudiced against Jews and Epstein. But this is the same "tangible-result" theory. That is, by presuming the rater was not *acting upon* perceived bigotry so the conduct could not really foment an offensive work place, nor materially affect Epstein's performance.

The commander's inquiry also exposes this same Title VII-like burden of proof to constitute unlawful discrimination. The inquiry admits that "any perception" of anti-Semitic prejudice arguably invalidates an OER if written by the offender. Sup.AR 6 ¶ 2c. But there is no discrimination here because the rating officials were not "motivated by anti-Semitic feelings." The inquiry then found no material affect on the OER because there was "corroboration" for the adverse performance. Sup.AR 3.

These two inquiries in effect or in *de facto,* apply the elements of a legally actionable Title VII claim. First, the ratings officials were not bonafide Jew haters but only wanted to provoke Epstein's enmity or incur his wrath for him to think they were biased. It follows that benignly intended comments and behavior could never legally produce a "hostile work environment" and spiral out to degrade Epstein's performance nor to prejudice OER ratings.

The JWV correctly shows that with respect to discriminatory speech and disloyalty, military readiness cannot afford a "chicken or the egg" thought-exercise. Unit cohesion in combat cannot allow any disparaging remarks by commanders to be interpreted as messages to ostracize their soldiers. Yet that intolerable message is what occurred here. The commander victimized his deputy commander LTC Epstein to perceive both personal prejudice and anti-Semitism. Not

coincidently, the rater's main accusation against Epstein was that he "had no loyalty to anyone other than himself." Sup.AR 16 ¶ 4a (rater's OSRB testimony).

**III.   General Officer pre-approval of reliefs for cause.**

Epstein and counsel find inappropriate defendant's sarcasm that his entitlement to General Officer review of his relief was because "he continues to claim that he was the actual commander.... [he] deludes himself as the man in charge." Def. Repl. 3. Defendant knows that the argument is based upon Epstein's position as deputy commander while the regulation requires such due process to officers, without qualification, "in any command position." A.Reg. 600-20.

Epstein does not dispute what other regulations may provide about colloquial uses of the term "commander," or their various responsibilities, or how they are appointed. But none mention relief procedures nor purport to qualify this rule under A.Reg. 600-20 (1988). The regulation was broadened from the prior 1986 version at ¶ 3-13b that had stated "officer in a command position." But the 2006 version retains the 1988 "in any command position." Id ¶ 2-17a. Moreover, the common definition of *any* includes "every, all without specification, to any degree or extent." Defendant does not confront Epstein's other arguments, such as that deputy commanders are provided certain command functions, while some units expressly organize in lieu of deputy commanders with "chief of staff" or "executive officer." The biggest problem for defendant is that the BCMR ignored this issue, never explaining its result. Public Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993); Federal Election Comm'n v. Rose, 806 F.2d 1081, 1088 (D.C. Cir. 1986)(requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result.).

CONCLUSION

For the foregoing reasons, plaintiff respectfully requests the Court deny defendant's motion for summary judgment, and grant plaintiff's cross-motion for summary judgment, and set aside LTC Epstein's OER for the period 22 October 1990 to 5 March 1991.

/s/   John A. Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen CO 80439
303 670-3825
Counsel for Larry Epstein